**Joshua L. Ross**, OSB No. 034387
Email:  jross@stollberne.com
STOLL STOLL BERNE LOKTING
& SHLACHTER P.C.
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone:  (503) 227-1600
Facsimile:  (503) 227-6840

**Walter J. Scott, Jr.,** (to be admitted *pro hac vice*)
skip@scott-llp.com
SCOTT LAW GROUP LLP
3249 Lake Drive
Southlake, Texas 76092
Telephone: (214) 755-1978
Facsimile: (817) 887-1874

**Attorneys for Plaintiffs**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| PATRICK R. DE BORJA, individually AND MAKILING FARMS, INC., a Philippine corporation,<br><br>   Plaintiffs,<br><br>  v.<br><br>ENRIQUE R. RAZON, JR., individually; INTERNATIONAL CONTAINER TERMINAL SERVICES, INC., a Philippine corporation; ICTSI OREGON INC. an Oregon corporation; AND JOHN AND/OR JANE DOES 1-20,<br><br>   Defendants. | Case No. <u>3:18-cv-01131</u><br><br>**COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT _____ 1

II.  PARTIES AND JURISDICTION_____ 3

     A.  Plaintiffs_____ 3
         Patrick R. de Borja _____ 3
         Makiling Farms, Inc. _____ 4

     B.  Defendants _____ 4
         Enrique R. Razon, Jr. _____ 4
         International Container Terminal Services, Inc._____ 9

     C.  Related Participants _____ 28
             Enrique Razon, Sr. _____ 28
             E. Razon, Inc. _____ 28
             Metro Port Services, Inc. _____ 28
             Alfredo "Bejo" Romualdez_____ 28
             Razon Industries, Inc. _____ 29
             Sureste Realty Corporation_____ 29
             Razon Industries, Inc. _____ 29

III. GENERAL FACTUAL BACKGROUND ALLEGATIONS _____ 30

     A.  Origins _____ 30
     B.  Sequestration _____ 34
     C.  ERI's Amalgamation:  1987 – 1990 _____ 40
     D.  Stock Scam_____ 45
     E.  Pattern and Practice _____ 54
     F.  Dissolution _____ 57
     G.  Evasion_____ 60

IV.  TOLLING OF STATUTE OF LIMITATIONS _____ 76

V.   CLAIMS _____ 78

     Claim I:      Actual Fraud  (Against All Defendants) _____ 79

     Claim II:     Constructive Fraud  (Against All Defendants) _____ 88

     Claim III:    Breach of Fiduciary Duty  (Against All Defendants) _____ 90

     Claim IV:     Breach of the Duty of Good Faith and Fair Dealing
                   (Against Defendant Razon Jr.) _____ 94

     Claim V:      Negligence/Gross Negligence  (Against All Defendants) _____ 94

     Claim VI:     Negligent Misrepresentation  (Against All Defendants) _____ 95

Claim VII:    Unjust Enrichment  (Against Defendant Razon Jr.) _____ 99

Claim VIII:   Conversion  (Against Defendant Razon Jr.) _____ 102

Claim IX:     Misappropriation of Business Value  (Against All Defendants) _____ 102

Claim X:      Constructive Trust  (Against all Defendants) _____ 104

Claim XI:     Rescission  (Against Defendant Razon Jr.)_____ 105

Claim XII:    Successor Liability  (Against Defendant ICTSI) _____ 107

Claim XIII:   Piercing the Corporate Veil (ERI)  (Against Defendant Razon Jr.) _____ 111

Claim XIV:    Piercing the Corporate Veil (ICTSI and ICTSI Oregon)
              (Against Defendant Razon Jr.)_____ 113

Claim XV:     Piercing the Corporate Veil (Razon Industries and Sureste Realty)
              (Against Defendant Razon Jr.)_____ 114

Claim XVI:    Piercing the Corporate Veil (ICTSI and ICTSI Oregon)
              (Against Defendant ICTSI and ICTSI Oregon) _____ 116

Claim XVII:   Fraudulent Transfer with Intent to Hinder, Delay, or Defraud
              (Against All Defendants) _____ 118

Claim XVIII:  Fraudulent Transfer within Zone of Insolvency
              (Against All Defendants) _____ 119

Claim XIX:    Civil Conspiracy  (Against All Defendants)_____ 120

Claim XX:     Declaratory Judgment  (Against all Defendants) _____ 121

Claim XXI:    Equitable Accounting  (Against all Defendants) _____ 122

Claim XXII:   Punitive Damages  (Against All Defendants) _____ 123

JURY DEMAND _____ 124

PRAYER FOR RELIEF _____ 124

## I.     PRELIMINARY STATEMENT

1.     This is a cross-border corporate conversion and successor liability dispute involving a United States citizen suing both individually and as principal of a family-owned Philippine-organized holding company against a Philippine-born transnational tycoon and the expansive world-wide port-handling empire he secretly formed (together with his own family and accomplices) from and with, in whole or in part, interests rightly belonging to Plaintiffs as minority shareholders of a predecessor entity.  This also is, as a result, a direct and indirect action in which Plaintiffs seek extraterritorial redress from the tycoon both directly and indirectly, as well as the successor enterprise both directly and indirectly.  It arises under the substantive laws of the Philippines, and follows hindered efforts in the Philippines.[1]  Jurisdiction and liability

---

[1] The Republic of the Philippines is the third-largest-English-speaking country in the world, with a total population of approximately 106 million people.  Physically, the country is an archipelago comprised of 7,107 islands covering a land area of 115,739 square miles.  The archipelago is located in Southeast Asia, east of Vietnam and north of Indonesia.  The main islands are Luzon, Visayas, and Mindanao.

The Philippines was a United States Territory from the time of the Spanish American War of 1898 through 1946.  It fell under Japanese occupation early in World War II and remained so until Filipino and American troops fought together to liberate the islands in 1944 and 1945.  Since gaining its independence in the wake of World War II, the Philippines has maintained very close economic, political, and military ties with the United States.  American military forces remained in the Philippines until 1992, and the Philippines is a key partner of the United States in the war on terrorism.  Moreover, millions of Filipinos travel to, work in, and reside throughout the United States.

Apart from a common language, the Philippines' educational and legal systems are modeled on those of the United States.  American jurisprudence is thus very much the bedrock of modern-day Philippines jurisprudence, with decisions of the United States judiciary very often serving as precedent for all manner of Philippine legal arguments and decisions, including those at hand here.  In particular, the Philippines' modern-day corporate law, including such key matters as corporate formation, organization and disregarding the corporate formality, is largely modeled after and borrows heavily from its American counterparts.

With substantial legal overlay formed by decades of applied American jurisprudence, the United States judiciary is well suited to the task of interpreting and applying Philippines law.

Page 1 -  COMPLAINT

accordingly are case-specific and fact-intensive, and thus presented at length to the extent

presently known or believed on information and belief in anticipation of expected scrutiny.[2]

2.      Plaintiffs' claims arise out of Defendants' concerted acts, omissions and deceit to

wrongfully squeeze out, divest and usurp Plaintiffs' rightful ownership interests as minority

shareholders and constructive beneficiaries of a preexisting entity.  Defendants, together with

others who acted and/or failed to act in connection therewith, effectively disregarded Plaintiffs'

underlying interests with the purpose and/or effect of wrongfully expropriating those interests

without Plaintiffs knowledge.  As more fully described below, Defendants effectively exercised

their domination and control as principal and agent of predecessor and successor entities alike to

give to and receive from one another what rightly belongs to Plaintiffs as preexisting minority

shareholders.  More specifically, the controlling shareholder of the predecessor entity in which

Plaintiffs held a minority interest ostensibly transferred in private all the predecessor's interests

to himself and a successor entity of his own creation and control—all to the exclusion of

Plaintiffs.[3]

---

[2] As recently quoted with approval by the Philippine Supreme Court in a cross-border case
against a foreign corporation doing business in the Philippines through a captive subsidiary:

> The more jurisdictions having an interest in, or merely even a point of contact
> with, a transaction or relationship, the greater the number of potential fora for the
> resolution of disputes arising out of or related to that transaction or relationship.
> In a world of increased mobility, where business and personal transactions
> transcend national boundaries, the jurisdiction of a number of different fora may
> easily be invoked in a single or a set of related disputes.

*Saudi Arabian Airlines et al v. Ma. Jopette M. Rebesencio et al,* G.R. No. 198587, 14 January
2015, 746 SCRA 141 (*quoting* George A. Bermann, Transnational Litigation in a Nutshell 86
(2003)).

[3] This case is not dissimilar from another cross-border litigation involving another Philippine
family dynasty, *ATR-Kim Eng Financial Corporation et al v. Carlos R. Araneta et al*, Del. Ch.,
No. 489-N, Stine, C. (Dec. 21, 2006).

Page 2 -  COMPLAINT

3.      Plaintiffs collectively and alternatively sue Defendants directly and indirectly

based on actual and constructive fraud, breach of fiduciary duty, breach of the duty of good faith

and fair dealing, negligence, negligent misrepresentation, unjust enrichment, conversion,

misappropriation of business value, constructive trust, rescission, successor liability, piercing the

corporate veil, fraudulent transfer, civil conspiracy, specific performance, accounting,

declaratory judgment, actual (direct and consequential) damages, exemplary damages, attorney's

fees, and interest in an amount to be proved, but in no event less than $37,194,310.15.[4]

## II.      PARTIES AND JURISDICTION

4.      Diversity jurisdiction inescapably applies and attaches to this cross-border

dispute.  This Court accordingly has subject matter jurisdiction over this case pursuant to 28

U.S.C. § 1332(a)(2).   The matter in controversy exceeds the sum or value of $75,000, exclusive

of interest and costs, and is between a citizen of the United States and foreign subjects.

Jurisdiction over Philippine and domestic state-law claims is proper under the doctrine of

Supplemental or Pendent Jurisdiction pursuant to 28 U.S.C. § 1367(a).

### A.      Plaintiffs

5.      **Patrick R. de Borja** ("PRB") is an individual citizen of the United States of

America and principal of Makiling Farms, Inc.  Upon graduating college in the Philippines, he

worked as an accounting clerk at E. Razon, Inc. ("ERI"),[5] where other relatives also had and

were working in various capacities.  He has subsequently lived, worked and owned and operated

businesses in the United States since 1984.  He first lived in and around the greater San

───────────────

[4] *See infra* fn. 113.

[5] Which as more fully described below is at the center of this dispute as the preexisting entity in
which Plaintiffs held a minority interest, and whose interests (including Plaintiffs) were
expropriated by and for Defendants.

Page 3 -  COMPLAINT

Francisco area where he owned and operated in succession a service station, butcher shop, and auto body repair shop.  He later moved to the Dallas/Fort Worth Metroplex and worked with a family relative who owns and operates a number of automobile dealerships in Texas (Dallas/Houston).  He is now retired and splits time between the Philippines and the United States.  He currently is and continues to regularly reside (when State-side) and receive mail at an address in San Bruno, California.  He has two children born, raised, and residing in the United States:  Jacqueline Sy de Borja and Patrick Ian Sy de Borja.  PRB sues in his individual capacity and as principal of co-plaintiff Makiling Farms, Inc., of which he is President.

6.    **Makiling Farms, Inc**. ("MFI") is a family holding company organized and beneficially owned and governed by PRB and his six siblings.  It is duly organized and existing under Philippine laws with its principal office located at Unit 28C Pacific Plaza Condominium, Apartment Ridge Road, 6741 Ayala Avenue, Barangay Urdaneta, Makati City, 1226 Metro Manila, Philippines.  The de Borja family originally formed MFI in 1975 to hold their common real estate interests primarily consisting of land in Calamba City, Laguna, Philippines.  The de Borjas subsequently added other common interests, including the shares in ERI that are at the very heart of this case in having been diverted and expropriated by those identified and otherwise referred to below.  As MFI's President, PRB is duly endowed with authority to exercise the powers of MFI, including, without limitation, acting as a principal for MFI.  This endowment encompasses the authority and rights of a corporate entity, including the right to protect its proprietary interests, and the right to sue on behalf of MFI.

### B.    Defendants

7.    **Enrique R. Razon, Jr**. ("Razon Jr.") is a Philippine icon and international magnate with extensive and wide-ranging global business interests including port-handling,

Page 4 -  COMPLAINT

logistics, freight, warehousing, hospitality, gaming, real estate, sports, energy, natural resources,

technology, banking, and financial investments.  Before all this, there was a family-named and

dominated business in ERI.  A Director and President of ERI, Razon Jr. and his family

subsequently reincarnated ERI in International Container Terminal Services, Inc. ("ICTSI").

Since 1995, Razon Jr. has been the Chairman and President of ICTSI, a publicly listed holding

company that develops, manages, and operates container ports and terminals around the world

through an elaborately centralized network of subsidiaries.  As more fully described below,

ICTSI's world-wide operations extend by and through its subsidiaries to the United States,

including extensive operations in Oregon.  As of Sept 30, 2017, Razon Jr. owned 61.4% of

ICTSI through direct individual shareholding and various family-owned corporations.

        8.      In addition to and apart from his many overlapping holdings and positions within

and amongst his port-handling empire as more fully described below, Razon, Jr. also serves as

the Executive Chairman and CEO of his hospitality conglomerate, Bloomberry Resorts

Corporation, a publicly listed company that develops tourist facilities, casino entertainment, and

hotel and amusement-themed projects around the world.  Its hospitality portfolio includes Solaire

Resort and Casino in the Philippines and Jeju Sun Hotel and Casino in South Korea.  As of

filing, Bloomberry's subsidiaries include Sureste Properties, Inc. and its wholly-owned

subsidiary, Bloomberry Resorts and Hotels, Inc. ("BRHI"), Bloom Capital B.V and its subsidiary

Solaire de Argentina S.A., Solaire Korea Co., Ltd and its subsidiaries Golden & Luxury Co., Ltd

and Muui Agricultural Corporation.  Founded in 1993, Sureste Properties, Inc. was subsequently

acquired by Bloomberry.  Razon Jr. serves as Chairman of Sureste Properties Inc.

        9.      In the natural resources arena, Razon Jr. is the Chairman and former principal

stockholder of Monte Oro Resources & Energy, Inc. ("MORE"), a private company that has full

Page 5 -  COMPLAINT

or partial ownership of assets related to mining both in the Philippines and foreign markets such as Mongolia, Sierra Leone and Burma (Myanmar).  MORE's mining interests in the Philippines include 100% ownership over Paracale Gold Ltd., which, in turn, fully owns Coral Resources Philippines, Inc. and 40% of Bulawan Mineral Resources Corporation.  In Mongolia, MORE has 100% shareholding in Minas de Oro Mongol LLC (a Mongolian company) which owns 51% equity in Erdenejas LLC, a joint venture company holding a mining license in Mongolia.  In Sierra Leone, MORE holds 90% shareholding in both Monte Oro Mining Company Ltd., which is engaged in mining exploration there, and MORE Minerals SL, which is engaged in artisanal mining and gold trading there.  In Myanmar, MORE has a 3.92% participation in National Prosperity Gold Production Group Ltd. which holds mining claims and a license from the government of Myanmar to develop and operate the gold mine located at Moe di-Moe mi Region, Township, Mandalay Division, Myanmar, known as the Maudi Taung Gold Mine. MORE's non-mining business consists of a 52% ownership over International Cleanvironment Systems, Inc., a company engaged in solid waste management, and a 30% participating interest in Service Contract No. 72 for natural gas in the Sampaguita gas field offshore northwest of Palawan in the West Philippine Sea.[6]

    10.    Razon Jr. also is the owner of Prime Metroline Transit Corporation, an entity which owns and operates hotels and casinos, and owns additional entities with the same purpose. Razon Jr. additionally serves as Chairman and President of Razon Industries, Inc. and Sureste Realty Corporation, both of which are material here as family-owned instrumentalities in which ICTSI stock was transferred from ERI by Razon Jr. and his family.  He is Chairman and

---

[6] As MORE's Chairman and principal stockholder in 2011, Razon Jr. caused MORE to acquire a 33.34% interest in publicly listed Apex Mining Co. Inc. for $6 million.  In 2014, Apex bought out MORE's shareholders and rolled them into newly issued shares of Apex.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

President of the following holding companies as well: Quasar Holdings Inc.; Falcon Investco

Holdings Inc.; Achillion Holdings Inc.; Collingwood Investment Company Ltd.; Bravo

International Port Holdings Inc.; and Provident Management Group Inc.

      11.    Razon Jr. also has served or serves as a Director of International Exchange Bank

(now part of Union Bank of the Philippines); Pentland International Holdings Ltd; CLSA

Exchange Capital Inc. (issues unit investment trusts, face-amount certificates); ABX Pan Globe

Logistics, Inc. (logistics for business activities); Kamahalan Publishing Co. (publications

business previously publishing Manila Standard, later sold to the so-called Romualdez group to

be further identified in connection with ERI); Kagitingan Printing Press, Inc. (multi-medium

printing business); Excell Properties and Phil Realty, Inc.; A. Soriano Corporation (holding

company to be further identified in connection with ICTSI's formation); Xcell Property Ventures

Inc. (niche-market real estate development); Philippine Skylanders International, Inc. (logistics

firm entrenched in the Ninoy Aquino International Airport ("NAIA") Complex in Manila); and

Asian Tour (principal professional golf tour in Asia).  He also is a member of the American

Management Association, Management Association of the Philippines, US Philippines Society,

the ASEAN Business Club, Philippines, Inc., Pacific Basin Economic Council and World

Economic Forum.

      12.    Razon Jr. openly embraces and extols his vast intercontinental footprint, having

pointedly declared: "I have occupied many sensitive positions (either as corporate officer or

director) in various business undertakings here [the Philippines] and abroad."

Page 7 -  COMPLAINT



13.     In addition to and apart from his expansive business interests around the globe and in the United States and Oregon, Razon Jr. owns, directly or indirectly, substantial personal property in the United States and Oregon.  On information and belief, he owns, in whole or in part, personal residences at:

    i.    329 South Mayfair Avenue in Daly City, San Mateo County, California, 94015;

    ii.    223 Sansome Street in San Francisco, San Francisco County, California, 94104;

    iii.    1215 Greenwich Street in San Francisco, San Francisco County, California, 94109; and

    iv.    8849 Stanwell Street in San Diego, San Diego County, California, 92126.

14.     On information and belief, Razon Jr. also has one or more personal cars, planes, and boats in the United States.

15.     In an interview with the Wall Street Journal regarding his vast business pursuits, Razon Jr. said that he travels 200 days of the year.  Much of that travel is international, including to and from the United States and Oregon.  In the 8-years between 2010 and 2018, Razon, Jr.'s Philippine immigration records reflect multiple trips a year to the United States for extended periods of time.  On information and belief, much of that time was in Oregon.

Page 8 -  COMPLAINT

16.     Given his extensive and growing presence in the United States and Oregon, Razon Jr. has purposefully injected himself into the United States and Oregon and has enjoyed the privileges and benefits of its laws.

17.     Based on Razon, Jr.'s systematic, continuous, and growing contacts with the United States and the State of Oregon, this Court has personal jurisdiction over Razon, Jr. pursuant to Oregon Rule of Civil Procedure ("ORCP") 4 and all other applicable federal and state statutes, rules, and constitutional provisions.

18.     Further, on information and belief, property belonging to Razon Jr. is within the actual or constructive *in rem* or *quasi in rem* jurisdiction of this Court, and the Court may assert such jurisdiction over Razon Jr.'s property pursuant to applicable federal and state statutes, rules, and constitutional provisions.

19.     Razon Jr. may be served with process pursuant to the Federal Rules of Civil Procedure ("FRCP"), ORCP, and/or the 1997 Rules of Civil Procedure ("PRCP")[7], including but not limited to process within Oregon by personal, substituted, or office service, or by mailing a copy of the summons and this Complaint to Razon Jr.

20.     **International Container Terminal Services, Inc.** ("ICTSI") is as previously mentioned the publicly listed international parent of Razon Jr.'s multinational port handling family of companies.[8]  Recognized by the Asian Development Bank as one of the top five major maritime terminal operators in the world, ICTSI's network of overlapping and interlocking subsidiaries and associated companies serves the global shipping industry through the

---

[7] The Philippines' code for civil procedure, including in part Filipino law for service in the Philippines.

[8] Although ICTSI is engaged in other non-port activities, it holds itself out as a multinational port handling company.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

acquisition, development, operation and management of maritime container ports and terminals. It also handles break bulk cargoes and provides various ancillary services, such as container packing and unpacking, weighing and services for refrigerated containers or reefers.

21.    The "Group," as ICTSI collectively refers to its family network, is broken down into components engaged either in providing types of services (business segment) or in providing the services within a particular economic environment (geographic segment).  Its services are divided into three primary categories: (1) on-vessel loading and unloading of cargoes; (2) off-vessel receiving and delivery of containers over piers and wharves; and (3) other related services including logistics.  There are four geographical segments:  Asia-Pacific and the Subcontinent; Africa; Americas; and Europe and the Middle East.  ICTSI's business strategy is to continue to maintain leadership in existing markets, pursue new opportunities for expansion and diversify geographically.

22.    Incorporated in Manila in 1987, ICTSI celebrated its silver anniversary in 2013, commemorating 25-years of expansion throughout the world after being formed as more fully described below to assume operations of the Manila International Container Terminal in what has been described as an amalgamation of interests by and between ERI, Anscor Consolidated Corporation ("Anscor") and Sealand Orient Ltd. ("SeaLand").  On its silver anniversary, ICTSI proudly counted 27 marine terminals and port projects in 19 countries, including the Philippines, Indonesia, Brunei, India, Pakistan, China, Japan, United States, Mexico, Colombia, Ecuador, Brazil, Argentina, Croatia, Poland, Georgia, Nigeria, Madagascar, and Honduras.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840



ICTSI 2015 Annual Report (p. 8).

23.    At the time of filing, ICTSI owns and operates 31 terminal facilities in 18 countries, employing over 8,000 people through some 48 subsidiaries across 6 continents.[9]

---

[9] These include:

| Royal Capital B.V. | Kinston Enterprise Co., Ltd | ICTSI Far East Pte. Ltd. |
|---|---|---|
| ICTSI Treasury B.V. | ICTSI Mauritius Limited | *Tecon Suape SA* |
| ICTSI Capital BV | Contecon Manzanillo, S.a. De Cv | Subic Bay International Terminal Corp. |
| ICTSI (Hong Kong) Ltd. | ICTSI Oregon Inc. | Bauan International Port, Inc. |
| International Container Terminal Holdings, Inc. | Prime Staffing & Selection Bureau, Inc. | Operadora Portuaria Centroamérica SA de CV |
| Iw Cargo Handlers Inc. | ICTSI (M.E.) JLT | Madagascar International Container Terminal Services Ltd. |

Page 11 -  COMPLAINT

ICTSI is duly organized under Philippines laws with its registered address at ICTSI

Administration Building, Manila International Container Terminal, MICT South Access Road,

Manila, Philippines 1012.  Its ordinary shares are traded on the Philippine stock exchange under

the symbol "ICT:PH," with unsponsored American Depositary Receipts ("ADRs")[10] being

traded over the counter in the United States under the symbol "ICTEY:OTC US".  As of filing,

ICTSI has a market capitalization of more than $4 billion.  In 2017, ICTSI's world-wide

operations reportedly produced over $1.128 billion in annual revenues.

| | | |
|---|---|---|
| Ensenada International Terminal S.A. de C.V | PT Perusahaan Bongkar Muat Olah Jasa Andal | New Muara Container Terminal Services Sdn Bhd |
| Abbotsford Holdings, Inc. | Hijo International Port Services Inc. | ICTS (India) Pvt. Ltd. |
| ICTSI Far East Pte. Ltd. | Future Water SA | Yantai Gangtong Container Terminal Co. Ltd. |
| ICTSI Warehousing Inc. | Terminal Marítima de Tuxpan, S.A. de C.V. | Bct Baltycki Terminal Kontenerowy Sp z.o.o. |
| South Pacific International Container Terminal Limited | Ensenada International Terminal S.A. de C.V | Baltic Container Terminal Ltd. |
| Contecon Guayaquil, S.A. | South Cotabato Integrated Port Services, Inc. | ICTSI Subic, Inc. |
| Container Terminals Systems Solutions Philippines, Inc. | Davao Integrated Port & Stevedoring Services Corp. | Tartous International Container Terminal JSC |
| Motukea International Terminal Limited | ICTSI Cooperatief U.A. | ICTSI Georgia Corp. |
| Mindanao International Container Terminal Services, Inc. | Batumi International Container Terminal LLC | PT Container Terminal Systems Solutions Indonesia |

[10] Basically, certificates issued by an American bank (or branch) representing shares of foreign stock.

Page 12 -  COMPLAINT

24.     ICTSI continues to develop its existing portfolio of terminals and to proactively seek acquisition opportunities to further expand and diversify geographically across the world's continents.  As such, ICTSI is currently pursuing an active program to acquire new terminal concessions in Asia, the Middle East, Africa, Europe, and the Americas.  Today, ICTSI Ltd., a wholly owned Bermuda organized subsidiary, manages ICTSI's foreign operations.[11]  Aside from developing new port concessions, this subsidiary oversees operations of all foreign terminals.  Regional representatives reside in Manila, Hong Kong, Miami, Sydney, Dubai, and Cape Town.

25.     As mentioned, Razon Jr. proudly sits atop and presides over ICTSI's global empire, having remarked in related proceedings:

> I am especially proud of what I have achieved through [ICTSI], a publicly listed corporation of which I have been the Chairman and Chief Executive Officer (CEO) since 1995 after my father died.  From a one terminal port in Manila in 1988, ICTSI has grown into one of the top port operators in the world.

As of March 31, 2018, Razon Jr. reportedly owned 61.36% of ICTSI through direct individual shareholding and various family-owned corporations with no other substantial shareholders being reported in the company.

---

[11] Previously, several of ICTSI's foreign terminals fell under ICTSI International Holdings until it was sold off as a unit in 2001 to Hutchison Ports Holdings.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840



Historically, Razon Jr. was an original Incorporator and Director upon ICTSI's inception in December 1987. He became Chairman of the Board in 1995 when his father passed away. He was appointed President in 2004. He also was the CEO from 2004 until April 2011. He has been Chairman of the Board and the President of ICTSI since April 2011.

26.    Concurrently, Razon Jr. is the Chairman and the President of ICTSI Warehousing, Inc., Bravo International Port Holdings Inc. and ICTSI Foundation, Inc. He also is a Director of ICTSI Capital B.V., ICTSI (Hongkong) Ltd. and Australian Container Terminals Ltd.

27.    ICTSI's extensive international family network involves, extends to, includes, and is immersed within the United States. ICTSI was formed at the outset with an American company, SeaLand, and two (2) of ICTSI's eleven (11) original shareholders, SeaLand and Carlos T. Soriano ("C. Soriano"), were American. American citizens also are and have been Directors and Officers of ICTSI, including:

---

[12] ICTSI Website, *Shareholdings Structure*, http://www.ictsi.com/content/about-us/shareholdings-structure/ (last visited June 12, 2018).

Page 14 - COMPLAINT

i.     C. Soriano, a member of one of the oldest and most established family conglomerates in the Philippines which also participated along with ERI and Sealand in the original formation of ICTSI through Anscor;

ii.    Andres Soriano, III, another member of the Soriano Family who has been an ICTSI Director since 1992;

iii.   Joseph R. Higden ("Higden"), an Independent Director since April 2007 residing in Washington D.C.;

iv.   Martin L. O'Neil ("O'Neil"), currently ICTSI's Executive Vice President and former Senior Vice President and Chief Financial Officer since 2006. From 1994 to 2001, O'Neil served as a Director of JP Morgan Capital Corporation, during which he invested in and served as Director of ICTSI subsidiary ICTSI International Holdings Corp.;

v.    Guillaume Lucci, identified as a Senior Vice President for Engineering; and

vi.   Lisa Marie Teresa Sommerville Escalar, identified as a Vice President.

28.    ICTSI's records further show each of these first three ICTSI Directors and Officers, along with several other American personages owning ICTSI ordinary shares.[13] Moreover, as indicated, ICTSI's records of shareholders entitled to vote at annual meetings include numerous United States institutional investors who beneficially own ICTSI ordinary shares traded or purchased as ADRs through established United States channels and markets, including among others: California Public Employees Retirement System (commonly referred to as "CalPERS"), one of the world's largest institutional investors with more than $320 billion in assets under management; California State Teachers Retirement System (commonly referred to as "CalSTRS"); Vanguard; Lincoln; Fidelity; Blackrock; Prudential; Hartford; Manulife; State Street; Mass Mutual; Oppenheimer; New York Life; Nationwide; Wells Fargo; JPMorgan; Morgan Stanley; and Goldman Sachs, and Capital Group Companies ("CCC").[14] By way of

---

[13] *E.g.,* SeaLand, C. Soriano; Andres Soriano III; Keith Awad; Craig Awad; and Philippine Remnants Company, Inc.

[14] The identities of U.S. investors are somewhat shrouded in ICTSI's regulatory filings insofar as they are held in the name of a local nominee, PCD Nominee Corporation ("PCDNC"), via

Page 15 -  COMPLAINT

example, CCC reportedly invested in ICTSI through its public mutual fund, which by itself represents more than 20 million American investors.  Investors throughout the United States including Oregon—and the United States itself as gatekeeper over the capital markets through which its citizens publicly invest—have a significant interest.

29.    ICTSI accordingly draws upon, uses and avails of United States' citizens, benefits, resources and instrumentalities to conduct and capitalize its operations by actively promoting and selling securities over established capital markets within the United States based on its financial reports, press releases, and other public filings.  Throughout, ICTSI directly and indirectly engages within the United States' stream of commerce, using the means and instrumentalities of both intrastate and interstate commerce, including, but not limited to, the statutory, administrative, regulatory, judicial, mail, telephone, and banking resources, facilities, and appurtenances.

30.    ICTSI also is active in the United States market from a logistics standpoint in facilitating shipments into and out of United States ports of call.[15]  According to ICTSI's 2016 Annual Report, container volumes from the Americas, including the United States, grew 9.7 percent to 3,004,690 TEUs[16] between December 2015 and 2016, accounting for 34.6 percent of

---

depository banks like Deutsche Bank (15%), HSBC (19%) and AB Capital Securities Inc. (5%).

[15] By way of example, ICTSI has proudly highlighted that in January 2011 it serviced a shipment from the U.S. Marine Corps containing gears, equipment, and vehicles to be used in the PHIBLEX (Amphibious Landing Exercise) 2011. The cargo, totaling 544 units/packages, included chinook helicopters, fuel trucks, medic trucks, humvees. PHIBLEX 2011 is an annual exercise between the US Marines and the Armed Forces of the Philippines. It includes ground, air, and amphibious training exercises as well as civil-military engineering activities and medical missions.

[16] The acronym for a Twenty-Foot Equivalent Unit, a standard unit for describing cargo volume. A standard forty-foot (40x8x8 feet) shipping container equals two TEUs (each 20x8x8 feet).

Page 16 -  COMPLAINT

ICTSI's overall consolidated handling volume in 2016.  Before that, volumes from the Americas

grew around 50 percent annually from 1,048,971 TEUs in 2010.   Much of this is attributable to

volumes generated by ICTSI's erstwhile terminal in the Port of Portland, Oregon.  In just its first

partial year, ICTSI's Portland terminal, which started operations on February 12, 2011,

accounted for 11.3 percent of the Americas' total volume for ICTSI in 2011.  The Americas, in

turn, jumped to 25 percent of ICTSI's overall volume that year.

   31.  ICTSI's physical footprint within the United States reportedly includes a regional

representative in Miami, Florida.  As further indicated, to reinforce and bolster its global

expansion in the United States and otherwise complement its overall port network along the

American continent's Pacific West Coast, ICTSI also established a prominent corporate presence

in Oregon at the Port of Portland.  It did so in part by and through ICTSI Oregon, Inc. ("ICTSI

Oregon"), a wholly-owned subsidiary organized and existing by and under the laws of the State

of Oregon.  ICTSI Oregon is part of a coalition of 29 West Coast port operators, called the

Pacific Maritime Association.  It has a registered agent in Oregon and is described as having a

principal place of business at the Port of Portland, Oregon.  ICTSI Oregon's CEO, Elvis J. Ganda

("Ganda"), also is identified as ICTSI's CEO North America.  He is said to be located in

Portland, Oregon.

   32.  ICTSI established ICTSI Oregon in April 2010 to acquire and operate the

container terminal in the Port of Portland, Oregon.  ICTSI Oregon subsequently signed a 25-year

lease for the container/break-bulk facility at Terminal 6, the sole shipping container terminal in

the Port of Portland.  Under the terms of the agreement, ICTSI paid $8.0 million at closing and

agreed to pay $4.5 million annually on an index-adjusted basis in rent payments.  ICTSI further

agreed to pay additional incremental revenue per container moved as terminal volume increased

Page 17 -  COMPLAINT

over time.  In return, the Port agreed to: (a) lease the terminal land, improvements, and

equipment to ICTSI; (b) grant an exclusive right to conduct stevedoring services at the terminal

and to operate, manage, maintain, and rehabilitate the port infrastructure, as well as to provide

terminal services and collect and retain user fees; and (c) grant a non-exclusive right to use the

common areas in keeping with permitted uses of the terminal.

      33.    ICTSI took over Portland's Terminal 6 operations on February 12, 2011.  ICTSI

has published the following snapshot depicting the extent, scope, and context of Terminal 6

operations:



As a local journalist explained:

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

ICTSI does all the work to keep Terminal 6 running, attract new business, hire the workers and so on…. Ganda … and his crew, make decisions about hiring, firing, scheduling, drumming up new business, all of that stuff that port operators do.[17]

34.    In expanding to and taking over Terminal 6, ICTSI further embedded itself within an integral part of commerce in Oregon, the United States, and beyond.  Much as with the United States' capital markets, ports like Terminal 6 are especially vital locally, regionally, nationally, and internationally because they have a ripple effect throughout the economy as a whole.[18] ICTSI publicly acknowledges as much:

A fully functioning, productive Terminal 6 is critical to the regional economy and benefits local businesses, importers, exporters, farmers and workers across various industries….[19]

35.    In further embedding itself, ICTSI regularly availed itself of Oregon's benefits and privileges to provide services to foreign and United States-based customers; complete transactions on its own behalf; and maintain and grow its business.  As with the United States as a whole, ICTSI directly and indirectly engaged throughout Oregon's stream of commerce, using the means and instrumentalities of both intrastate and interstate commerce, including, but not limited to, the statutory, administrative, regulatory, judicial, mail, telephone, and banking resources, facilities, and appurtenances.  This includes sourcing, negotiating and acquiring equipment and supplies.  It also involves arranging for and otherwise employing personnel for its business from management and office staff to longshore equipment operators, machinists and

---

[17] Molly Harbarger, *What the heck is going on at the Port of Portland: A beginner's guide to longshore, Hanjin, more, The Oregonian/Oregon Live* (2/13/15).

[18] According to a 2012 study by the Brookings Institution, roughly one-fifth of the local economy is generated by exports, supporting 142,270 jobs in the Portland area.  Moreover, a Portland Business Alliance study found that $16.5 billion of goods were made and exported from Oregon to countries worldwide in 2012, creating 490,000 jobs in the process (not necessarily all due to port).

[19] *See infra,* ICTSI Press Release, *Oregonian* (September 30, 2015), discussed at 38.

Page 19 -  COMPLAINT

dock workers.  Through it all, ICTSI has regularly touted and used e-commerce systems and the internet to promote and facilitate unlimited commerce within and beyond Oregon and its global network.  It also has regularly used state and national banks in Oregon and the United States. ICTSI's immersion was recognized in 2012 by the Foreign Direct Investment Business Award at the Annual International Awards and Scholarship Dinner in Portland, Oregon.

36.    At Oregon's Terminal 6, ICTSI has regularly employed over 400 people to move some 2,000 containers a week—deriving approximately $100 million annually in revenue and accounting for a substantial part of ICTSI's global volume.

37.    Beginning in 2012, ICTSI became embroiled in a prolonged labor dispute with its longshore workers at Portland's Terminal 6.[20]  Over the next several years, ICTSI purposefully

---

[20] The labor dispute has since extended well beyond ICTSI's Terminal 6 in Portland and both cuts to and substantiates the same corporate culture that underlies the crux of Plaintiffs' own claims insofar as a lack of transparency and absence of corporate governance in favor of Razon Jr.'s unbridled dominance and control are concerned.  The world's largest proxy advisory service, Institutional Shareholder Services ("ISS"), recently supported the corporate governance concerns raised by the International Transport Workers' Federation ("ITF") in the ever-expanding labor dispute to finally unseat two of Razon Jr.'s entrenched insider Directors:

> ICTSI's managers have ambitiously grown the company over the last decade. However, we believe that their growth has not been accompanied by sufficient managerial oversight and appropriate internal controls to ensure productive industrial relations, compliance with local laws and international labour conventions, and even fail to ensure compliance with ICTSI's own internal policies and Codes of Conduct.

> *****

> Given the overwhelming majority of voting rights maintained by Mr. Razon and his family, we are under no illusion that we will prevail in this vote.  However, we wish to sharply signal to Mr. Razon and other Board members, that there is a need for change at ICTSI.  While shareholder value at the company has increased over the last five years, we believe it is critical that governance and operational changes be made to position the company for further growth, and to attract the support of outside investors, lenders, and joint-venture partners.

Page 20 -  COMPLAINT

availed itself of Oregon's and the United States' judicial process in actively and affirmatively initiating, defending, and otherwise participating in a swarm of interrelated lawsuits and administrative proceedings.  ICTSI complained to the National Labor Relations Board ("NLRB") that workers belonging to the International Longshore and Warehouse Union ("ILWU") engaged in deliberate work stoppages and slowdowns, made false safety claims, and engaged in other threats and coercion to disrupt the operations of Terminal 6.[21,22]  The longshoremen and their union(s) contested ICTSI's allegations and separately sued ICTSI in the United States District Court for Oregon for a hostile and unsafe workplace.  The NLRB agreed with ICTSI and in 2014 ultimately ordered ILWU and Local 8 and 40 to cease and desist based on evidence and arguments prepared over many months and presented at two 12-day evidentiary hearings.  But the Occupational Health and Safety Administration ("OSHA") meanwhile fined ICTSI in 2014 for "violation of more than a dozen worker safety codes, such as not informing employees about potential exposure to airborne lead and having workers operate machinery that lacked proper guards against flying objects."  In November 2017, the United States Court of Appeals for the District of Columbia Circuit upheld the NLRB's decisions against ILWU and its local unions.

---

ITF, *Proxy Advisory Note*, https://www.workerscapital.org/IMG/pdf/ictsi_proxy_letter_final.pdf (last visited June 12, 2018).  A majority of non-insider shareholders including both CalPERS and CalSTRS voted against the re-election of Directors Stephen A. Paradies and Jon Aboitiz at ICTSI's Annual Stockholders' Meeting on April 19, 2018.

[21] *See Hooks ex rel. NLRB v. ILWU,* 2012 WL 2994056 (D. Or. July 20, 2012) (discussing July 3 temporary restraining order); and 2012 WL 6115046 (D. Or. Dec. 10, 2012) (discussing July 19 injunction); *see also Hooks ex rel. NLRB v. ILWU,* 905 F.Supp.2d 1198 (D. Or. 2012), affd. in relevant part 544 Fed. App'x. 657 (9th Cir. 2013).

[22] ICTSI also alleged unlawful secondary conduct by ILWU and its Local Union Nos. 8 and 40 by inducing and encouraging the actions of their members that ICTSI employed.  Local 8 represents crane operators, truckdrivers, gearlockermen, and various other longshore workers. Local 40 represents marine clerks and vessel planners.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

38.     As in other aspects of its business in the United States and Oregon, ICTSI persistently availed itself of the media during its protracted legal proceedings to influence public opinion in Oregon and beyond.[23]   Ganda and other representatives are frequently quoted by local news outlets regarding the dispute, and their quotes are then often repeated and included on ICTSI's website.  In a prepared statement following the NLRB's ruling in 2014, Ganda is quoted by the *Oregonian*:

> We are gratified by the NLRB's ruling, which rejected all of the ILWU's legal arguments.  Hopefully, this decision will bring us one step closer to ending the ILWU's orchestrated and illegal campaign to undermine the success of Terminal 6 and to convincing the shipping companies to return to the Port of Portland.  A fully functioning, productive Terminal 6 is critical to the regional economy and benefits local businesses, importers, exporters, farmers and workers across various industries—including rank-and-file ILWU longshoremen who have suffered a substantial loss of work as a result of their leaderships' actions.

ICTSI again issued a prepared statement late last year after the appellate decision in which Ganda states:

> We are extremely pleased with the DC Circuit decisions because this means that the Court, as well as the NLRB, confirmed our position that the ILWU's actions at Terminal 6 violated federal labor law.  Our effort continues in federal court here in Portland to hold the ILWU accountable and obtain compensation for the harm it has done.

 As indicated, ICTSI's legal battles continue in Oregon.  ICTSI continues to affirmatively pursue damages there from ILWU.  And ILWU's claims against ICTSI for a hostile and unsafe workplace also are still separately pending.

---

[23] *See, e.g.,* ICTSI Website, *Our Releases*, *Brochures*, and *ICTSI in the News*, http://www.ictsi.com/media-center/ (last visited June 12, 2018); Josh Thomas, *Port Welcomes ICTSI to Portland*, https://www.portofportland.com/Notices/POP_Mar_ICTSI_Ancmnt_02_BLT.htm (last visited June 12, 2018).

Page 22 -  COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

39.     ICTSI's ongoing battle over damages in Oregon has been compounded by overall expansion of the labor dispute across ICTSI's network and the local loss of Terminal 6's key shipping customers during the dispute.[24]  Favorable decisions by the NLRB and the United States Court of Appeals for the District of Columbia Circuit notwithstanding, ICTSI was unable to keep shippers from avoiding Terminal 6.  Hanjin Shipping Co. Ltd. ("Hanjin"), stopped calling on Terminal 6 in February 2015, taking between 65-80% of the terminal's business to other ports.  Hapag-Lloyd America Inc. subsequently followed suit and ceased service to Terminal 6 in April 2015, followed by Westwood Shipping Lines in May 2016.[25]  ICTSI won the legal battle to keep Terminal 6 running, but not the war.

40.     Without the key shippers, ICTSI sought at the end of 2016 to get out of Terminal 6 by negotiating with the Port of Portland to mutually terminate the lease early.  Months later, ICTSI and the Port of Portland signed a Lease Termination Agreement terminating the 25-year Lease Agreement to operate the container facility at Terminal 6 of the Port of Portland effective March 31, 2017.[26]

---

[24] *See* ISS *Advisory Proxy Note, supra*:

> In October 2017, the ITF published a report that detailed how operational failures across the ICTSI network had resulted in a pattern of labour violations and had called into question ICTSI's ability to ensure productive industrial relations across its global network. These violations had led to protracted disputes that directly affected multiple port stakeholders, including governments, global brands and shipping lines. Since the release of that report, other disputes have hit ICTSI operations, including at their flagship Melbourne terminal, global brands and shipping lines.

[25] ICTSI and the Port of Portland sought to retain shippers through a cost sharing program designed to pass along subsidies.  To this end, ICTSI and the Port agreed to reimburse ICTSI for increased and unrecoverable costs incurred as a result of the work slowdowns, stoppages and other disruptions caused by ILWU.  ICTSI could then pass along the reimbursements to shippers.

[26] ICTSI's Consolidated Financial Statements provide in relevant part:

Page 23 -  COMPLAINT

41.    At all relevant times, ICTSI has treated its Oregon operations as its own. It does not, on its website, in press releases, or in other publications, claim that its Oregon operations are directed by, controlled by, or operated for the benefit of any entity other than itself. On the contrary, ICTSI expressly refers to itself and its subsidiaries on its website and in its accompanying annual reports and financial statements as being controlled by it and part of one homogenous "Group."[27] In keeping with and reflected above, ICTSI's website states that:

- [ICTSI] is in the business of acquiring, developing, managing and operating container ports and terminals worldwide.

- [W]e realized the potential for an independent international terminal operator like ourselves, and launched an aggressive international and domestic expansion program in 1994.

- Our management has a proven track record of success in port development and management in numerous ports all over the world.

- ICTSI is currently pursuing an active program to acquire new terminal concessions in Asia, the Middle East, Africa, Europe and the Americas.

- ICTSI signs a 25-year lease with the Port of Portland for the operation of the 77.7-hectare container terminal and breakbulk facility at Terminal 6.

---

In October 2016, the Board of ICTSI Ltd. has authorized the management of ICTSI Oregon to negotiate with the Port of Portland and reach terms mutually acceptable to both parties with respect to the termination of the lease agreement after two major customers, Hanjin Shipping Co. and Hapag-Lloyd stopped calling the Port of Portland in March 2015 due to continuing labor disruptions. In late 2016, the Port of Portland and ICTSI Oregon began discussions of a mutual agreement to terminate the lease agreement. … On March 8, 2017, ICTSI, through ICTSI Oregon, and the Port of Portland have signed a Lease Termination Agreement and both parties have mutually agreed to terminate the 25-year Lease Agreement to operate the container facility at Terminal 6 of the Port of Portland with an effective date of March 31, 2017. The Lease Termination Agreement allows ICTSI Oregon to be relieved of its long-term lease obligations. In exchange, the Port of Portland will receive US$11.45 million in cash compensation and container handling equipment including spare parts and tools.

[27] ICTSI's Consolidated Financial Statements again provide in relevant part:

"*Subsidiaries.* Subsidiaries are entities controlled by the Parent Company".

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

- ICTSI Ltd., a wholly owned subsidiary, manages our foreign operations.
- Subsidiaries are entities controlled by the Parent Company.[28]

42.    As demonstrated and admitted, at all relevant times ICTSI's subsidiaries including ICTSI Oregon have no functional or meaningful existence independent of ICTSI as the parent, its Board of Directors, and its officers.  ICTSI Oregon's management has not acted independently of ICTSI.  To the contrary, its orders have come from ICTSI.

43.    Based on the breadth and scope of ICTSI's activities and operations in Oregon, including but not limited to the large amount of revenue generated therefrom, if ICTSI had not conducted operations in Oregon through its wholly-owned subsidiaries including ICTSI Oregon, it would have been necessary for ICTSI to conduct those operations itself.

44.    In sum, ICTSI has so completely dominated its wholly-owned subsidiaries including ICTSI Oregon that they possess no separate mind, will, or existence of their own. They simply are pass through conduits or vehicles as ICTSI has referred to them, *i.e.,* shells, that have enabled ICTSI to operate its hemogenic enterprise.

45.    ICTSI and its subsidiaries including ICTSI Oregon have been dominated and controlled in turn by Razon Jr. and his family.  As acknowledged above and further described below, ICTSI and its progeny are, from inception to now, a closely controlled creation and extension of what Razon Jr. and his father and father's father initially forged in Manila.  ERI was their instrumentality throughout the years immediately preceding ICTSI's formation via ERI. Razon Jr. and his father created and controlled ERI as their personal domain.  They then exercised their control to privately reincarnate ERI in ICTSI.  Acting as one and the same with

---

[28] *See also, e.g. infra,* fn. 26 (referring to ICTSI's actions by and through its subsidiaries ICTSI Ltd. and ICTSI Oregon); *see also, e.g.,* other brochures, newsletters, press releases included within ICTSI's website, as well as footnotes to ICTSI's Financial Statements.

Page 25 -  COMPLAINT

ERI and ICTSI alike in taking from one and giving to the other, the Razons' knowledge and actions in connection with ERI are imputed to ICTSI and ICTSI Oregon.



46.    Given its extensive presence in Oregon, ICTSI has purposefully injected itself into Oregon and has, at least since 2010, enjoyed the privileges and benefits of its laws.

47.    This Court has personal jurisdiction over ICTSI because ICTSI has directly and indirectly availed itself of the laws of Oregon and pursued and maintained continuous and systematic contacts in conducting a substantial amount of business in Oregon.

48.    Based on ICTSI's continuous and systematic contacts with the State of Oregon, this Court has personal jurisdiction over ICTSI pursuant to ORCP 4 and all other applicable federal and state statutes, rules, and constitutional provisions.  By and through its wholly owned subsidiary agent(s) and alter ego(s), ICTSI admittedly and effectively: is a corporation created by or under the laws of Oregon; engaged in substantial and not isolated activities within Oregon at the Port of Portland; and expressly consented to the exercise of personal jurisdiction in Oregon by purposefully engaging in litigation within Oregon.  On information and belief, ICTSI has financed its substantial activities and operations in Oregon with moneys rightly due and owing in whole or in part to Plaintiffs.

49.    This Court may further exercise jurisdiction over ICTSI because ICTSI has continuously and systematically availed of United States capital markets to directly and

Page 26 -  COMPLAINT

indirectly sell its securities, using the means and instrumentalities of both intrastate and interstate commerce, including, but not limited to, the statutory, administrative, regulatory, judicial, mail, telephone, and banking resources, facilities and appurtenances.  In as much as the underlying facts and circumstances involve and concern ICTSI's original formation and shares, the integrity and interests of the United States capital markets and United States' investors are substantially impacted.

50.     Further, on information and belief, property belonging to ICTSI is within the actual or constructive *in rem* or *quasi in rem* jurisdiction of this Court, and the Court may reasonably assert such jurisdiction over ICTSI's property pursuant to applicable federal and state statutes, rules, and constitutional provisions.

51.     Venue is proper in this District pursuant to 28 U.S.C. §§1391(b) and (c) because the acts and practices complained of persist in and/or have an ongoing effect in this District.

52.     ICTSI may be served with process pursuant to FRCP, ORCP, and/or PRCP, including but not limited to by leaving a copy of the summons and this Complaint at its place of business with attention to Enrique R. Razon, Jr. as Chairman of the Board and President and Mr. Antonius Floris (Ton) Martijn van den Bosch as General Counsel and Vice President of Corporate Affairs & Compliance at 3rd Floor ICTSI Administration Building, South Access Road, MICT, Port of Manila, and by office service upon its registered agent SW&W Registered Agents, Inc. at 1211 SW. Fifth Ave., Ste 1900, Portland, OR 97204.

53.     **Defendants John and/or Jane Doe Nos. 1-20** are pseudonyms for other participants in, and facilitators of, the bad acts described herein, including professionals who aided and abetted the Defendants.  The identities and service addresses for John and/or Jane Does Nos. 1-20 are not presently known, and cannot be known, until certain discovery occurs in

Page 27 -  COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

these proceedings.

      **C.**    **Related Participants**

    54.    In addition to the Defendants, reference is made to the following present and former affiliates of Razon Jr., all of which are involved in relevant respects and related to, affiliated with, owned, or have been owned, in whole or in part, by Razon Jr. or one of his entities during the periods relevant here.

    55.    **Enrique Razon, Sr.** ("Razon Sr.") (deceased) was the father of Razon Jr. and former Chairman of ICTSI and its predecessor(s) identified below.  Razon Sr. passed away in 1995.

    56.    **E. Razon, Inc.** ("ERI") was organized by Razon Sr. in 1962 for the purpose of bidding for the arrastre services in South Harbor, Manila.  Razon Sr. and his family were at all relevant times the controlling shareholders of ERI.  Plaintiffs were at all relevant times minority shareholders of ERI.  In 1987, ERI was reportedly amalgamated into and assumed 46.7493% ownership of ICTSI.  ERI has been administratively dissolved for non-compliance with applicable regulatory requirements but not liquidated.

    57.    **Metro Port Services, Inc.** ("MPSI") is as described below another name given to ERI between 1978 and 1987.  ERI was renamed MPSI during that time by a group allegedly included within ERI under the auspices of the late former President of the Philippines, Ferdinand Marcos.

    58.    **Alfredo "Bejo" Romualdez** ("Romualdez") (deceased) was a brother-in-law of late President Marcos and former principal of the group allegedly included within ERI under the auspices of President Marcos.

Page 28 -  COMPLAINT

59.    **Razon Industries, Inc.** was organized by Razon Sr. in 1985 to acquire and manage other business interests or, as more recently reported, for "general business industry stock investment."[29]  The only interests included within it are 20,313,674 common shares of ICTSI stock.[30]  Those shares were issued to ERI in 1987 upon the formation of ICTSI.  They were assigned to Razon Industries, Inc. on September 5, 1989.  They form part of Plaintiffs' claims as stakeholders in ERI.  Razon Industries, Inc.'s principal office is listed at ICTSI's headquarters at 3rd Floor ICTSI Administration Building, South Access Road, MICT, Port of Manila.

60.    **Sureste Realty Corporation** was organized by Razon Sr. in 1982 for the primary purpose of real estate development.[31]  The only interests included within it are 22,725,800 common shares of ICTSI stock.[32]  Those shares were issued to ERI in 1987 upon the formation of ICTSI.  They were assigned to Sureste Realty Corporation on September 5, 1989.  They form part of Plaintiffs' claims as stakeholders in ERI.  Sureste Realty Corporation's principal office is listed at ICTSI's headquarters at 3rd Floor ICTSI Administration Building, South Access Road, MICT, Port of Manila.

61.    **Razon Group** is often loosely referred to by the Razons without definition as to who or what is in fact intended or included in any particular context or at any particular point in time.  It is submitted that the designation thus serves more as a practical if deceptive means to expediently lump together, gloss over, disguise, or altogether hide actual facts and

---

[29] Razon Industries, Inc.'s 2017 General Information Statement ("GIS") as filed with the Philippines SEC.

[30] *Id.*

[31] Sureste Realty Corporation 1982 Articles of Incorporation.

[32] Sureste Realty Corporation's 2016 GIS as filed with the Philippines SEC.

Page 29 -  COMPLAINT

circumstances.

### III.    GENERAL FACTUAL BACKGROUND ALLEGATIONS

#### A.    Origins

62.    ICTSI's genesis purportedly stems from Razon, Jr.'s grandfather of the same family name ("Captain Razon").  Captain Razon is said to have started working at a port in Manila in 1916 and established Manila's South Harbor port.  Razon Sr., sometimes referred to as "Pocholo," is credited with rebuilding the family business after World War II.  Razon, Jr. has taken it multinational.

63.    Judge Juan M. de Borja ("Judge de Borja") was the patriarch of the de Borjas and benefactor of MFI.  Prior to assuming the bench as a Regional Trial Court Judge of the Philippines, Judge de Borja served as an administrative officer and chief legal counsel for Captain Razon's early pre-World War II arrastre interests in Manila's South Harbor.  Judge de Borja became a friend of the family as a result, including Razon Sr., who was some 10-15 years younger, and his wife and son, Razon Jr.

64.    Following World War II, Captain Razon's South Harbor contract ended in or around 1948 after he lost out when it came up for rebidding.

65.    Several years later, in 1962, ERI was incorporated by Razon Sr., Enrique Valles, Luisa M. de Razon, Jose Tuazon, Jr., Victor L. Lim, Jose F. Castro, and Salvador Perez de Tagle. While duly formed then as a privately held company under Philippine law, ERI did not actually conduct any business until several years later when Razon Sr. sought in 1966 to run South Harbor again.

66.    At that time, Razon Sr. asked to see Judge de Borja and told him that he wanted to try and bid again to regain the contract for South Harbor's arrastre services.  Over the next few

Page 30 -  COMPLAINT

months, Razon Sr. would go almost every day to Judge de Borja's house for tutelage about the arrastre business and they worked together to prepare a bid.  Razon Sr. then asked Judge de Borja if he also would help to secure a bond to back ERI's bid because his family had assets, but not cash.  Judge de Borja again helped by asking his friend and law school classmate, Pablo Roman ("Roman"), at then Republic Insurance for a guaranty to back ERI's bid.  ERI won the public bid in 1966 to handle arrastre services in piers 3 and 5 of Manila's South Harbor.  In addition, Roman's Republic Bank provided working capital for ERI's operations.  ERI went on to win the bidding again in 1974 and was awarded the arrastre contract for all South Harbor's piers.

67.     On information and belief, Razon Sr. and his family controlled ERI at all relevant times.

68.     MFI became a minority shareholder of at least 5% percent of ERI's equity with 8,213 common shares as of January 22, 1976.[33, 34]  The stock certificates issued in MFI's name are duly signed by Razon Sr. as President; countersigned by Rafael T. Durian as Corporate Secretary; and sealed with the seal of ERI.[35]  They are further validated in the December 13, 1977 Minutes of ERI's annual stockholders meeting; ERI's December 15, 1978 General Information Sheet; ERI's December 9, 1980 SEC disclosures; MPSI's August 21, 1981 letter affirming MFI's 8,213 shares; and the May 14, 1985 Minutes of ERI's annual stockholder's meeting.

---

[33] True and correct copies of MFI stock certificates are attached hereto as Exhibit 1.

[34] MFI's interest in ERI is greater still in as much as MFI was not issued the corresponding stock certificates for stock dividends declared by ERI to all stockholders.  Neither did MFI receive any cash dividends that were declared by ERI.

[35] *See* Corporate Code of the Philippines, Sec. 63.

Page 31 -  COMPLAINT

69.     Of particular significance here, Juan T. Chuidian ("Chuidian") also has been judicially determined to have received 1,500 common shares of ERI's stock.  The Philippine Supreme Court upheld Chuidian's proprietary right to not only the 1,500 shares registered to him, but to all stock and cash dividends and preemptive rights.[36]  It did so over Razon Sr.'s unsupported assertion that he was the actual intended owner of the Chuidian shares.  In rejecting Razon Sr.'s self-serving claim, the Court held fast to age-old maxims of corporate governance:

> **The law is clear that in order for a transfer of stock certificate to be effective, the certificate must be properly *indorsed* and that title to such certificate of stock is vested in the transferee by the delivery of the *duly indorsed* certificate of stock.** (Section 35, Corporation Code) Since the certificate of stock covering the questioned 1,500 shares of stock registered in the name of the late Juan Chuidian was never indorsed to the petitioner, the inevitable conclusion is that the questioned shares of stock belong to Chuidian. The petitioner's asseveration that he did not require an indorsement of the certificate of stock in view of his intimate friendship with the late Juan Chuidian can not overcome the failure to follow the procedure required by law or the proper conduct of business even among friends. **To reiterate, indorsement of the certificate of stock is a mandatory requirement of law for an effective transfer of a certificate of stock.**[37]

(emphasis in bold added).

70.     Moreover, the Court reiterated that "cash and stock dividends and all . . . pre-emptive rights are all incidents of stock ownership," and expounded that "[t]he rights of stockholders are generally enumerated as follows:"

> [F]irst, to have a certificate or other evidence of his status as stockholder issued to him; second, to vote at meetings of the corporation; **third, to receive his proportionate share of the profits of the corporation**; and lastly, to participate proportionately in the distribution of the corporate assets upon the dissolution or winding up."  (Purdy's Beach on Private Corporations, sec. 554) (*Pascual v. Del

---

[36] *Vicente B. Chuidian v. Intermediate Appellate Court, E. Razon and E. Razon, Inc.* G.R. No. 74315, 16 March 1992 207 SCRA 234.

[37] *Id.*

Page 32 -  COMPLAINT

*Saz Orozco*, 19 Phil. 82, 87).[38]

(emphasis in bold added).

71.     Like Chuidian, MFI's shares have never been indorsed/assigned nor encumbered

by MFI.  And more so than Chuidian, the original stock certificates are still in MFI's possession.

MFI accordingly is imbued with and entitled to all the rights incident to its shares, including all

dividends (cash and stock) and pre-emptive rights pertaining to them.[39, 40]

72.     In 1978, Razon Sr. purportedly assigned 60% of ERI to Romualdez and his group.

He did so at a time when he sought to further entrench himself with and extend ERI's South

Harbor management contract under the Marcos regime.[41]  While Razon Sr. reportedly gave 60%

of ERI's equity vis-à-vis Romualdez, he in turn took some of it from one or more of ERI's then

existing minority shareholders, including Chuidian (subsequently reversed as discussed by the

---

[38] *Id.*

[39] *See supra* fn. 36.

[40] *See Philcomsat et al. v. Africa et al.,* G.R. No. 184622, 3 July 2013, 700 SCRA 453:

> Time and again, the Court has held that it is a very desirable and necessary
> judicial practice that when a court has laid down a principle of law as applicable
> to a certain state of facts, it will adhere to that principle and apply it to all future
> cases in which the facts are substantially the same.  *Stare decisis et non quieta
> movere.*  Stand by the decisions and disturb not what is settled.  *Stare decisis*
> simply means that for the sake of certainty, a conclusion reached in one case
> should be applied to those that follow if the facts are substantially the same, even
> though the parties may be different.  It proceeds from the first principle of justice
> that, absent any powerful countervailing considerations, like cases ought to be
> decided alike.  Thus, where the same questions relating to the same event have
> been put forward by the parties similarly situated as in a previous case litigated
> and decided by a competent court, the rule of *stare decisis* is a bar to an attempt to
> relitigate the same issue.

[41] It was also amid a squabble with the Marcos regime over the floating casino that Razon Jr.'s
sister was running in Manila Bay.

Page 33 -  COMPLAINT

Philippine Supreme Court) and Gervel, Inc.[42]  Razon Sr. also demanded Plaintiffs' equity

interest, but Plaintiffs refused, resulting in a falling out.  The shares of MFI accordingly were not

affected.

73.    ERI was renamed MPSI at the same time; and, as such, continued to manage

South Harbor over the next decade under President Marcos' patronage.[43]  Thus, ERI's

management contract was first extended in 1978 to June 30, 1980, at which time a new contract

was then executed with MPSI for a term of eight (8) years beginning July 1, 1980.

## B.    Sequestration

74.    When President Marcos was subsequently deposed in 1986, those associated and

benefited by patronage sought to distance themselves.[44]  The Presidential Commission on Good

Government ("PCGG") was created as the first official act of the reform government.[45]  The

PCGG is a government agency tasked with pursuing and filing suit against Marcos and his

---

[42] Of which MFI principal Alfredo de Borja was then President when he was instructed by its
principal, Geronimo Velasco, to turn over Gervel's shares to Razon Sr. as requested.  Razon Sr.
offered Gervel payment at par, which Mr. Velasco considered unconscionably unfair and refused
to accept as a matter of principal.

[43] Razon Jr. has been reported as saying that dictatorships are the most efficient form of
government:

> If you really look at it, those that have the most advanced infrastructure are the
> ones that are not democratic. The countries with the best infrastructure in the
> world are dictatorships….

Philippine Inquirer, Roy Stephen C. Canivel, *Countries with best infrastructure are dictatorships
– Razon,* November 13, 2017.

[44] President Marcos' regime under the effective patronage of the United States came to an end
with the world-acclaimed Edsa People Power Revolution in 1986 when millions of Filipinos
peacefully rose up and drove the infamous dictator into exile.

[45] Executive Order No. 1, February 28, 1986.

Page 34 -  COMPLAINT

cronies to recover ill-gotten wealth accumulated during the Marcos regime.[46]

75.    Against this backdrop, Razon Sr. is said to have ousted the Romualdez group from MPSI and renamed it ERI again.  Razon Sr. is reported to have contemporaneously:  (i) convinced the nominee company, Maximum Trading and Industrial Corporation ("MATICO"), in whose name the 60% equity had been registered as a proxy for Romualdez, to voluntarily return the shares to him under a so-called "Deed of Reconveyance with Irrevocable Power of Attorney"; and (ii) called a special stockholders' meeting at which he re-organized the Board of Directors by seating his own nominees under newly renamed ERI.  The combination removed the specter of Romualdez and the Marcos regime while further institutionalizing the Razons. Even if anyone were inclined to resist the Razons, they would necessarily fail.  A rogue committee dominated by the Razons effectively governed ERI and repeatedly plunged it into one self-interested deal after another—all to the detriment of ERI and its minority shareholders like Plaintiffs.

---

[46] *See, e.g.,* the PCGG's July 22, 1987 Complaint on behalf of the Republic of the Philippines:

### I. NATURE OF THE ACTION

1. This is a civil action against Defendants Alfredo (Bejo) T. Romualdez, Ferdinand E. Marcos, Imelda R. Marcos, and the rest of the Defendants in the above-entitled case, to recover from them ill-gotten wealth consisting of funds and other property which they, ·in unlawful concert with one another had acquired and accumulated in flagrant breach of trust and of their fiduciary obligations as public officers, with grave abuse of right and power and in brazen violation of the Constitution and laws of the Republic of the Philippines; thus resulting in their unjust enrichment during Defendant Ferdinand E. Marcos' 20 years of rule from December 30, 1965 to February 25, 1986, first as President of the Philippines under the 1935 Constitution . and, thereafter, as one-man ruler under martial law and Dictator under the 1973 Marcos-promulgated Constitution.

2. The wrongs committed by Defendants, acting singly or collectively and in unlawful concert with one another, include the misappropriation and theft of public funds, plunder of the nation's wealth, extortion, blackmail, bribery, embezzlement and other acts of corruption, betrayal of public trust and brazen abuse of power, as more fully described below, all at the expense and to the grave and irreparable damage of Plaintiff and the Filipino people.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

76.    The window-dressing proved of no use when it came to scrutiny of Razon Sr.'s

ties to the Marcos regime.  As documented by the Philippine Supreme Court, the Philippine Ports

Authority ("PPA") cancelled MPSI's *fka* ERI's South Harbor management contract in July 1986

on the basis that the contract was "the fruit of corruption in the Marcos government" in which

Razon Sr. *admittedly* "fronted for Romualdez with respect to the latter's illegal dealings."[47]  The

PPA took over and reportedly used ERI's equipment before re-letting the arrastre contract to

Marina Port Services Inc. ("Marina").

---

[47] *See generally E. Razon, Inc. and Enrique Razon v. Philippine Ports Authority, G.R. No.* 75197, 22 June 1987, Resolution:

> [The] PPA et al. submit in their joint memorandum the following arguments [for cancelling MSPI's contract]:
>
> 1. Contrary to petitioners' assertion, the cancelled arrastre contract was previously awarded, not to petitioner Enrique Razon or his old company, E. Razon, Inc., but to Metro Port Services, Inc. that President Marcos' brother-in-law, Alfredo 'Bejo" Romualdez, admittedly controlled.
>
> 2. Since the cancelled contract was the fruit of corruption in the Marcos government, it is a nullity and petitioners cannot sue for its enforcement;
>
> 3. **With his admission that he agreed to front for Romualdez with respect to the latter's illegal dealings with the Philippine Port Authority, Razon forfeits his claim as having been a victim of the Marcos rule;**
>
> 4. Besides, since petitioners themselves admit the existence of sufficient grounds for PPA's cancellation of Metro Port's arrastre contract, they cannot complain;
>
> 5. Under the circumstances, respondent PPA was not required to hear petitioners prior to its cancellation of the contract;
>
> 6. Given the validity of PPA's cancellation of that contract and its takeover of the arrastre operations, the designation of respondent Marina Port Services, Inc. to assist PPA in the operations is not for petitioner to question; and,
>
> 7. At all events, respondent MARINA is qualified to handle the limited task PPA assigned to it. (pp. 546-547, Rollo)

(bold emphasis added).

Page 36 - COMPLAINT

77.    Razon Sr. challenged the PPA's cancellation in a series of questionable legal maneuvers on the premise that he was a victim rather than knowing consort of the Marcos regime.  The Philippine Supreme Court rejected the premise:

> Petitioners attempt to evade the consequence of the Romualdez connection by alleging that the 60% equity of petitioner E. Razon, Inc. was obtained thru force and duress and without any monetary consideration whatsoever. Otherwise stated, the transfer of the shares of stock to persons close to President Marcos, later disclosed to be Alfredo "Bejo" Romualdez was, at the very least, voidable for lack of consent, or altogether void for being absolutely fictitious or simulated.

> Verily, the transfer of the shares of stock of petitioner E. Razon, Inc. representing 60% equity to persons fronting for Alfredo "Bejo" Romualdez was null and void. The invalidity springs not from vitiated consent nor absolute want of monetary consideration, but for its having had an unlawful cause — that of obtaining a government contract in violation of law. While the general rule is that the *causa* of the contract must not be confused with the motives of the parties, this case squarely fits into the exception that the motive may be regarded as *causa* when it predetermines the purpose of the contract. (*Liguez v. Court of Appeals,* 102 Phil. 577). On the part of Romualdez, the motive was to be able to contract with the government which he was then prohibited by law from doing, and on petitioner Razon's part, to be able to renew his management contract. ***For it is scarcely disputable that Enrique Razon would not have transferred said shares of stock to Romualdez without an assurance from the latter that he would be unduly favored with a renewal of the Management Contract. Thus, it came to pass that by transferring 60% of the shares in his company to Romualdez, petitioner Enrique Razon was able to secure an eight-year contract with respondent PPA and for six years before its cancellation benefit from the proceeds thereof.***

> ***Petitioners' attempt to dissociate or divorce themselves from the illegality of the transfer and, consequently, of the management contract, as well as their claim of innocence or being a victim of the Marcos regime must fail for the "view has been taken ... that a party is a participant in the unlawful intention where he knows and intends that the subject matter will be for an illegal purpose and there would seem to be no doubt that one may be deemed to be a participant in the other's unlawful design if he shares in the benefits of the violation of law.*** However, whether he is to derive any benefit from the unlawful use of the subject matter is not the sole test.  A test which has been said to be more confortable to sound morality is whether he intends to aid the other in the unlawful object. He may be deemed to be a participant in the unlawful purpose if, with knowledge thereof, he does anything which facilitates the carrying out of such purpose." (17 Am Jur 2d 515-516).

Page 37 - COMPLAINT

> The transfer of the control of petitioner E. Razon, Inc. from petitioner Enrique Razon to Alfredo "Bejo" Romualdez, **which We have resolved to be null and void**, served as the direct link to petitioner company's obtaining the Management Contract. Being the direct consequence and result of a previous illegal contract, the Management Contract itself is null and void as provided in Article 1422 of the Civil Code.[48]

(bold italics added for emphasis).  For convenience, this case is hereinafter referred to as the "*PPA Case.*"

78.    The PCGG also named Razon Sr. in July 1987 as a co-defendant with Romualdez and the Marcoses in a civil case before the Sandiganbayan, a special court in the Philippines with jurisdiction over criminal and civil cases involving graft and corrupt practices, including the PCGG's so-called "ill-gotten wealth" cases:[49]

> The following Defendants acted as dummies, nominees, agents, incorporators, directors, board members and/or stockholders of corporations beneficially held and/or controlled by Defendants Alfredo (Bejo) T. Romualdez, Ferdinand E. Marcos and Imelda R. Marcos … RAZON, Enrique.
>
> *****
>
> Defendant Alfredo (Bejo) T. Romualdez …:
>
> c) acquired sixty (60%) percent of the Metroport Services, Inc., formerly known as E. Razon, Inc., a private domestic corporation engaged in the arrastre business, with the active collaboration, knowledge and willing participation of Defendants Enrique Razon, Tomas Aguirre, Anthony Aguirre, Jose D. Campos, Jr., Orlando P. Pacencia, Cecilia Redona, Ernesto Anza and Fe Certezo, who acted as the dummies, nominees and agents of Defendants Ferdinand E. Marcos, Imelda R. Marcos and Alfredo (Bejo) T. Romualdez.[50]

For convenience, this case is hereinafter referred to as the "*Plunder Case.*"

---

[48] *Id.*

[49] Executive Orders No. 14 and No. 14-A.

[50] *See Republic of the Philippines vs. Alfredo (Bejo) T. Romualdez,* Case No. 0010 July 22, 1987, at ¶¶ 6 and 14; s*ee also infra,* fn. 46.

Page 38 -  COMPLAINT

79.    The PCGG's *Plunder Case* Complaint clearly stated that as far as ERI was concerned, the government was pursuing only the 60% share of ERI that Razon, Sr. had earlier given to Romualdez and his group.  ERI itself was not named or sequestered.[51]  Nor were the rights of MFI placed in jeopardy by the sequestration of the 60% shares given to Romualdez by the Razon family.[52]

80.    Razon Sr., on the other hand, was impleaded in his personal capacity.  He was named not only in connection with Romualdez and ERI, but other corporations as well, including Manila International Ports Terminal Inc. and Philippine Jai-Alai and Amusement Corporation.  Above all, the PCGG sought to hold Razon Sr.—not ERI—solidarily liable to the government in several respects and along with 48 other impleaded defendants for ₱51 billion in damages:

> Fifth Cause of Action: -LIABILITY FOR DAMAGES- (a) By reason of the unlawful acts set forth above, Plaintiff and the Filipino people have suffered actual damages in an amount representing the pecuniary loss sustained by the latter as a result of Defendants' (including Enrique Razon, Sr.) the approximate value and interest on which, from the time of their wrongful acquisition, plus expenses which Plaintiff has been compelled to incur and shall continue to incur in its effort to recover Defendants' (including Enrique Razon, Sr.) ill-gotten wealth all over the world. Defendants are, therefore, jointly and severally liable for actual damages and for expenses incurred in the recovery of Defendants'

---

[51]  *See Philippine Overseas Telecommunications Corporation (POTC), Philippine Communications Satellite Corporation (PHILCOMSAT) v. Sandiganbayan, et al.,* G.R. No. 174462, 10 February 2016, 783 SCRA 425 ("[A] corporation has a legal personality distinct and separate from its stockholders" and "the filing of a complaint against a stockholder is not *ipso facto* a complaint against the corporation."  *See also, Republic of the Philippines (Presidential Commission on Good Government) v. Sandiganbayan, et al.,* G.R. No. 88126, 12 July 1996, 258 SCRA 685. (affirming that "Dio Island Resort, Inc., was not sequestered on March 18, 1986 nor at anytime thereafter" where Dio Island Resort, Inc. was not impleaded in the *Plunder Case* but only listed, like ERI, within the attached Annex of companies in which those actually impleaded allegedly maintained ill-gotten interests).

[52]  As noted, while Razon Sr. reportedly gave and got back 60% of ERI's equity vis-à-vis Romualdez, he in turn took some of it from one or more of ERI's then existing minority shareholders.

Page 39 -  COMPLAINT

(including Enrique Razon, Sr.) ill-gotten wealth. [53]

81.     Significantly, Razon, Sr. also was sued by the PCGG in other respects completely unrelated to the *Plunder Case*. Specifically (and significantly as explained below), the PCGG brought criminal charges against Razon Sr. in connection with another $30 million corruption case:

> This is a complaint for violation of the Anti-Graft and Corrupt Practices Act (RA No. 3019), as amended, Presidential Decree No. 1883 (a law which defines and penalizes blackmarketing and salting of foreign exchange), as amended, and the Central Bank Act (RA No. 3650), as amended, filed by the Director of the Investigation and Research Department, Presidential Commission on Good Governance, against ex-President Ferdinand E. Marcos and Enrique Razon, president of the Razon International Stevedoring Corporation (RISCO for brevity), for having conspired and confederated in obtaining Central Bank approval of the application for a $30-million dollar allocation for RISCO purportedly to be remitted to their office in Jeddah, Saudi Arabia to finance the acquisition of various handling.[54]

For convenience, this case is hereinafter referred to as the "*Forex Case.*" Clearly, the crime charged in this separate and distinct respect arose in connection with Razon Sr.'s stint as President of yet another company known as Razon International Stevedoring Corporation.

82.     However untargeted as an entity, ERI's namesake needed a face lift after ERI's South Harbor contract was terminated. With years of valuable know-how and experience, ERI had a proven track record. But Razon Sr. was suspect at best in multiple respects and 60% of ERI's equity consequently hung in limbo under the PCGG's *Plunder Case*.

C.     **ERI's Amalgamation:  1987 – 1990**

83.     Acting without notice to, knowledge of, or consent by Plaintiffs, Razon Sr. responded in late 1987 by acting in private to amalgamate ERI with two other companies to bid

---

[53] *See supra* fn. 50, at ¶ 20.

[54] Republic of the Philippines v. Enrique Razon, PCGG I.S. NO. 0044.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

on the Manila International Container Terminal ("MICT") located in the North Harbor.[55]  As

mentioned and previously acknowledged under oath, Razon Sr. joined ERI together with Anscor

and Sealand to that end.  As further acknowledged in and by other historical records and

accounts, Anscor is associated with the so-called Soriano Group, which as noted broadly refers

to the vast business interests of the Sorianos, one of the oldest and most established family

conglomerates in the Philippines.[56]  As for the third party in interest, Sealand also presumably

refers to Sea-Land Services, Inc., both being historically associated with the original SeaLand

("SeaLand") founded after World War II by American trucking entrepreneur, Malcom McLean,

who is credited with revolutionizing modern-day shipping through uniform containers easily

shipped over different modes of transportation.[57, 58]

---

[55] As stated, on ICTSI's website and in other respects over the years and, in particular, when dealing with the past, loose reference is time and time again made to the so-called "Razon Group" without any real or meaningful definition as a means of glossing over details and painting with a broad brush to whitewash inconvenient key aspects and material facts and circumstances.  ICTSI's website timeline reference, to the effect that on December 8, 1987 "[ICTSI] is incorporated by the Soriano Group, Razon Group, and Sea-Land Services, Inc.," is a case in point.    In fact, ERI, not the Razon Group, was the real party in interest.  As will be shown, this same indiscriminate expediency bleeds into the assignments at issue.

The effect, intended or not, was to mask and hide ERI's involvement from Plaintiffs, who knew only that the Razons were somehow involved with ICTSI, but not by or through ERI.  Plaintiffs accordingly had no idea of their own interest in ICTSI by and through ERI.  For all they knew ERI had been abandoned by the Razons in favor of tying-up with altogether different interests.  While this may well have been a source of frustration and disappointment for Plaintiffs insofar as it left them and ERI out, they had no idea that ERI had been used as it was.

[56] In May 2006, The Soriano Group's holdings in ICTSI shares were sold to the so-called Razon Group.

[57] Levinson, Marc. "The Box That Changed Asia and the World," Forbes, Retrieved 16 February 2016.

[58] Sealand was later acquired by and is now a division of the Maersk Group, an intra-regional container shipping company headquartered in Miramar, Florida.  "Return of the Sea-Land," *Ships & Ports,* Retrieved 16 February 2016.

Page 41 -  COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600    FAX (503) 227-6840

84.    In privately amalgamating ERI into a so-called consortium that included a local icon, on the one hand, and an international operator with strong ties to the United States, on the other hand,[59] Razon Sr. unilaterally shifted the face from him and ERI.[60]  ERI still provided the actual technical know-how, experience and track record accumulated over years of actual port operations—but subsumed within and cloaked by Anscor's local and SeaLand's international personage.  Using its operational experience and available resources, ERI is said to have prepared the principal bid materials, including a Port Equipment Acquisition Schedule and a Port Infrastructure Development Program, as well as having contributed to the preparation of the financial package along with Anscor and SeaLand.

85.    The ERI-led consortium succeeded in winning the bid and securing a renewable twenty-five-year concession or contract (25+25) for the management, operation, and development of MICT (the "MICT Contract"), reportedly beating out seven (7) other competing bidders.  It is acknowledged and admitted that after the consortium won the MICT Contract, the consortium incorporated ICTSI as the project company to perform the contract.

86.    ICTSI was thus incorporated in Manila on December 8, 1987 with 60,000,000 original common shares primarily distributed between ERI, Anscor and SeaLand.  According to ICTSI's original Articles of Incorporation, ERI represented 46.7493% with 28,049,600 common shares; Anscor 46.749% with 28,049,400 common shares; and SeaLand 6.5% with 3,900,000 common shares:[61]

---

[59] From 1967 to 1973, SeaLand became notable for delivering 1,200 containers a month to the Indochina peninsula during the Vietnam War, resulting in $450 million in revenues from the U.S. Defense Department.

[60] Effectively disenfranchising ERI and Plaintiffs in the process.

[61] ICTSI Website, *Articles of Incorporation December 1987*,

Page 42 -  COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840



87.    As the operational principal, ERI's know-how and experience in planning and

preparing to assume responsibility for MICT was especially significant to the consortium turned

ICTSI because MICT is acknowledged to have been an undeveloped and dilapidated terminal

facility at the time:

http://www.ictsi.com/admin/images/download/07292014082654Original%20Articles%20of%20Inc.%20December%2024,%201987.pdf (last visited June 12, 2018) (excerpts provided for ease of reference).  A true and correct copy of ICTSI's original Articles of Incorporation are also attached hereto and incorporated herein as Exhibit 2, as available on ICTSI's Website.  The Articles of Incorporation further reflect that ERI fully paid on the shares of capital stock from which it subscribed.  A true and correct copy of ICTSI's 1988 Philippine Securities and Exchange Commission ("SEC") General Information Sheet ("GIS") also is attached hereto and incorporated herein as Exhibit 3.  Both ICTSI's original Articles of Incorporation and GIS prominently reflect ERI's original shareholding in ICTSI separate and apart from the Razons individually.

Page 43 -  COMPLAINT

> Back then, all we had was an undeveloped port with two dilapidated quay cranes. But ICTSI's executives then knew that we could transform the container port and make it part of the world's best.[62]

ICTSI was tasked by its own account with transforming the undeveloped terminal port amid uncertainty about the newly instituted democracy, political dynamics and power shifts, and a cautious business environment. Anscor and SeaLand provided strength and stability under these conditions. Operationally, though, it is said to have involved immediate projects for infrastructure upgrades, computerization, purchase of equipment, streamlining of processes and procedures—all of which fell to and were spearheaded by ERI, including, but not limited to, the previously prepared Port Equipment Acquisition Schedule and Port Infrastructure Development Program.

88.    Following ICTSI's formation, ERI essentially became a holding company. It continued to exist as a founding principal holding approximately 47% of ICTSI, but for all intents and purposes ceased to operate independently of ICTSI. ERI's functional attributes, activities, and responsibilities were basically assimilated into ICTSI. This proved perilous for ERI—and Plaintiffs.

89.    As in other respects at that time and to come, Plaintiffs were left out of the loop about ERI's amalgamation into what became ICTSI. Once Judge de Borja refused Razon Sr.'s earlier turnover demand, there was a falling out. The Razons effectively operated and governed ERI as they pleased without informing Plaintiffs. As a result, Plaintiffs did not even know that

---

[62] *See* Business Beyond Borders, *ICTSI Terminals: Gateways for Opportunities* (May 1, 2015) at 34, https://www.dropbox.com/s/tgj4beftngs96ng/business%20beyond%20borders.pdf?dl=0; *see also* ICTSI Website, *Portfolio, The Official Publication of International Container Terminal Services, Inc.* (July 2015) at 8, https://www.ictsi.com/admin/images/download/10262015045655July%202015%20Portfolio_International%20edition.pdf.

Page 44 - COMPLAINT

ERI's operational know how and experience had been exchanged for ICTSI shares.  This goes to the heart of Plaintiffs' complaint.  As controlling stakeholders, the Razons systematically omitted to foster and employ institutional policies, practices, and procedures in connection with ERI's corporate governance.  While Plaintiffs came to realize that the Razons were heavily involved with ICTSI, they never imagined it was with and through ERI to begin with.  Whether intended or not, reference to the Razon Group—rather than ERI—effectively promoted and perpetuated this misimpression.

### D.    Stock Scam

90.    The private dealings persisted for the worse.  Almost as soon as ICTSI succeeded in taking over MICT and leapfrogged atop the Philippines' upper business echelon, ERI was stripped away and shed like an old snakeskin.[63]   Unbeknownst to MFI, ERI's entire block of what became 53,038,674 common shares in ICTSI were ostensibly assigned away by and for the benefit of the Razons alone.  What appears on record after finally being revealed[64] is that the following four purported assignments were entirely orchestrated by and through father and son to Razon Sr. and two Razon affiliated companies:

    i.    **Transfer 1 ("T1")**—on September 5, 1989, Razon Sr., acting as Chairman of ERI, assigned 22,725,000 common shares of ERI's stock in ICTSI to Sureste Realty Corporation through its President Razon Jr. ("Sureste Deed");

---

[63] In December 1990 ICTSI is said to have joined the ranks of the Philippines' top 1000 companies.

[64] Tellingly, it had been conveniently asserted by Razon Jr.:

> The records of ERI, the Razon Group and of ICTSI relevant to these transactions and the period subject of the complainant's claim have faded, deteriorated, been misplaced, flooded, lost, disposed, destroyed or no longer be found in the ordinary course.

Not so.  Records requests have yielded what was claimed missing.

Page 45 -  COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

ii. **Transfer 2 ("T2")**—on September 5, 1989, Razon Jr., acting as President of ERI, assigned 20,313,674 common shares of ERI's stock in ICTSI to Razon Industries, Inc. through its Chairman Razon Sr. ("Razon Industries Deed");

iii. **Transfer 3 ("T3")**—on April 10, 1990, Razon Jr., acting in an undisclosed capacity for ERI, assigned 7,700,000 common shares of ERI's stock in ICTSI to his father, Razon Sr. personally ("Razon Sr.'s Personal Deed"); and

iv. **Transfer 4 ("T4")**—on April 10, 1990, Razon Sr., acting as Chairman of ERI, assigned 2,300,000 common shares of ERI's stock in ICTSI to Razon Jr. personally ("Razon Jr.'s Personal Deed").[65]

91. So Razon Sr. assigned as Chairman of ERI to Razon Jr. as Chairman of Sureste Realty Corporation; Razon Jr. assigned as President of ERI to Razon Sr. as Chairman of Razon Industries Inc.; Razon Jr. assigned in an undisclosed capacity of ERI to Razon, Sr. personally; and Razon Sr. assigned as Chairman of ERI to Razon Jr. personally. In each and every instance, the Razons are the principal beneficiaries of the assignments. Each:



---

[65] Belatedly revealed copies of the above referenced Deeds of Assignment are attached hereto and incorporated herein as Exhibit 4-1 through 4-4.

Page 46 - COMPLAINT

Amidst all these transformational changes, the Razons are clear constants.[66]

92.    Throughout, the Razons treated ERI as their own, and operated it accordingly—as a mere vehicle for their own personal use and benefit without regard for the rights and interests of others, including Plaintiffs.  They exercised their domination and control over ERI to disenfranchise Plaintiffs in a freeze, trade, and transfer scheme that froze Plaintiffs out while ERI was first traded away for shares that were then transferred to the Razons.  They privately funneled and stripped away to themselves all ERI's interests—including Plaintiffs'—by first amalgamating ERI into ICTSI in exchange for ICTSI shares and then transferring all ERI's newly exchanged shares in ICTSI to themselves through four self-dealing assignments.



93.    All the transfers thus appear—as they are—to be expedient products of ill-conceived self-dealing.  They undoubtedly reflect the Razons' decision to give effect to their expropriation.  However, even apart from their fundamentally improper purpose, in doing so hastily and self-servingly, the Razons managed to violate most if not all corporate governance

---

[66] Along with and through their other family instrumentalities and overly cooperative advisors, including but not limited to Atty. Rafael T. Durian, both ERI's and ICTSI's Corporate Secretary and long-time cohort of the Razons.

Page 47 -  COMPLAINT

principles.[67]

94.     All the Razon's self-dealing transfers accordingly were done without notice to, knowledge of, or consent by Plaintiffs.  Moreover, they were, in whole or in part: predicated upon demonstrably false pretenses; fundamentally unauthorized; ultra vires; without any or sufficient consideration; and ostensibly made to deceive MFI and other similarly situated stockholders.

95.     Not only were the self-dealing assignments not disclosed as they must to Plaintiffs, they were, in whole or in part, falsely made to appear as if they were compensation for benefits to or for ERI.  In particular, the assignment of ERI's 7,700,000 shares in ICTSI under Razon Sr.'s Personal Deed was thus disguised to look like ERI was repaying Razon Sr. for *supposedly*:  negotiating and concluding an undisclosed agreement with the PCGG to un-sequester ERI; securing the corresponding dismissal of Sandiganbayan Case No. 0010 against ERI; and paying the PCGG ₱9 million on behalf of ERI:

> WHEREAS with prior authority from the Board of Directors of ERI, RAZON (referring to respondent Enrique Razon), successfully negotiated and concluded an agreement with the PCGG for the lifting of sequestration and dismissal of Sandiganbayan Case No. 0010 (PCGG Case No. 0011) as against ERI among the terms of which is the ERI shall pay the government thru PCGG the amount of ₱9 Million, of which ₱2 Million shall be paid upon the signing of the agreement.
>
> ******
>
> WHEREAS, ERI can only reimburse and compensate RAZON with 7.7 Million shares of stocks of ERI in ICTSI with a par value of ₱1.00 per share amounting to ₱7.7 Million ....[68]

Razon Sr. is first represented having "successfully negotiated and concluded an agreement with

---

[67] As further described elsewhere, this high-handed abuse was not an isolated instance for the Razons as they betrayed ERI and its patrons.

[68] April 10, 1990, Deed of Assignment assigning 7,700,000 common shares of ERI's stock in ICTSI to Razon Sr. personally.

Page 48 -  COMPLAINT

the PCGG" "for the lifting of sequestration and dismissal of Sandiganbayan Case No. 0010

(PCGG Case No. 0011) as against ERI" provided that "ERI shall pay the government thru PCGG

the amount of ₱9 Million."

96.     The phrases "as against ERI" and "ERI shall pay" made it appear that it was ERI

that sought to lift the sequestration of it and the dismissal of the *Plunder Case* in exchange for

the payment of ₱9 million to the PCGG.

97.     The next clause stating that "ERI can only reimburse and compensate RAZON

with 7.7 million shares of stocks of ERI in ICTSI with a par value of ₱1.00 per share amounting

to ₱7.7 Million" then deceptively made it appear that the ₱9 million Razon, Sr. supposedly

advanced to settle his own personal liability and exposure for ₱51 billion in damages to the

government was for ERI when ERI had nothing to do with it.

98.     But as previously addressed, none of this was true.  ERI was not a party to the

*Plunder Case*.  Razon Sr. was.  Nor was any such case ever filed against ERI.  So there never

was any case to dismiss against ERI—only Razon Sr.[69]  And just as there was no case against

ERI, there was no corresponding agreement or payment made on behalf of ERI.

99.     When finally revealed 26-years later in late 2016,[70] the referenced agreement

turned out to be an unofficially executory April 10, 1990 compromise settlement agreement

---

[69] ERI is not, and could not have been, a party to the agreement because ERI, as a corporation, had a personality separate and distinct from Razon, Sr.  *See, e.g., California Bus Lines, Inc. v. State Investment House, Inc.* G.R. No. 147950, 11 December 2003, 418 SCRA 297.

[70] After 26 years, Plaintiffs finally were able in September 2016 to obtain from the PCGG through Executive Order No. 2 of President Rodrigo Duterte a certified true copy of the original April 10, 1990 agreement executed by Razon Sr. and the PCGG.  Executive Order No. 2 grants every Filipino the right to access to information, official records, public records and documents and papers pertaining to official acts, transactions or decisions, as well as government research data used as basis for policy development.

Page 49 -  COMPLAINT

between Razon, Sr. and one member of the PCGG (the "1990 Compromise"):

> This [1990 Compromise] is entered into this 10th day of April, 1990 in Pasig, Metro Manila, Philippines, by and between:
>
> The REPUBLIC OF THE PHILIPPINES, through the Presidential Commission on Good Government ('PCGG'), represented herein by Chairman M. A. T. Caparas (hereinafter referred to as the 'REPUBLIC');
>
> and
>
> ENRIQUE RAZON, for himself and on behalf of the members of his family and E. Razon, Inc. also known as Metroport Service, Inc. (hereinafter referred to as 'RAZON').[71]

100.    Razon Sr.'s Personal Deed was deceptively crafted to purposefully convey the misimpression that ERI was the beneficiary of the 1990 Compromise and that ERI was obligated to pay the PCGG ₱9 million.   Razon Sr., however, was the beneficiary of the 1990 Compromise—not ERI.   He settled with the PCGG in his personal capacity to obtain immunity from criminal prosecution and to put an end to the PCGG's claims for damages in the *Plunder Case* against him and the 60% share of ERI that he had earlier given to Romualdez.   The 1990 Compromise accordingly provides in relevant part:

> WHEREAS, RAZON is the subject of an investigation conducted by the PCGG in connection with the accumulation of ill-gotten wealth by Ferdinand and Imelda Marcos and their associates in violation of Philippine laws, rules and regulations.
>
> 1. Contractual Intent - It is the intention of the Parties that in consideration of and relying on RAZON's fair and complete and truthful disclosures in his sworn statements, the statements as may be required of RAZON in any proceedings here or abroad, and the payment to the REPUBLIC of a sum of money as hereinbelow provided, the REPUBLIC grants RAZON immunity from criminal prosecution as provided in Section 5 of Executive Order No. 14, as amended, for any and all acts or omissions covered by Executive Order No. 1 and 2 and/or by reason or on account of the transactions, matters or things subject of his disclosures only insofar as RAZON is concerned and releases and discharges RAZON from civil liability for all acts and omissions covered by said Executive Order No. 1, 2 and 14.

---

[71] A copy of the purported 1990 Compromise is attached hereto as Exhibit 5.

Page 50 -  COMPLAINT

101.    The 1990 Compromise is silent about ERI apart from providing in clause 5.2 that the "sequestration and freeze orders on RAZON and [ERI] is lifted." In particular, there is no mention of any obligation on the part of ERI to pay anything in clause 3, entitled "Obligations of RAZON." If ERI, and not Razon Sr., had been obligated to pay the PCGG ₱9 million, the 1990 Compromise could, should and would have expressly said so. It did not because the concessions granted by the PCGG were for the benefit of Razon, Sr. and his family. Nor could Razon Sr. bind ERI in any event under the 1990 Compromise without a special power of attorney for that express purpose.[72] Since the PCGG's claims against Razon Sr. included the 60% share of ERI that he had earlier given to Romualdez, releasing those claims and lifting the sequestration and freeze orders against him likewise included ERI's shares, all as further subject to approval by the Sandiganbayan.

102.    Notably, however, the 1990 Compromise was never presented to or approved as it must by the Sandiganbayan.[73] Indeed, it was not even properly approved by the PCGG itself. It was instead only acknowledged quite anomalously by the former PCGG Chairperson—all of which was effectively concealed by the Razon's in failing to disclose the 1990 Compromise at the time or since. Why? Because the 1990 Compromise does not say or do what is claimed in Razon Sr.'s Personal Deed. To the contrary, it negates any obligation on the part of ERI stockholders, Plaintiffs included, to reimburse Razon Sr. anything. The ₱9 million payment to

---

[72] *See Anacleto v. Van Twest, et al.* G.R. No. 131411, 29 August 2000, 339 SCRA 211 ("a compromise agreement entered into by a person not duly authorized to do so by the principal is void and has no legal effect").

[73] According to the Philippine Supreme Court, any compromise agreement falls within the unquestionable jurisdiction of and must be approved by the Sandiganbayan. *San Miguel Corporation, et al. v. Sandiganbayan (First Division), et al.* G.R. Nos. 104637-38, 14 September 2000, 340 SCRA 289.

Page 51 -  COMPLAINT

the PCGG was Razon Sr.'s personal liability.

103.    The timing and related *bona fides* of the self-dealing assignments also is anomalous not only because they occurred just when ICTSI experienced success, but because they occurred approximately three years after Razon Sr. reportedly ousted the Romualdez group and renamed ERI again.    ERI has been described as an already bankrupt company at that time. So why continue then and wait until later to shed its skin when its value was going up via ICTSI? Because ERI had value in the first place.  And to cut out and take ERI's value from others in the second case.

104.    Time and again, both ERI and ICTSI experienced hardship without being extinguished.  ICTSI itself weathered upheaval during the recent global financial crisis and the Asian financial crisis of the 1990s when it was forced to sell off some of its foreign operations:

> ICTSI was not spared from the Asian financial crisis of the 1990s and was forced sell off some of its foreign operations.  A few years after, ICTSI regained its foothold and expanded its foreign presence.

> During the most recent global financial crisis, ICTSI's management drive for debt refinancing and fund-raising made it one of the few Southeast Asian companies that continued to generate revenues.  In fact, New York-based management consulting firm Stern & Stewart cited ICTSI for its resilience.[74]

The true purpose of the self-dealing assignments was to both opportunistically and deceptively cut out others like Plaintiffs and reap the benefits without them.

105.    The ICTSI shares were ERI's legacy—not just the Razons.  The idea of expropriating them is contrary to fundamental principles of corporate governance, jurisprudence, equity, and all common sense.  Even if ERI was illiquid as has been suggested, it was not

---

[74] Business Beyond Borders, Success Story: ICTSI Terminals: Gateways for Opportunities, 1st Edition, May 1, 2015.  Published by the Department of Trade & Industry, Philippines, with the support of USAID.

Page 52 -  COMPLAINT

without assets.[75]  It was asset rich if anything.  Stripping it of the very assets giving it value is

absurd.  Rendering it insolvent is wrong.  Taking it for themselves is unseemly.[76]

106.    ERI's outlook in late 1989 and early 1990 might have been different had the

Razons observed their fiduciary duties and done their best to preserve ERI's assets.  They

potentially could have then, as they have since, sought out other independent capital sources and

borrowed against ERI's ICTSI shares from traditional or non-traditional third-party lenders,

providing the ICTSI shares as collateral pending repayment.[77]  An outside lender would have

been repaid many times over while maintaining ERI's equity interests in the long-term growth

and prosperity of ICTSI.  Apart from borrowing, they also could have sought out additional

equity capital from existing and new investors based upon the substantial value in ERI's ICTSI

shareholding.  Any legitimate recapitalization necessarily would have taken into account all

stockholders' equity and preserved it accordingly.

107.    But that was the point—to circumvent the equity interests of other stockholders in

favor of the Razons alone.  The Razons dominated and manipulated ERI in every respect to their

own advantage.  In the process, they avoided available alternatives and made it virtually

impossible for anyone to protect and preserve their interest.  At all times, they controlled the

flow of and access to information; excluding others from meaningful participation in the

---

[75] Many a company is cash-poor without being bankrupt.  The two are by no means synonymous, although often related.

[76] Why would Razon, Sr. ever be treated as a preferred creditor over the assets of ERI (including the 7.7 million block of ICTSI shares) and allow him to unilaterally expropriate the ICTSI shares in payment of an unspecified amount of salaries?  The law is inapposite.

[77] *See, e.g.* Miguel R. Camus, *ICTSI raises $400M for expansion plans* (Jan. 12, 2018), http://business.inquirer.net/ 243950/ictsi-raises-400m-expansion-plans; Alex Hughes, *Finding Funding* (Jan. 26, 2016), http://www.portstrategy.com/news101/world/south-america/la-funding.

Page 53 - COMPLAINT

decision-making process.  So, Plaintiffs were never informed of the events through which their interests by and through ERI were extinguished.  They were never afforded an opportunity to proffer any alternatives through independent, third-party funding on either a debt or equity basis. And they were never afforded any opportunity to protect and preserve their interests in any recapitalization.  They were just oppressed and unilaterally extinguished altogether in absentia through the conflict-laden series of blatantly self-serving assignments.

### E.    **Pattern and Practice**

108.    The Razons' abuse of ERI and its other principals is evident in other respects as well.  They contemporaneously sacked ERI's former Chief Accountant, Nicolas S. Garzota, for supposedly taking ERI records in a callous effort to not just purge him but deprive him of his retirement benefits.[78]  Garzota started out with ERI when it first won the South Harbor bid in 1966.  Whether forced or otherwise motivated by prevailing circumstances, he put in for retirement in the turmoil of Razons' restructuring after the 1986 Revolution.[79]  The Razons first withheld action on his request pending an audit and then fired him instead without benefits.

109.    The Philippine Supreme Court assailed and condemned the Razons' handiwork on appeal of an equally negative Resolution of the National Labor Relations Commission:

> In the case at bar, petitioners' rejection of the subject claim cannot be justifiably sustained. The reported loss of confidence was due to the disappearance of certain books of account which petitioners directly attributed to private respondent. Petitioners were convinced that simply because private respondent could not produce the needed books on demand, he was no longer worthy of their trust and confidence. They abruptly dismissed him without giving him a chance to explain his side.  **In short, there was not the slightest pretense at fair play.**  Had

---

[78] "[R]etirement pay, loyalty bonus and cash conversion of accrued vacation leave in the total amount of ₱131,400.00."

[79] Garzota subsequently went to work for MARINA when the PPA awarded the management and operation of the arrastre services at the South Harbor to it.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

petitioners been less hasty and conducted an investigation, they would have found out that on November 30, 1982, a fire gutted the western portion of petitioners' warehouse in front of Pier 5, destroying records, books, vouchers and general ledgers. The circumstances surrounding the fire were duly investigated and reported to the Commissioner of Internal Revenue. But whatever documents might have been salvaged from that conflagration were subsequently lost during the flood on July 25, 1985.

The fact that private respondent sought employment elsewhere should not hinder him from claiming his retirement benefits. It is an inexorable fact that at 65 years, he reached the mandatory age for retirement and, therefore, qualified to retire. **We have here an ironic situation where instead of enjoying the fruits of his retirement, private respondent was forced to seek reemployment for his survival. Surely, private respondent does not deserve such a pathetic end to his long and faithful service with petitioners.**

As to the issue of whether petitioner Enrique Razon, Jr. in his capacity as president and majority stockholder should be held solidarily liable with co-petitioner Metroport Services, Inc. for the payment of the disputed retirement claim, we rule in the affirmative. Under Sec. 31 of the Corporation Code, "directors or trustees who willfully and knowingly vote for or assent to patently unlawful acts of the corporation or who are guilty of gross negligence or bad faith in directing the affairs of the corporation . . . shall be liable jointly and severally for all damages resulting therefrom suffered by the corporation, its stockholders or members or other persons." **The manner of dismissal of private respondent by petitioner Enrique Razon, Jr. smacks of high-handedness, caprice and arbitrariness. No regard was given to private respondent's long and faithful service to the corporation, nor opportunity afforded him to explain the loss imputed to him through a properly-conducted investigation. The willingness and alacrity on the part of petitioner Enrique Razon, Jr. to terminate the services of private respondent without taking into consideration private respondent's service to the company and without affording him his right to due process, to our mind, suffice to taint the act complained of with bad faith.**[80]

(emphasis added in bold).

110.    The Philippine Supreme Court separately implicated Razon Jr. in the

misappropriation of ERI's assets at or about the same time. In a revealing turn of events, Razon

Jr. evidently coopted members of the PCGG into allowing him to use ₱5M of ERI's supposedly

---

[80] *Enrique Razon, Jr. v. National Labor Relations Commission*, G.R. No. 80502, 7 May 1990, 185 SCRA 44.

Page 55 -  COMPLAINT

scarce funds for his own personal use.[81]  More anomalous and revealing still, he evidently was able to somehow further avoid being directly charged in connection with the ensuing criminal graft and corruption proceedings against the complicit PCGG members themselves under the Philippine Anti-Graft Law.[82]  He, after all, was both the instigator and beneficiary of the misappropriation.

111.    While accordingly confined in the criminal case to the public officials at hand, the Philippine Supreme Court nevertheless made clear that Razon Jr.: (i) had coopted officials in manipulating the system; and (ii) was guilty of actual or constructive fraud in misappropriating ₱5M from ERI:

> "Here in the instant case, there is no question that the PCGG Commissioners are public officers, **that Enrique Razon, Jr. was given unwarranted benefits and/or advantage** by the approval of his application for P5M by the PCGG Commissioners, **because Enrique Razon was allowed to use company funds for his personal use and there was evident bad faith, there being actual or constructive fraud** because while the application for P5M was approved for the use of Metro Port, the corresponding check was made in the name of Enrique Razon, Jr.[83]

(emphasis added in bold).

112.    Apart from using their institutional dominance to overtly strip ERI and purge its pre-existing principals, the Razons systematically omitted to properly maintain and preserve ERI by preparing, furnishing, and submitting required institutional documentation with applicable

---

[81] Allegedly for the purchase of 100 sewing machines for another controlled entity, Cherokee Apparel Corporation.

[82] Specifically R.A. 3019, Section 3, paragraph (e), wherein the essential elements are: (1) that the accused is a public officer; (2) that as such public officer he caused any undue injury to any party, including the government, or gave any private party unwarranted benefits, advantage, or preference in the discharge of his official administration or judicial functions; (3) that said undue injury to any party, or giving to any party of any unwarranted benefits, advantage or preference was done through manifest partiality, evident bad faith or gross inexcusable negligence.

[83] *Ramon A. Diaz v. Sandiganbayan,* G.R. No. 101202, 8 March 1993, 219 SCRA 675.

Page 56 -  COMPLAINT

regulatory authorities.  While they failed to regularly do so as a matter of course even before supplanting and divesting ERI, they altogether ceased complying with applicable reporting requirements after 1990.  In short, they let it die on the vine through inaction.  In doing so, they further disenfranchised ERI and its shareholders like Plaintiffs.

### F.    Dissolution

113.    On January 12, 1998, the Philippine SEC issued an order and gave notice of hearing on February 20, 1998 to show cause why ERI's Certificate of Registration should not be suspended or revoked in the face of its prolonged reporting noncompliance.  In the absence of any appearances as scheduled, the hearing officer deemed the matter duly submitted for resolution.  On March 28, 2000, ERI's Certificate of Registration was "involuntarily" suspended.  ERI was given 90-days to move to set aside the suspension.  No action was taken by the Razons as controlling principals.

114.    By way of explanation if not justification, it has been conveniently volunteered that "ERI was unable to pursue its business and simply ceased to operate" when "faced with government sequestration of its financial assets and the takeover of its business."  It has been further claimed that ERI's "equipment and other assets which were sequestered by PCGG were sold to pay for separation pay of its employees and claims of other creditors."

115.    But as demonstrated, ERI was not sequestered.  Razon Sr. was.  And ERI also did not simply cease to operate.  ERI served as a founding principal to the formation and development of ICTSI, into which ERI's operational know how, experience, and manpower were then assimilated, and upon which ERI effectively became a non-operating holding company owning approximately 47% of ICTSI.  At all times and in all respects, ERI remained fully endowed with and safeguarded by all the rights and privileges afforded to a juridical entity as a

Page 57 - COMPLAINT

body corporate under the law, including, but not limited to, the rights, obligations, and principles

pertaining to dissolution and liquidation.

116.    Nor as discussed above did ERI have to be raided and left for dead when it had

valuable assets with which to not just survive but prosper as a substantial stakeholder of ICTSI.

The substantial prosperity enjoyed by the Razons because of ICTSI are rightfully ERI's—and by

and through ERI—Plaintiffs'.

117.    In point of fact, under Philippine law, ERI's corporate license allowed it to exist

for 50-years from its date of incorporation on June 22, 1962, or until June 22, 2012.  However,

ERI's franchise license was on information and belief willfully forfeited for failing to file

mandatory reports with the Philippine SEC over several years and despite repeated opportunities

to cure the deficiencies.  ERI's management ignored repeated written demands from the

Philippine SEC to file its reports.  When ERI was then advised by the Philippine SEC that its

license would be revoked, no appearance was made on its behalf in scheduled hearings where it

would have had an opportunity to appeal the impending Philippine SEC closure.  On January 29,

1998, the Philippine SEC, in accordance with procedure, published the impending closure of ERI

in a Philippine newspaper (Malaya).  The Philippine SEC finally revoked ERI's license on

March 28, 2000.  ERI did not appeal its closure.

118.    Closure and liquidation are related but not one and the same with both entailing

formal requirements.  Closure or dissolution officially terminates a corporation's existence.

Liquidation involves the distribution of the corporation's assets in cash or property to its

shareholders in exchange for their shares of stock in the corporation.  As soon as a corporation is

dissolved, stockholders acquire a legal interest over the remaining assets of the corporation.

Page 58 -  COMPLAINT

119.    ERI was dissolved but its assets were never liquidated.  Razon Sr. never undertook to formally liquidate ERI's assets, including the ICTSI shares (and all cash and stock dividends earned).  As Chairman and controlling stockholder of ERI, Razon Sr. is deemed to have held the ICTSI shares in trust for the benefit of ERI stockholders—including MFI.  Rather than adhere to and act accordingly, the Razons circumvented their responsibilities and acted for their own personal benefit by and through their self-dealing assignments to unfairly usurp and otherwise deprive Plaintiffs of their rightful share as a minority stockholder of ERI.

120.    All told, Razon Sr. gained immunity from criminal prosecution.  He also got the former PCGG Chairman's waiver of the government's "ill-gotten wealth" claim against him.  Moreover, he and the Razon family appropriated ERI's entire block of 53,038,674 common shares in ICTSI.  All at Plaintiffs' expense.

121.    By way of quantification, by itself, the block of 7.7 million shares under Razon Sr.'s Personal Deed now amount to 60,810,750 shares or approximately ₱5.4 billion at a price of ₱88.50 per share.[84]  Accordingly, the combined value of Plaintiffs' stake in the stock and cash dividends attributable to the 7.7 million ERI shares in ICTSI is ₱286,681,539.40, or $5,399,761.47.  And that is but one of the four assignments.  Altogether, the combined value of Plaintiffs' stake in the expropriated stock and corresponding cash dividends totals ₱1,974,702,430.10, or $37,194,310.15.

122.    It is on this basis and for these reasons that MFI and its principals demand their proportionate share in the ICTSI shares.  Unfounded, ill-conceived and without legitimate purpose, consideration, notice, disclosure, or authority, the Razons' self-dealing assignments

---

[84] *See infra* fn. 113.

Page 59 -  COMPLAINT

were fundamentally flawed and void *ab initio.* Consequently, ownership over the ICTSI shares (including the right to cash and stock dividends and preemptive rights) remained with ERI in and at all relevant respects and times.[85]

### G.    Evasion

123.    Since first being partly exposed and confronted in 2004, Razon Jr. has repeatedly evaded various efforts to resolve or otherwise impose liability upon him for his acts and omissions.

124.    Without notice of ERI's stockholders' meetings or transactions, Plaintiffs had no way of knowing when the Razons first amalgamated ERI into ICTSI or subsequently assigned ERI's entire block of ICTSI shares to themselves. The amalgamation and assignments were concealed from Plaintiffs then and after. The amalgamation was masked under the auspices of the so-called Razon Group. The assignments were not provided or made part of any public filing with the Philippine SEC or any other governmental body. Plaintiffs had a right and deserved to know their interests in and through ERI were being expropriated by the Razons. But that would be self-defeating when, similar to fronting for Romualdez, the purpose is itself improper.

125.    The Razons instead altogether ignored, physically excluded and otherwise prevented Plaintiffs' access to information in the wake of Plaintiffs' refusal to voluntarily surrender their shares to Razon Sr. so he could then redistribute them to Romualdez. They were aided in their purpose by Judge de Borja's failing health and untimely passing shortly thereafter in 1981. In the resulting vacuum and upset, Plaintiffs were left unaware that they were not just

---

[85] It has been said that since certain of the ICTSI shares were assigned to Razon Sr. prior to ERI's dissolution, Razon Sr. cannot be deemed to have held those specific ICTSI shares in trust. But because the assignments are null and void, ERI never lost ownership over the ICTSI shares. Therefore, ERI continued to be entitled to all cash and stock dividends pertaining to the ICTSI shares.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

ostracized, but altogether stripped of their valuable interest in and through ERI.

126.    Not until late 2004 were Plaintiffs finally made aware of what had happened when copies of the assignments were obtained and given to them by Attorney Vicente B. Chuidian's law partner, Attorney Manuel R. Singsong.[86]  By then, Razon Sr. also had passed away.

127.    Plaintiffs accordingly approached Razon Jr. as an active participant and Razon Sr.'s successor-in-interest, protégé, and accomplice to inquire about and address what had happened to ERI's interests in ICTSI without their knowledge.[87]  In an ironic and questionable turn of events, ERI's erstwhile Corporate Secretary, Attorney Rafael T. Durian, who also happens to have been at all relevant times ICTSI's Corporate Secretary as well, responded as counsel for Razon Jr. by insisting that Plaintiffs first verify their shares of stock:

> Mr. Enrique K. Razon, Jr. referred to us for reply your October 7, 2004 letter on behalf of Makiling Farms, Inc. (MFI) which claims to be a stockholder to the extent of ten percent (10%) equity of E. Razon, Inc. (ERI). We will appreciate your (a) giving us copies of the share certificates covering the alleged ten percent (10%) equity of MFI and (b) recounting to us how MFI came to be a stockholder of the said equity as claimed, before we make a definite response".[88]

Plaintiffs complied as requested despite Atty. Durian's obvious conflict of interest.[89]

---

[86] For clarity, Plaintiffs note the distinction between "Attorney Vicente B. Chuidian" and "Juan T. Chuidian" (referred to as "Chuidian" in this pleading).  Attorney Vicente B. Chuidian was a relative of, and attorney for, Juan T. Chuidian, and represented the Estate of Juan T. Chuidian against Razon Sr. and ERI.  *See supra* fn. 36.

[87] *See* e.g., Letter dated October 7, 2004 attached hereto as Exhibit 6.

[88] *See* e.g., Letter dated October 20, 2004 attached hereto as Exhibit 7.

[89] As ERI's Corporate Secretary, Atty. Durian would have been obligated to ERI itself and not the Razons, and thus barred from taking even a potentially adverse position against ERI. Moreover, Atty. Durian would be further barred from representing one interest against another. At the very least, it presents an appearance of impropriety, as does the fact that he was Corporate Secretary of both ERI and ICTSI at the same time, and thus implicitly knew and imputed one to the other all of the Razons' self-serving and self-dealing actions the same as the Razons

Page 61 -  COMPLAINT

128.    Even then, though, Razon Jr. did not timely, fully, or accurately provide information to Plaintiffs.  Instead, Razon Jr. further contributed to the prevailing confusion and resulting apprehensions by skirting the actual underlying circumstances and feigning ignorance while stringing Plaintiffs along for years under false pretenses.  In particular, at a meeting held at the Manila Golf Club,[90] Plaintiffs' former President, Alfredo R. de Borja, requested a copy of the underlying "Agreement" that is mentioned in Razon Sr.'s Personal Deed.  Another emissary for Razon Jr., Jose Eduardo "Chito" Alarilla, claimed that Razon Jr. did not have any copy of the "Agreement" because it was either lost or destroyed due to the passage of time.

129.    In all, Razon Jr. continued to withhold the actual underlying documents surrounding and supposedly substantiating the suspect assignments, including:

     i.    the 1990 Compromise;

    ii.    other underlying documentation in support of the assignments such as:

        −  promissory notes or similarly typical documents substantiating alleged advances;

        −  employment agreements or other similarly typical documents substantiating alleged salaries or terms of compensation; and

        −  corporate governance records providing appropriate notices, meetings, deliberations, or authorizations documenting or otherwise substantiating the various reasons given for the summarily enacted assignments.

    iii.    proof of payments allegedly advanced or made;

    iv.    underlying case files relating to the various cases supposedly at issue including:

---

themselves, including those involving ERI's illicit amalgamation and stock transfers.  Atty. Durian is no stranger to ethical impropriety.  He was soundly censured and suspended by the Philippine Supreme Court in connection with Razon Sr.'s earlier proceedings against the PPA.

[90] In Makati City, Manila, Philippines.

Page 62 -  COMPLAINT

      –   reported MICT bid disputes and challenges;

      –   the *Plunder Case*;[91]

      –   the *Forex Case*;[92] and

      –   the *PPA Case*;[93]

    v.   underlying correspondence with, deliberations of, and pronouncements by the PCGG, including:

      –   May 29, 1990, PCGG Resolution regarding I.S. No. 0044;

      –   Former PCGG Commissioner's May 22, 1990, Pronouncement (unacted upon); and

      –   PCGG May 29, 1990, Meeting Minutes; and

    vi.   underlying correspondence with, deliberations of, and pronouncements by the Sandiganbayan.

130.     In the absence of actual underlying documentation, Razon Jr. proposed to pay-off

Plaintiffs for initially ₱1 and then ₱2 million, all the while making it appear that:

    i.   ERI itself had been sequestered by the PCGG;

    ii.   ERI itself had been sued by the Sandiganbayan;

    iii.   Razon Sr. accordingly had to negotiate with the PCGG to lift the sequestration over ERI;

    iv.   Razon Sr. accordingly had to further negotiate to have the Sandiganbayan case dismissed against ERI;

    v.   Razon Sr. successfully effected a final agreement with the PCGG to lift the sequestration over ERI;

    vi.   Razon Sr. successfully effected the dismissal of the Sandiganbayan case against ERI;

---

[91] *See supra* fn. 50.

[92] *See supra* fn. 54.

[93] *See supra* fn. 47.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

    vii.    in consideration thereof, Razon Sr. paid the government, through the PCGG, ₱9 million;

    viii.    ERI legally obligated itself to pay and otherwise reimburse open-ended, indefinite and undetermined expenses, advances, and compensation, including:

        –   MICT-related bond, escrows and expenses;

        –   other ERI-related legal fees and expenses over its past concession and associated claims for and against it;

        –   ICTSI capital contribution and publicity-related expenses; and

        –   personal services as Chairman of ERI; and

    ix.    all due notices, deliberations and approvals were accorded to and provided by ERI in relation to such purported obligations and concomitant assignments.

131.    Throughout, the Razons were in a position such that they were required to disclose the whole truth about the underlying facts and circumstances surrounding their assignments of ERI's shares in ICTSI, and not partial truths or make misleading disclosures. The Razons failed and refused to do so.  When the Razons made representations to Plaintiffs, they knew the representations were false and otherwise predicated upon false pretenses, misleadingly incomplete, or made recklessly, as a positive assertion, and without knowledge of its veracity.

132.    Without accurately knowing the underlying facts and associated circumstances, Plaintiffs were left to navigate blind.  They had no way of determining who or what was in fact involved.  Yet they were being asked to decide and just accept in a vacuum that all was above-board based on a self-serving story, resulting in uncertainty and delays.  How could the Razons wipe-out ERI and take everything for themselves to the exclusion of everyone else just when ERI's privately amalgamated stake-hold in ICTSI was flourishing from explosive growth?  Why

Page 64 -  COMPLAINT

were they not told or furnished anything?  And why not attach a copy of the supposed "Agreement" to Razon Sr.'s Deed or, at the very least, incorporate or repeat verbatim each of the salient provisions to provide the factual and legal basis for the assignment of ERI's 7.7 million shares in ICTSI, let alone any underlying information or documentation related to any of the assignments or antecedent amalgamation?

133.    None of it made or makes sense—at least not on the up and up.  However turbulent the times, one does not supposedly preserve a company to then just gut it and run away with the prize on the upside—at least not in good faith.  One also does not do it in secret.  One certainly does not do anything like it in a vacuum without openly and thoroughly considering and pursuing all available options, including possible third-party equity or debt using ICTSI's shares as collateral.  As it appears then and now in purpose and effect, the Razons essentially used their position of dominance to privately foreclose on ERI's ICTSI shares without any of the legally cognizable requirements by way of approved loan documents and security agreements. That did and does not measure up.

134.    Plaintiffs determined under the exigent circumstances to err on the side of caution and further inquire and investigate matters as able.

135.    It was not easy.  Not until January 8, 2016, did Plaintiffs finally learn that the Sandiganbayan, in fact, never:

    i.     issued any order lifting the sequestration over the ERI shares that Razon Sr. had assigned to Romualdez; or

    ii.    approved any agreement between ERI and the PCGG; and

    iii.   dismissed the case against Razon Sr.

The Sandiganbayan certified as much, on January 8, 2016, in response to Plaintiffs' inquiries:

Page 65 - COMPLAINT

REPUBLIC OF THE PHILIPPINES
Sandiganbayan
QUEZON CITY

FOURTH DIVISION

CERTIFICATION*
Re: Civil Case No. 0010
(Republic of the Philippines vs. Alfredo "Bejo" Romualdez, et al.)

This CERTIFIES that: (1) that the Sandiganbayan, Fourth Division, where the above-entitled case is now pending, as well as the Sandiganbayan, First Division, where the above-entitled case was previously pending, have not issued any order/resolution lifting the sequestration issued against E. Razon, Inc. (Metro Port Services, Inc.); and (2) there is no motion filed or agreement on record between E. Razon, Inc. (Metro Port Services, Inc.) and the Presidential Commission on Good Government (PCGG) which "led to the lifting of the sequestration" issued against said corporation.

Issued this 8th day of January 2016 at Quezon City, Philippines, upon the written request of Atty. Alfonso M. Cruz, counsel for Makiling Farms, Inc. (MFI), for whatever legal purpose/s it may serve him.

ATTY. JOFFRE GIL C. ZAPATA
Executive Clerk of Court III
Sandiganbayan, Fourth Division

*    This certification supersedes a similar certification dated December 17, 2015, which erroneously/inadvertently stated that the request for issuance of a certification was made by "Atty. Alfonso M. Cruz, counsel for ERI, Inc. (Metro Port Services, Inc.)."

The Sandiganbayan further previously confirmed as noted in December 17, 2015, that ERI was never a party in the *Plunder Case*:

> Mr. Enrique Razon is one of the impleaded defendants in the above-entitled case, while E. Razon, Inc./Metro Port Services, Inc. is not.[94]

---

[94] *See* Original Resolution of the Sandiganbayan (Fourth Division), attached hereto as Exhibit 8.

Page 66 -  COMPLAINT

136.    Upon learning this, Plaintiffs furnished a copy of the above-reprinted Certification to Razon Jr. with a renewed demand for reparation.[95]  In response, Razon Jr. called for another meeting with Alfredo de Borja at the Manila Golf Club.  At that meeting, Razon Jr.'s emissary, Alarilla, and attorney, Silverio "Benny" Tan, produced a photocopy of the May 22, 1990, Order signed by the former PCGG Chairman (alone and without further conformity or endorsement by the PCGG as a whole).  Evermore suspicious, Plaintiffs insisted upon: (i) a properly authenticated/certified copy of the PCGG Order; and (ii) the "Agreement" mentioned in it.[96]  At or about that point in the meeting, Plaintiffs were offered ₱10,000,000.00 to desist from further action.  The proposal would have required Plaintiffs to assign all MFI's shares in ERI to Razon Jr.

137.    Plaintiffs refused each of the proposals as and when made for the fundamental reasons that: (i) there were more questions than answers; and (2) they all were grossly disproportionate to the value of Plaintiffs' interests in and through ERI.[97]

138.    Having suspended disbelief in the interest of trying but failing to resolve matters amicably, Plaintiffs were left with no alternative but to pursue legal recourse.  Plaintiffs did and do not do so lightly out of respect for the person and position of Razon Jr., who despite disagreement over ERI is given great credit and well-regarded for his many achievements and goodwill.  Plaintiffs thus proceeded quite begrudgingly in March 2016 by enlisting the local

---

[95] *See* letter dated January 14, 2016, attached hereto as Exhibit 9.

[96] Note that there is nothing in the PCGG Order (assuming that it existed) that mentions, even remotely, a ₱9 million payment by Razon Sr. to the PCGG.

[97] *See* letter dated March 28, 2016, attached hereto as Exhibit 10.

Page 67 -  COMPLAINT

prosecutor to bring criminal fraud or *estafa*[98] charges against Razon Jr. in a determined effort to get to the bottom of the underlying facts and circumstances surrounding Razon Sr.'s Personal Deed in particular.[99]  To that end, it was hoped that a public prosecutor might provide a third-party medium through which to examine and assess matters notwithstanding the disagreeable criminal undertone.  The case was decidedly constrained to only Razon Sr.'s Personal Deed because it is demonstrably false and misleading on its face in several material respects even without the 1990 Compromise itself.  Indeed, up to the filing of the July 2016 Complaint, Plaintiffs still had no clue what the referenced "Agreement" in Razon Sr.'s Personal Deed provided.

139.    However much Plaintiffs had wanted and tried to avoid exacerbating the situation while still being determined to pursue their legitimate interests, Razon Jr. understandably took offense and became further entrenched.  He persisted as such in prevaricating and perpetuating an ever-changing stream of wayward claims and contentions while continuing to suppress and otherwise mischaracterize and distort material documents and information.  He thus:

      i.    claimed that Plaintiffs as complete strangers were obligated to produce a copy of the missing "Agreement" even though they had no personality with it before the PCGG and the Razons could and should

---

[98] The crime of estafa under Philippine Revised Penal Code, Art. 315, par. 1(b) provides:

ART. 315. Swindling (estafa). – Any person who shall defraud another by any of the means mentioned hereinbelow:

1. With unfaithfulness or abuse of confidence, namely:

(b) By misappropriating or converting, to the prejudice of another, money, goods, or any other personal property received by the offender in trust or on commission, or for administration, or under any other obligation involving the duty to make delivery of or to return the same, even though such obligation be totally or partially guaranteed by a bond; or by denying having received such money, goods, or other property

[99] *Makiling Farms, Inc. v. Enrique Razon, Jr.,* No. XV-07-INV-lGG-03550.

Page 68 -  COMPLAINT

have not only safeguarded it but attached it to Razon Sr.'s Personal Deed;[100]

    ii.    sought to erroneously shift the burden of proof in virtually every other respect, including proof of the professed authority and consideration for Razon Sr.'s Personal Deed;

    iii.    wrongly questioned the standing of Plaintiffs to pursue their direct and indirect claims on the futile and self-serving premise that only ERI, and hence the Razons as ERI's controlling principal, could do so;

    iv.    proffered the circuitous thesis that the Sandiganbayan's approval is not necessary when successfully negotiating the dismissal of the sequestration case before the Sandiganbayan is an express premise upon which he assigned ERI's 7.7 million ICTSI shares to his father under Razon Sr.'s Personal Deed;

    v.    while finally conceding that ERI was never a party to the PCGG's case before the Sandiganbayan, nevertheless postured that ERI was "subject to an adverse decision … no different from being a defendant in that case";

    vi.    made the ironic contention in conceding that ERI itself was not sequestered that if "in the end only 60% of the company will be affected is no comfort if ERI would be dead business-wise by the time the case is resolved" when he and his father gutted ERI anyhow—in their favor;[101]

    vii.    conflated Razon Sr.'s individual liability in separate proceedings with ERI;

---

[100] Given the importance of the so-called Agreement, not only to Razon, Sr., but to his family and Razon Jr. in particular as the surviving compulsory heir, it is far more likely than not that Razon Jr. not only retained a copy of the Agreement but made sure that he had a duplicate original copy kept in his personal vault or a bank safety deposit box for safe-keeping.

The reason is obvious. The Agreement ostensibly granted immunity from criminal prosecution not only to Razon, Sr., but to the members of his family [including Razon Jr.]. Under the law, when the defendant dies, the estate of the deceased is substituted as the party-defendant in the Sandiganbayan case (Civil Case No. 0010). Naturally, a person with the educational and professional background and business empire as Razon Jr. would have lost no time in ensuring that the Agreement be approved by the Sandiganbayan—but he did not.

Razon Jr. instead consistently claimed that, in view of the passage of time, his copy of the Agreement was either lost or damaged. This is not credible.

[101] What is the point of preserving ERI only to gut it—unless you do so only to preserve and appropriate it for oneself.

Page 69 -  COMPLAINT

viii.    tried to use the concealment of documents and information to time-bar Plaintiffs' claims;

ix.     attempted to again bootstrap ERI "as if" the Sandiganbayan case was dismissed against it when a case cannot be dismissed against a non-party because you cannot dismiss what never existed;

x.      inconsistently switched positions and claimed upon being faced with the disclosure of the 1990 Compromise that it was nevertheless immaterial because of other previously disregarded "multiple considerations" to support Razon Sr.'s Personal Deed;[102]

xi.     persisted in passing off an unauthenticated and unacted upon document signed only by the former PCGG Commissioner as if it were an act of the PCGG as a whole; and

xii.    pretended that the Sandiganbayan had in fact dismissed the PCGG case when it has not.

140.    Through and above it all, Razon Jr. persistently hid behind the missing 1990 Compromise to spin a revisionist story—at least until he could not.  Only when the PCGG unexpectedly produced the 1990 Compromise pursuant to President Duterte's Executive Order did he change his story when it was finally revealed that the 1990 Compromise did not say or do what was claimed.  No wonder that the erstwhile "Agreement" was so indefinitely identified in Razon Sr.'s Personal Deed, much less attached as it could, should, and would have been were it to actually say and do what was claimed.

141.    Was the distortion of facts in Razon Sr.'s Deed deliberate and with full knowledge of the true state of affairs?  As a participant and beneficiary, Razon Jr. cannot credibly feign ignorance.  The 1990 Compromise was concealed, and its actual terms kept secret 26-years for a reason.  Had it been attached, or its contents otherwise revealed, Plaintiffs would have known and been able to act when they first learned of the self-dealing assignments back in

---

[102] Note that it is only the Agreement between Razon, Sr. and the PCGG which states a liquidated amount, *i.e.* ₱9 million.  No monetary value was ever indicated for any other alleged "multiple considerations."

Page 70 - COMPLAINT

2004, and all of the chicanery surrounding it as the basis for Razon Sr.'s Personal Deed would not have been possible and thereby avoided.[103]

142.    Even so, the influence and power of Razon Jr. in general and especially in the Philippines with the explosive success of ICTSI and all that it has in turn enabled Razon Jr. to attain has proven to be a formidable obstacle.  In a real sense, Razon Jr. has made a mockery of the Philippine administrative and judicial system.  But it has served him well all the same. Notwithstanding overwhelming evidence exposing the Razons' misdeeds behind Razon's Sr.'s Deed, the City Prosecutor assigned to Plaintiffs' case succumbed under the weight of the circumstances and neglected to indict Razon Jr. despite his solemn duty to indict all persons who appear responsible for the commission of a crime.

143.    To avoid indicting, the City Prosecutor took pains to disregard incontrovertible incriminating evidence against Razon Jr., not the least that:

     i.      ERI was never sequestered, but rather only the 60% interest of Razon, Sr. in ERI that the PCGG claimed was owned by Romualdez as a crony of Marcos;

     ii.      ERI itself was never liable to the PCGG;

     iii.      ERI did not stand to benefit from the lifting of the sequestration over the 60% shares of Razon, Sr. in ERI;

     iv.      the *Plunder Case* remains pending even now;[104] and

---

[103] As it turns out, the conveniently indefinite and altogether missing "Agreement" was not notarized; was concealed since 1990 from the Office of the Solicitor General ("OSG") representing the Republic of the Philippines before the Sandiganbayan in the *Plunder Case;* and concealed from the Sandiganbayan which is tasked to determine whether the Agreement was grossly disadvantageous to the government.  Indeed, the City Prosecutor surmised that "perhaps" the Agreement was not submitted to the Sandiganbayan because the Agreement itself anticipated that the OSG would oppose the Agreement.

[104] Indeed, the Sandiganbayan only recently set the *Plunder Case* on April 10, 2018, for Preliminary Conference and Marking of Exhibits.  The significance of this is two-fold.  One, the *Plunder Case* has not been dismissed as claimed.  Two, the case is still ongoing over 30-years

Page 71 -  COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

      v.        no less than the Sandiganbayan itself certified that there is no record of any agreement between Razon, Sr. and the PCGG lifting any sequestration under or resulting in any dismissal of the *Plunder Case*.

144.    Only by glossing over and outright ignoring evidence was the City Prosecutor able to stop short of indictment.  Even then, he could only posit that the element of misappropriation was purportedly lacking: "it seems that the element of misappropriation is not supported with enough evidence."[105]  To do that, he necessarily placed form over substance— and fiction before reality—to conjure a result-oriented domino effect in which consideration was presumed, however illusory, to negate the element of misappropriation and prematurely preempt the claim of *estafa*.  All turned thus on the fallacy of consideration.

145.    For that the City Prosecutor turned a blind eye and deaf ear to completely overlook the PCGG's May 29, 1990 Minutes.  Those official minutes confirm in no uncertain terms that the long-obscured Agreement has nothing to do with ERI.  Quite the opposite, those minutes reveal that it was in fact the *Forex Case*—the criminal blackmarketing and salting case against Razon Sr.—that was the subject of dismissal and immunity from criminal prosecution

---

later, underscoring an over-arching problem within the Philippine judicial system.

[105] The elements of *estafa* under Revised Penal Code, Art. 315, par. 1(b) are:

    1) that money, goods or other personal property be received by the offender in trust, or on commission, or for administration, or under any other obligation involving the duty to make delivery of, or to return, the same;

    2) that there be misappropriation or conversion of such money or property by the offender, or denial on his part of such receipt;

    3) that such misappropriation or conversion or denial is to the prejudice of another; and

    4) that there is demand made by the offended party on the offender."

*See e.g., Burgundy Real TV Corporation v. Reyes, et al* G.R. No. 181021, 10 December 2012, 687 SCRA 524.

Page 72 -  COMPLAINT

under the referenced Agreement.  The City Prosecutor thus conveniently side-stepped the pivotal

fact that to the extent that Razon Sr. paid ₱9 million to the PCGG, he did so on his own behalf

for his immunity in connection with an entirely separate action having nothing to do with ERI.

By directly and arbitrarily ignoring reality, the City Prosecutor perpetuated the fiction of

payment having been made for or on behalf of ERI when it was not—and thus conjured up

consideration when there really was none:

> Razon succeeded in having the lifting of the sequestration and freeze Orders of
> the PCGG against [ERI], after complying with the conditions embodied in the
> agreement *such as payment of the subject amount as indicated therein.* Hence,
> the same was not misappropriated. It was used for the intended purpose as
> contained in the AGREEMENT between the People of the Philippines thru the
> PCGG and Enrique Razon. Consequently, the complaint is dismissible for the
> insufficiency of evidence.[106]

146.    Tortured and attenuated to the point of unintelligible as this is, it is compounded

by the City Prosecutor's attendant leap about the Sandiganbayan.  There again he dodged the

undeniable fact that the Sandiganbayan never even saw the 1990 Compromise, let alone

approved it or dismissed the *Plunder Case* as claimed.  In yet another instance of selective

consideration, he proffered that the Sandiganbayan's approval was inconsequential because the

1990 Compromise is silent on it even though Razon's Sr.'s Deed expressly claimed otherwise.

147.    In further insult, the City Prosecutor once again indiscriminately cited the lifting

of the sequestration as proof that Razon's payment of ₱9 million to the PCGG "was used for the

intended purpose as contained in the AGREEMENT."  As amply demonstrated, this is sophistry.

There is nothing on which the City Prosecutor could possibly say or believe that ERI itself was

even a party to the *Plunder Case* much less benefited directly from any lifting of the

---

[106] Note the same careless modality in specifically and consistently referring to an
"agreement" or "AGREEMENT."

Page 73 -  COMPLAINT

sequestration against Razon Sr. and his shares of ERI.  Indeed, the Sandiganbayan's own pronouncements diametrically confirm that: (i) ERI was never impleaded as a defendant in the *Plunder Case*; and (ii) ERI accordingly was never sequestered to begin with.

148.    The City Prosecutor effectively ignored the objective documentary evidence adduced during the proceedings before him to preclude genuine relief in the guise of appearances.  His bewildering order arose, first, from fundamental factual misconceptions and misapplications of law.  Those problems are most evident in the City Prosecutor's legally and factually baseless willingness to equate two entirely separate proceedings to confer consideration, and in his insistent refusal to address the actual factual premises upon and to which the lynchpin "Agreement" was formed and applied.  The City Prosecutor's handling of the procedural aspects surrounding the proceedings and relative burdens of proof further confused matters.  In short, he swallowed Razon Jr.'s story and let him off in every respect.  Razon Jr. was never required to meet his burden.  The City Prosecutor's expansive willingness to equate fiction with reality served to relieve the Razons of the burden to truly establish the most basic legal predicate of contractual consideration.

149.    Contrarily, there is no way that the City Prosecutor could **not** have found probable cause in the face of incontrovertible evidence.[107]  That he did not has more to do with

---

[107] *Burgundy, infra.*at fn. 1055 (misappropriation includes "every attempt to dispose of the property of another without right"):

> The essence of estafa under Article 315, par. 1 (b) is the appropriation or conversion of money or property received to the prejudice of the owner.  The words "convert" and "misappropriate" connote an act of using or disposing of another's property as if it were one's own, or of devoting it to a purpose or use different from that agreed upon.  To misappropriate for one's own use includes not only conversion to one's personal advantage, but also every attempt to dispose of the property of another without right."

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

everything other than justice under the actual objective evidence.  The Razons had no legal right to use ERI's 7.7 million ICTSI shares to "reimburse" Razon Sr. for something that ERI did not owe the PCGG to begin with.  And the City Prosecutor had no basis to whitewash it by pretending that the shares were "used for the intended purpose as contained in the AGREEMENT between the People of the Philippines (sic) thru the PCGG and Enrique Razon."

150.    The City Prosecutor's abject abdication of responsibility under overpowering manipulation and influence amounts to nothing less than an arbitrary denial of justice.   A denial of justice may be caused by a failure to afford access to or otherwise exercise adjudicative jurisdiction where a power to do so exists.  Even when access to justice is thus afforded as here if only in name, justice is still denied absent genuine or effective access to a remedy in relation to violations of rights by either public or private parties.  A right without a remedy is no right at all.  And superficial access without real justice is no access at all.

151.    Plaintiffs have appealed the City Prosecutor's denial of justice to the Philippine Secretary of Justice based upon a patent bias and partiality in favor of Razon Jr., flagrant disregard of overwhelming evidence, and grave abuse of discretion.  The appeal has now been pending for over a year without movement.  What may come of it is uncertain.

152.    What is known is that all previous efforts to resolve matters to date both amicably and through the Philippine legal system have been met with protracted delays, obstruction, arbitrary disregard, and abject denial.  And this is in the context of just part of ERI's expropriated shares under one of the four self-dealing assignments in a criminal context.  Justice delayed is justice denied.  While Plaintiffs are resolved to pursue the appeal of their criminal complaint regarding the Razon Sr. Deed before the Philippine Secretary of Justice, they are resolved as well to pursue civil claims in this Court for each of the four self-dealing assignments

Page 75 -  COMPLAINT

covering all their expropriated interests in and through ERI. Plaintiffs do so in furtherance of a

fair, impartial, timely, and effective forum in which to adjudicate their legitimate claims.[108]

## IV.    TOLLING OF STATUTE OF LIMITATIONS

153.    Under the applicable law, the statutes of limitations for Plaintiffs' causes of action

have not begun to run, have not run, and/or have been tolled due to the following legal principles

and doctrines, among others:

  i.    adverse interest and/or domination;

---

[108] Plaintiffs submit that any additional local action beyond the currently pending criminal proceeding is futile. The Philippine Supreme Court has acknowledged:

> Occasionally, doubts will be raised as to the integrity or impartiality of the foreign court (based, for example, on suspicions of corruption or bias in favor of local nationals), as to the fairness of its judicial procedures, or as to is operational efficiency (due, for example, to lack of resources, congestion and delay, or interfering circumstances such as a civil unrest). In one noted case, [it was found] that delays of 'up to a quarter of a century' rendered the foreign forum... inadequate for these purposes.

*Saudi Arabian Airlines et al*, 746 SCRA 141, *supra* fn. 2. Courts in the United States have likewise found the Philippine judicial system wanting:

> The [US] State Department's report on the Philippines convinces the Court that defendants cannot carry their burden of demonstrating that the Philippines provides an adequate forum in which the parties will not be deprived of all remedies or treated unfairly. **To the contrary, given the situation in the Philippine court system, it appears that there is a very real risk that plaintiffs will be denied basic fairness in the prosecution of their claims. This Court is especially disturbed by the reports of improper relationships between the Philippine courts and corporate litigants, given that the defendants in this case surely represent some of the most powerful corporation doing business in the Philippines.** To the extent that justice delayed is justice denied, it also seems likely that justice is not possible in the Philippines -- plaintiffs' expert testified that their case could take 15 years to wind its way through the court system, and that is consistent with the evidence in this case that in six years, no trial date has been set for the re-filing Delgado plaintiffs.

*Martinez v. Dow Chemical Company,* 219 F. Supp. 2d 719, 740-41 (E.D. La., 2002) (emphasis added). Notably, the *Plunder Case* remains unresolved even now after 30-years. And Razon Jr. and ICTSI are some of the most powerful figures in the Philippines.

Page 76 -  COMPLAINT

    ii.    the discovery rule;

    iii.    fraudulent concealment;

    iv.    equitable estoppel;

    v.    the doctrine of continuing torts;

    vi.    interruption by written demand and/or acknowledgement; and

    vii.    the prohibition against "lulling" by a prospective Defendant.

154.    The information necessary to institute suit is inherently unknowable because those in power and guilty of the alleged misconduct exercise control over the information and have deliberately and persistently denied and concealed the underlying facts and circumstances giving rise to Plaintiffs' claims.  Plaintiffs never received notice of the improper acts and omissions and could not have discovered the actual nature and extent of them through the exercise of reasonable diligence.  Indeed, Plaintiffs were deliberately misled by the Razons and those acting in consort with them as to the true nature and extent of their misdeeds and misappropriation.

155.    The Razons and their accomplices intentionally and persistently concealed their acts and omissions through a concerted and ongoing scheme of nondisclosure and misinformation. This made it all but impossible to detect the convoluted array of internal improprieties giving rise to Plaintiffs' direct and indirect claims.  This is not surprising; after all, it was the Razon's decided purpose and intent to cloak and shield themselves from detection.

156.    Indeed, with respect to the whole convoluted sham regarding Razon Sr.'s Personal Deed, it was not until October 5, 2016 that Plaintiffs finally were able to independently obtain from the PCGG—not Defendants—the actual 1990 Compromise relied upon in support. And it took an Executive Order from President Duterte to do that.  Defendants did not see fit to attach it to Razon Sr.'s Personal Deed as is typical when a document is informed by and relies upon another, especially in the case of transferring assets, be it tangible or intangible.  And all

Page 77 -  COMPLAINT

copies in their possession were said to "have faded, deteriorated, been misplaced, flooded, lost, disposed, destroyed or no longer be found in the ordinary course."[109]

157.    Before President Duterte's Executive Order, nothing was disclosed or even readily identified, and Plaintiffs were not a party themselves to anything and thus had no personality whatsoever with the PCGG itself.  Plaintiffs were thus not yet aware that it was not ERI, but Razon Sr. that was obligated to pay the PCGG.

158.    Because of the fraudulent concealment of material facts, Plaintiffs did not discover, and could not have discovered, through the exercise of reasonable diligence, the true nature of the acts and omissions giving rise to the underlying claims.  Because of the ongoing concealment, the full extent of the scheme is not known even today.  Plaintiffs have only been able to discover what they have through extraordinary effort before this action was filed.  As of the time of filing, the Defendants are still actively obstructing and misleading Plaintiffs.  For these and other reasons, the Defendants are estopped from relying on any statute of limitations in defense of any claims in this action.

## V.    CLAIMS

159.    All claims are plead concurrently, cumulatively and in the alternative.

160.    All conditions precedent either have been performed, have occurred or have been excused.

161.    All claims plead against Razon Jr. are plead against him both directly as an active participant in all relevant respects and indirectly as Razon Sr.'s surviving compulsory heir, successor-in-interest and ultimate beneficiary.

---

[109] *See infra* fn. 64.

Page 78 -  COMPLAINT

162.     All claims plead against Razon Jr. also are plead against ICTSI and ICTSI Oregon on agency, alter ego, and successor liability grounds.

163.     Pursuant to FRCP 44.1, Plaintiffs hereby notify Defendants that all claims should be interpreted as applicable according to the laws of the Republic of the Philippines.

### Claim I:  Actual Fraud
### (Against All Defendants)

164.     Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as if set forth herein.

165.     Plaintiffs owned at least 5% percent of ERI's equity with 8,213 common shares, as of January 22, 1976.  Plaintiffs ownership increased thereafter considering cash and stock dividends earned by these shares.

166.     At all material times alleged herein, the Razons in general and Razon Jr. and Razon Sr. in particular held positions of superiority and influence over ERI and Plaintiffs as ERI's inside management and controlling shareholder group.  As controlling stakeholders, the Razons systematically institutionalized their domination and control while eschewing fundamental policies, practices, and procedures in connection with ERI's corporate governance.

167.     Through inextricably related business entities and by means of false and fraudulent practices and deceptions, misrepresentations, and omissions, the Razons engaged in a concocted and concerted business scheme or artifice to defraud Plaintiffs in connection and association with ERI and ICTSI.  The purpose of the Razons' scheme was to directly and indirectly enrich themselves through new and increased interest and financial advantage at the expense of those like Plaintiffs that the Razons wrongfully and deceptively induced into unknowingly and unwittingly standing by while they (Razons) expropriated their (Plaintiffs) legitimate interests in and through ERI.

Page 79 -  COMPLAINT

168.    As a principal part and in furtherance of the Razons' scheme, Razon Jr.,

separately and together with Razon Sr. and others acting in concert, deceived Plaintiffs by

exploiting the Razons' domination and control over ERI to: ignore, physically exclude and

otherwise prevent Plaintiffs' access to information about or participation within ERI; privately

amalgamate ERI into ICTSI without Plaintiffs' knowledge, participation, or consent; mask

ICTSI's amalgamation under the so-called Razon Group as a means of further disguising ERI's

role from Plaintiffs; unilaterally assign all of ERI's shares in ICTSI from and to himself either

directly or as successor in interest to Razon Sr. without Plaintiffs' knowledge, participation, or

consent; string Plaintiffs along for years thereafter under false pretenses; and effectively sabotage

ERI's continued existence.

169.    The Razons started excluding Plaintiffs from meaningful participation in ERI in

1978 after Plaintiffs' patriarch, Judge de Borja, refused to voluntarily surrender Plaintiffs'

interest in ERI to Razon Sr. in order to help Razon Sr. front Romualdez on behalf of the

Marcoses.  From 1978 forward, the Razons cut Plaintiffs out from any information or activities

involving ERI.  Plaintiffs were not provided any information about ERI or informed of or

allowed to participate in any discussions or meetings involving ERI.  Nor were Plaintiffs

provided any information concerning their interests in ERI.

170.    In late 1987, the Razons further exercised their dominion and control over ERI to

privately amalgamate ERI into ICTSI without Plaintiffs' knowledge, participation, or consent.

Plaintiffs accordingly were not informed and thus unaware that ERI was a founding principal

holding approximately 47% of ICTSI's equity with 28,049,600 of ICTSI's 60,000,000 original

common shares.  Plaintiffs also accordingly were not informed and thus unaware that the number

of common shares that ERI owned subsequently increased to 53,038,674 considering cash and

Page 80 -  COMPLAINT

stock dividends earned.  By extension of their stockholding in ERI, Plaintiffs also owned a legally cognizable interest in and over ERI's block of ICTSI shares.

171.    In late 1989 and early 1990, Razon Jr., separately and together with Razon Sr. and others acting in concert, used their dominant position as ERI's inside management and controlling shareholder to unilaterally expropriate all ERI's 53,038,674 ICTSI shares by means of the four self-dealing assignments previously identified and described above—stripping away ERI's and Plaintiffs' interests in ICTSI.

172.    Plaintiffs were not given any notice whatsoever at the time of any of the four assignments, let alone their self-serving purpose.  Beyond not even giving any notice to Plaintiffs, Razon Jr., separately and together with Razon Sr. and others acting in concert, did not obtain Plaintiffs' informed consent to the Razons' patent conflict of interest, much less advise Plaintiffs of the true nature of the irreconcilable conflict involved.  Rather than take any affirmative actions to provide any notice or disclosure, Razon Jr., acting directly and in concert with Razon Sr. and others, omitted to divulge and affirmatively concealed their transgressions from Plaintiffs.  Even when subsequently caught and confronted, the details of the illicit assignments were never fully disclosed to Plaintiffs or the appropriate authorities.  Rather, Razon Jr. and those aiding and abetting him interposed one pretext after another.  In so doing, Razon Jr., separately and together with Razon Sr. and others acting in concert, deceived and otherwise placed the Razons' interests ahead of ERI and its shareholders, including Plaintiffs.

173.    Apart from omitting to disclose material information, what Razon Jr. and those acting in concert with him did say during and after first amalgamating and then expropriating ERI's interest in ICTSI was equally misleading.  They simply made up what they wanted to suit their purposes.  This includes the misimpressions involving the amalgamation in the first place.

Page 81 -  COMPLAINT

It also includes all the misstatements and misimpressions surrounding Razon Sr.'s Deed and the 1990 Compromise, as well as the unsubstantiated circumstances surrounding each of the Razons' other three self-dealing assignments. In every respect, Razon Jr., separately and together with Razon Sr. and others acting in concert, engaged in revisionist and fictional pronouncements, document drafting, and packaging to rewrite the corporate history associated with the illicit amalgamation and expropriation. Razon Jr. and those aiding and abetting him then persisted in continuing the fraud on ERI and Plaintiffs by continuing to misrepresent the true facts and circumstances.

174.     Razon Jr., separately and together with Razon Sr. and others acting in concert, specifically omitted to disclose the following to Plaintiffs in furtherance of the deceitful scheme:

   i.     the fact or existence of ERI's amalgamation into ICTSI;

   ii.    the fact or existence of ERI's shareholding interest in ICTSI;

   iii.   the amount of ERI's shareholding interest in ICTSI;

   iv.    the absence of appropriate institutional notices and approvals authorizing ERI's amalgamation into ICTSI;

   v.     the fact or existence of each of the four assignments of ERI's ICTSI shares to themselves and two Razon affiliated companies;

   vi.    the self-serving purpose of each of the four assignments;

   vii.   that ERI was effectively being stripped of its ICTSI's shares;

   viii.  the 1990 Compromise;

   ix.    other underlying documentation in support of the assignments such as:

   −   promissory notes or similarly typical documents substantiating alleged advances;

   −   employment agreements or other similarly typical documents substantiating alleged salaries or terms of compensation; and

Page 82 -  COMPLAINT

- corporate governance records providing appropriate notices, meetings, deliberations, or authorizations documenting or otherwise substantiating the various reasons given for the summarily enacted assignments;

 x. proof of payments allegedly advanced or made;

 xi. underlying case files relating to the various cases supposedly at issue including:

- reported MICT bid disputes and challenges;

- the Plunder Case; [110]

- the Forex Case; [111] and

- the PPA Case; [112]

 xii. underlying correspondence with, deliberations of, and pronouncements by the PCGG, including:

- May 29, 1990, PCGG Resolution regarding I.S. No. 0044;

- Former PCGG Commissioner's May 22, 1990, Pronouncement (unacted upon); and

- PCGG May 29, 1990, Meeting Minutes;

 xiii. underlying correspondence with, deliberations of, and pronouncements by the Sandiganbayan;

 xiv. the failure to prepare, furnish, and submit required institutional documentation on behalf of ERI with applicable regulatory authorities;

 xv. the Razons were not acting as ERI's fiduciaries entrusted to ensure that ERI's business and assets are being properly managed and protected; and

 xvi. the Razons instead dominated and manipulated ERI in every respect to their own advantage.

---

[110] *See supra* fn. 50.

[111] *See supra* fn. 54.

[112] *See supra* fn. 47.

Page 83 - COMPLAINT

175.    Moreover, Razon Jr., separately and together with Razon Sr. and others acting in concert, also specifically misrepresented the following to Plaintiffs, both orally and in writing, in furtherance of the deceitful scheme:

i.    The Razon Group rather than ERI was involved in the formation of ICTSI;

ii.    ERI itself had been sequestered by the PCGG when only the 60% share of ERI that Razon Sr. had earlier given to Romualdez was sequestered;

iii.    ERI itself had been sued by the Sandiganbayan when only Razon Sr. was individually sued;

iv.    Razon Sr. had to negotiate with the PCGG to lift the sequestration over ERI when ERI was not sequestered;

v.    Razon Sr. had to further negotiate to have the Sandiganbayan case dismissed against ERI when there was never a case against ERI;

vi.    Razon Sr. successfully effected a final agreement with the PCGG to lift the sequestration over ERI when ERI was never sequestered;

vii.    Razon Sr. successfully effected the dismissal of the Sandiganbayan case against ERI when there was never any case against ERI;

viii.    the Sandiganbayan dismissed the Plunder Case when it is still pending;

ix.    in consideration of the dismissal of the Sandiganbayan case against ERI, Razon Sr. paid the government, through the PCGG, ₱9 million when there was never any case filed against ERI to begin with;

x.    the PCGG approved the 1990 Compromise when the PCGG did not sign off on the 1990 Compromise—only the former Commissioner did;

xi.    the 1990 Compromise involved ERI when it had nothing to do with ERI but rather Razon Sr.'s payment to the PCGG for immunity from criminal prosecution and a release from liability in connection with the Forex Case;

xii.    ERI legally obligated itself to pay and otherwise reimburse open-ended, indefinite and undetermined expenses, advances and compensation, including:

–    MICT-related bond, escrows, and expenses;

Page 84 -  COMPLAINT

- other ERI-related legal fees and expenses over its past concession and associated claims for and against it;

- ICTSI capital contribution and publicity-related expenses; and

- personal services as Chairman of ERI.

xiii.    all due notices, deliberations and approvals were accorded to and provided by ERI in relation to such purported obligations and concomitant assignments;

xiv.    corporate governance policies, practices, and procedures were properly instituted for and implemented on behalf of ERI;

xv.    institutional documentation was properly prepared, furnished, and submitted on behalf of ERI with applicable regulatory authorities; and

xvi.    the Razons were acting at all relevant times as ERI's fiduciaries entrusted to ensure that ERI's business and assets are being properly managed and protected.

176.    The actions, representations and omissions described and delineated were made intentionally, recklessly, and negligently to expropriate by transfer and concealment all the interests of ERI and its minority shareholders like Plaintiffs for the exclusive benefit of Razon Jr. and his relations by and through ICTSI and its progeny.

177.    The actions, representations, and omissions described and delineated are all attributable to Razon Jr. as a direct and active participant, accomplice, and successor-in-interest to and beneficiary of Razon Sr. and others acting in concert.

178.    The actions, representations, and omissions described and delineated also are imputed from and through Razon Jr. to ICTSI and ICTSI Oregon as the direct and indirect product, extension, and successor-in-interest to and beneficiary of Razon Jr. and his relations. Razon Jr. directly and indirectly gained these businesses by improperly usurping ERI's corporate opportunities and interests in the first place, and by diverting ERI's corporate assets to his own uses in order to usurp those opportunities and interests.

Page 85 -  COMPLAINT

179.    Razon Jr. and his father controlled ERI.  They exercised their control to expropriate to themselves all the interests of ERI and its other shareholders in a two-step scheme. First, they privately amalgamated ERI into newly formed ICTSI as part of a stock transaction that left ERI holding shares in ICTSI.  Not only did they not offer the opportunity to ERI, they also used ERI's assets and resources in effecting their amalgamation and creating ICTSI and, by extension, its progeny including ICTSI Oregon.  They then privately transferred all ERI's shares in ICTSI to themselves, purporting to reimburse and otherwise compensate themselves for unsubstantiated and illusory fees and services supposedly extended on behalf of ERI when ERI itself received no benefits from any of the funds or services.  Acting together as one and the same with ERI and ICTSI alike in taking from one and giving to the other and themselves, the Razons' separate and collective knowledge and actions are imputed between and amongst themselves and ICTSI and its local proxy ICTSI Oregon.

180.    The fraud committed by amalgamation and transfer injured ERI and its other shareholders including Plaintiffs, who sue for those damages resulting from the injuries to their proportionate interest in ERI.

181.    Based on official public records of the Philippine Stock Exchange, Plaintiffs seek damages equal to the current market value of the expropriated stock and cash dividends therefrom, together with interest, as follows:

    i.     inclusive of ICTSI's stock dividends between 1992 and 1999, ERI's original 53,038,674.00 ICTSI shares now equate to 418,872,928.00 shares;

    ii.    Plaintiffs' 5% interest in and through ERI is thus equivalent to 20,943,636.40 ICTSI shares;

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

    iii.    as of June 12, 2018, ICTSI's share price was ₱88.50[113];

    iv.    applying ICTSI's share price of ₱88.50 to Plaintiff's equivalent interest in 20,943,636.40 ICTSI shares totals ₱1,853,512,706.40 in equivalent share value;

    v.    furthermore, between 1993 and 2015, cash dividends totaling ₱2,423,794,474.00 were paid by ICTSI in relation to ERI's block of ICTSI shares;

    vi.    Plaintiffs 5% share of such cash dividends equals ₱121,189,724.00;

    vii.    the combined value of Plaintiffs' stake in the stock and cash dividends accordingly totals ₱1,974,702,430.10, or $37,194,310.15.[114, 115]

182.    In as much as Plaintiff's foregoing damages figure of $37,194,310.15 is limited to 5% of ERI's equity interests, Plaintiffs further reserve the right to adjust it as appropriate to the extent that Plaintiffs are determined to own 10% of ERI's equity, effectively doubling the amount provided.

---

[113] As of and pursuant to the applicable share price for ICT:PM at market close on June 12, 2018. *See, e.g.* https://www.bloomberg.com/quote/ICT:PM and https://quotes.wsj.com/PH/ICT (last visited June 12, 2018).

[114] As of and pursuant to the applicable exchange rate on June 12, 2018.

[115] By way of curiosity, the figures related to just Razon Sr.'s Personal Deed are:

  (i)    after and including stock dividends occurring between 1992 and 1999, ERI's 7.7 million ICTSI shares increased to 60,810,750.00 shares;

  (ii)    Plaintiffs' 5% stake is thus equivalent to 3,040,537.50 shares;

  (iii)    based upon a June 12, 2018 share price of ₱88.50, those 3,040,537.50 shares are valued at ₱269,087,568.75;

  (iv)    furthermore, between 1993 and 2015 cash dividends totaling ₱351,879,413.00 were paid in relation to ERI's 7.7 million ICTSI shares;

  (v)    Plaintiffs likewise seek their 5% share of those cash dividends amounting to ₱17,593,970.65;

  (vi)    the combined value of Plaintiffs' stake in the stock and cash dividends attributable to the 7.7 million ERI shares in ICTSI is ₱286,681,539.40, or $5,399,761.47 as of June 12, 2018.

Page 87 - COMPLAINT

183.    All Defendants are jointly and severally liable for Plaintiffs' damages hereunder.

## Claim II:  Constructive Fraud
### (Against All Defendants)

184.    Plaintiffs repeat and allege each and every allegation contained in the above

paragraphs as if set forth herein.

185.    Razon Jr., separately and together with Razon Sr. and others acting in concert,

committed constructive fraud on ERI and its minority shareholders like Plaintiffs by their

conflicted and disloyal misuse of ERI to their own advantage and improper benefit.  Without

limitation, Razon Jr. and his father and others acting in concert committed constructive fraud by

negligently, recklessly, or intentionally misrepresenting, both affirmatively and by omission, the

true nature and extent of their interests and activities with respect to ERI and ICTSI and the illicit

amalgamation and assignments by and between them.  They altogether failed to disclose and

otherwise masked ERI's involvement with and investment in ICTSI, and thereafter failed to

disclose and otherwise disguised and concealed their expropriation of ERI's interest in ICTSI.

They further excluded and otherwise failed throughout to provide true and timely information to

Plaintiffs as legitimate stakeholders in ERI and ICTSI, and failed to effectively, fairly, and

impartially conduct themselves for the benefit of ERI by, among other things:

   i.    subverting their inside management and controlling position in such a
         manner to displace their true principals in ERI and Plaintiffs;

   ii.   failing to properly disclose the true financial condition of ERI at all
         relevant times both before and after ERI's transformation;

   iii.  failing to keep Plaintiffs informed of significant changes in
         circumstances that would have impacted Plaintiffs' interests;

   iv.   failing to invite, consider, or explore prospective alternative financial
         resources and assistance;

   v.    suppressing information both before and after ERI's transformation;

   vi.   institutionalized and systematic looting of ERI;

Page 88 -  COMPLAINT

vii.    improperly diverting funds both before and after ERI's transformation;

viii.    orchestrating and masking ERI's amalgamation in ICTSI;

ix.    orchestrating and covering up the illicit stock scam;

x.    failing to act in Plaintiffs' best interest with respect to themselves (the Razons);

xi.    acting in bad faith in favor of their own financial interests and entrenched positions;

xii.    acting in bad faith and in reckless disregard for the interest of Plaintiffs; and

xiii.    failing to maintain ERI in good standing by properly preparing, furnishing, and submitting institutional documentation on behalf of ERI with applicable regulatory authorities.

186.    In sum, Razon Jr., separately and together with Razon Sr. and others acting in concert, failed in all important respects to manage the business and affairs of ERI and its related and affiliated interests in the legally required manner.

187.    The actions and failures to act by Razon Jr. and his father and others acting in concert were premised, in part, on their self-interested violation of Plaintiffs' confidences and exploitation of the gap between them and Plaintiffs regarding ERI's direction and control and the distorted picture of ERI they sought to create and exploit.

188.    The actions and failures to act had a tendency to deceive others, including the Plaintiffs.

189.    Moreover, the deceptions fostered by the actions and failures to act by Razon Jr. and his father and others acting in concert injured serious and important public interests concerning principles of corporate governance and the integrity of the regulatory system under which entities are formed and exist in the Philippines and the United States, which public interests are reflected in numerous criminal and civil statutes, regulations, and common law decisions seeking to insure that the disclosures and conduct of entities like ERI and ICTSI and its

Page 89 - COMPLAINT

progeny are timely, accurate, and complete, and that insiders do not omit or misrepresent material facts for their own benefit.

190.    The actions and failures to act are contrary to fundamental principles of corporate governance, regulatory oversight, jurisprudence, equity, and common sense.  Even if amalgamating ERI into ICTSI made sense at the time, doing it unilaterally and in secret and by disguise is indefensible.  Subsequently stripping ERI of the interest it assumed in ICTSI just when ICTSI blossomed is absurd.  Taking it for themselves is disgraceful.  Nevertheless, it is what Razon Jr. and his father and others acting in concert did and thereafter perpetuated.

191.    The actions and failures to act are all attributable to Razon Jr. as a direct and active participant, accomplice, and successor-in-interest to and beneficiary of Razon Sr. and others acting in concert.

192.    The actions and failures to act also are imputed from and through Razon Jr. to ICTSI and ICTSI Oregon as the direct and indirect product, extension, and successor-in-interest to and beneficiary of Razon Jr. and his relations.

193.    The constructive fraud injured ERI and its minority shareholders like Plaintiffs, who sue for those damages resulting from the injuries to their proportionate interest in ERI.

194.    Plaintiffs seek damages equal to the current market value of their proportional interest in the expropriated stock, together with interest, all as set forth above.

195.    All Defendants are jointly and severally liable for Plaintiffs' damages hereunder.

### Claim III:  Breach of Fiduciary Duty
### (Against All Defendants)

196.    Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as if set forth herein.

Page 90 -  COMPLAINT

197.    Razon Jr., separately and together with Razon Sr. and others acting in concert, stood in a fiduciary relationship with Plaintiffs.  As ERI's controlling shareholder, Razon Jr. and his father and others acting in concert owed ERI and Plaintiffs fiduciary duties of care, obedience, loyalty, disclosure, and good faith.

198.    By their intentional or reckless failure to properly inform Plaintiffs, their abdication of their duties to refrain from and properly disclose their own misconduct, including several self-serving insider transactions, Razon Jr. and his father and others acting in concert engaged and participated in breaches of fiduciary duty through their wrongful conduct by overt acts, inaction and/or failure to disclose the wrongdoing perpetrated by them.

199.    Razon Jr., separately and together with Razon Sr. and others acting in concert, more specifically breached their fiduciary duty to Plaintiffs by, among other things:

    i.    subverting their inside management and controlling position in such a manner to displace their true principals in ERI and Plaintiffs;

    ii.    failing to properly disclose the true financial condition of ERI at all relevant times both before and after ERI's transformation;

    iii.    failing to keep Plaintiffs informed of significant changes in circumstances that would have impacted Plaintiffs' interests;

    iv.    failing to effectively, fairly, and impartially operate ERI while it was in financial distress;

    v.    failing to invite, consider or explore prospective alternative financial resources and assistance;

    vi.    suppressing information both before and after ERI's transformation;

    vii.    institutionalized and systematic looting of ERI;

    viii.    improperly diverting funds both before and after ERI's transformation;

    ix.    orchestrating and masking ERI's amalgamation in ICTSI;

    x.    orchestrating and covering up the illicit stock scam;

    xi.    failing to act in Plaintiffs' best interest with respect to themselves (the Razons);

Page 91 -  COMPLAINT

xii.    acting in bad faith in favor of their own financial interests and entrenched positions;

xiii.   acting in bad faith and in reckless disregard for the interest of Plaintiffs;

xiv.    improperly negotiating and/or approving compensation packages for insiders;

xv.     failing to maintain ERI in good standing by preparing, furnishing, and submitting institutional documentation on behalf of ERI with applicable regulatory authorities; and

xvi.    their own wrongful conduct, inaction, and/or affirmative cover-up and/or failure to disclose the wrongdoing.

200.    ERI's reportedly poor financial state by late 1989 might have been very different had Razon Jr. and his father and others acting in concert observed their fiduciary duties and done their best to preserve ERI's assets. They might then as they have since sought out alternative independent capital sources from which to borrow against ERI's ICTSI shares. They also might have then sought out additional independent equity capital from existing and new investors based upon the substantial value in ERI's ICTSI shareholding. In either case, any legitimate recapitalization necessarily would have taken into account all stockholders' equity and preserved it accordingly.

201.    Instead, in 1989 and 1990, as in the years before and after, the Razons and those aiding and abetting them relentlessly looted ERI—depriving it of the ICTSI shares, cash, real and personal property, other assets, and business opportunities, simply because it suited them to do so, and because it satisfied their self-serving greed.

202.    The Razons and those aiding and abetting them dominated and manipulated ERI in every respect, always to their own advantage. At all times, they controlled the flow of and access to information, precluded participation by others in the decision-making process, and avoided alternatives that did not suit their self-serving interests.

Page 92 -  COMPLAINT

203.    ERI basically functioned as the Razons' private piggy bank, as they, year after year misappropriated ERI-owned monies or assets for their own personal benefit.  In most instances, they did so with the active help of other cohorts.  In virtually every instance Attorney Durian assisted in covering up their misappropriations.

204.    At all relevant times, Razon Jr., separately and together with Razon Sr. and others acting in concert oppressed ERI's minority shareholders like Plaintiffs and altogether extinguished their interests in absentia through the illicit amalgamation and assignments.

205.    The acts and omissions described and delineated are all attributable to Razon Jr. as a direct and active participant, accomplice, and successor-in-interest to and beneficiary of Razon Sr. and others acting in concert.

206.    The acts and omissions also are imputed from and through Razon Jr. to ICTSI and ICTSI Oregon as the direct and indirect product, extension, and successor-in-interest to and beneficiary of Razon Jr. and his relations.

207.    The misappropriated ERI assets and/or monies were misappropriated by or in favor of Razon Jr. himself or as proxy, principal, and successor in interest.

208.    The described and delineated breaches of fiduciary duty proximately caused injury.  As a direct and proximate result of this harm, substantial damages were incurred by ERI and Plaintiffs, who sue for those damages resulting from the injuries to their proportionate interest in ERI.

209.    Plaintiffs seek damages equal to the current market value of their proportional interest in the expropriated stock, together with interest, all as set forth above.

210.    All Defendants are jointly and severally liable for Plaintiffs' damages hereunder.

Page 93 -  COMPLAINT

### Claim IV:  Breach of the Duty of Good Faith and Fair Dealing
### (Against Defendant Razon Jr.)

211.     Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as if set forth herein.

212.     As ERI's controlling shareholder and inside management, Razon Jr. and his father and others acting in concert owed ERI and Plaintiffs a duty of good faith and fair dealing.

213.     By virtue of Razon Jr.'s wrongful acts and failures to act, Razon Jr. has breached and continues to breach the duty of good faith and fair dealing it owes to ERI and Plaintiffs. Razon Jr.'s actions and omissions are and have been intentional, willful, wanton, malicious, and committed in flagrant mockery of applicable legal standards without justification or excuse.

214.     On information and belief, rather than abide the express good faith edict as ordained by well-established legal principles, Razon Jr. and his agents, including, in particular, Rafael T. Durian, ERI's Corporate Secretary at all relevant times, openly perverted it as a means of avoiding what it was meant to ensure.

215.     As a direct and proximate result of Razon Jr.'s failure to comply with his good faith commitment, substantial damages were incurred by ERI and Plaintiffs, who sue for those damages resulting from the injuries to their proportionate interest in ERI and by extension ICTSI and its related entities including ICTSI Oregon.

216.     Plaintiffs seek damages equal to the current market value of their proportional interest in the expropriated stock, together with interest, all as set forth above.

### Claim V:  Negligence/Gross Negligence
### (Against All Defendants)

217.     Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as if set forth herein.

Page 94 -  COMPLAINT

218.    As ERI's controlling shareholder and inside management, Razon Jr. and his father and others acting in concert owed ERI and Plaintiffs a duty of due care.

219.    Razon Jr., separately and together with Razon Sr. and others acting in concert, breached that duty of due care in all respects described and delineated above.

220.    The acts and omissions described and delineated are all attributable to Razon Jr. as a direct and active participant, accomplice, and successor-in-interest to and beneficiary of Razon Sr. and others acting in concert.

221.    The acts and omissions also are imputed from and through Razon Jr. to ICTSI and ICTSI Oregon as the direct and indirect product, extension, and successor-in-interest to and beneficiary of Razon Jr. and his relations.

222.    By reason of the breaches of the duty of due care, substantial damages were incurred by ERI and Plaintiffs, who sue for those damages resulting from the injuries to their proportionate interest in ERI.

223.    The acts and omissions described and delineated were not only negligently committed but were done with that entire want of care that would raise the belief that the actions and/or omissions were done with conscious or knowing indifference to Plaintiffs' rights and welfare.

224.    Plaintiffs seek damages equal to the current market value of their proportional interest in the expropriated stock, together with interest, all as set forth above.

225.    All Defendants are jointly and severally liable for Plaintiffs' damages hereunder.

### Claim VI:  Negligent Misrepresentation
### (Against All Defendants)

226.    Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as if set forth herein.

Page 95 -  COMPLAINT

227. As described and delineated above, Razon Jr., separately and together with Razon Sr. and others acting in concert, supplied false and misleading information, both orally and in writing, and both affirmatively and by and omission of material facts, concerning ERI and ICTSI when Razon Jr. and his father and others acting in concert had a pecuniary interest and knew Plaintiffs had entrusted Plaintiffs' interests in ERI to Razon Jr. and his father and would necessarily be dependent upon and accordingly be guided by and rely upon the false and misleading information to their substantial detriment.

228. More specifically, Razon Jr. and his father and others acting in concert participated in supplying at least the following false and misleading representations:

    i.     the Razon Group rather than ERI was involved in the formation of ICTSI;

    ii.     ERI was defunct and ceased to exist or possess any assets in the aftermath of the Marcos regime and ICTSI's formation in 1987 when ERI held shares of ICTSI;

    iii.     Plaintiffs' interests in ERI had been legitimately superseded and otherwise extinguished in any event;

    iv.     ERI itself had been sequestered by the PCGG when only the 60% share of ERI that Razon Sr. had earlier given to Romualdez was sequestered;

    v.     ERI itself had been sued by the Sandiganbayan when only Razon Sr. was individually sued;

    vi.     Razon Sr. had to negotiate with the PCGG to lift the sequestration over ERI when ERI was not sequestered;

    vii.     Razon Sr. had to further negotiate to have the Sandiganbayan case dismissed against ERI when there was never a case against ERI;

    viii.     Razon Sr. successfully effected a final agreement with the PCGG to lift the sequestration over ERI when ERI was never sequestered;

    ix.     Razon Sr. successfully effected the dismissal of the Sandiganbayan case against ERI when there was never any case against ERI;

    x.     the Sandiganbayan dismissed the Plunder Case when it is still pending;

    xi.     in consideration of the dismissal of the Sandiganbayan case against

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

ERI, Razon Sr. paid the government, through the PCGG, ₱9 million when there was never any case filed against ERI to begin with;

xii. the PCGG approved the 1990 Compromise when the PCGG did not sign off on the 1990 Compromise—only the former Commissioner did;

xiii. the 1990 Compromise involved ERI when it had nothing to do with ERI but rather Razon Sr.'s payment to the PCGG for immunity from criminal prosecution and a release from liability in connection with the Forex Case;

xiv. ERI legally obligated itself to pay and otherwise reimburse open-ended, indefinite and undetermined expenses, advances and compensation, including:

- MICT-related bond, escrows, and expenses;

- other ERI-related legal fees and expenses over its past concession and associated claims for and against it;

- ICTSI capital contribution and publicity-related expenses; and

- personal services as Chairman of ERI;

xv. all due notices, deliberations, and approvals were accorded to and provided by ERI in relation to such purported obligations and concomitant assignments;

xvi. corporate governance policies, practices, and procedures were properly instituted for and implemented on behalf of ERI;

xvii. institutional documentation was properly prepared, furnished, and submitted on behalf of ERI with applicable regulatory authorities; and

xviii. the Razons were acting at all relevant times as ERI's fiduciaries entrusted to ensure that ERI's business and assets are being properly managed and protected.

229.    Razon Jr. and his father and others acting in concert anticipated the described and delineated information would be provided to Plaintiffs to rely upon in connection with Plaintiffs' interests in ERI, and in fact intentionally or negligently communicated the information with that belief.

Page 97 - COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

230.    Razon Jr. and his father and others acting in concert failed to exercise reasonable care or competence in obtaining or communicating the false information to Plaintiffs.

231.    Plaintiffs justifiably relied on such false information.  Plaintiffs' reliance was especially justified given the Razons' inside dual role as ERI's management and controlling shareholder, which imposed elevated disclosure and candor obligations upon the Razons.  If the Razons had provided accurate and timely information in connection with the described and delineated misrepresentations, Plaintiffs could have avoided or minimized material losses they suffered in reliance on the falsehoods statements.

232.     The acts and omissions described and delineated are all attributable to Razon Jr. as a direct and active participant, accomplice, and successor-in-interest to and beneficiary of Razon Sr. and others acting in concert.

233.    The acts and omissions also are imputed from and through Razon Jr. to ICTSI and ICTSI Oregon as the direct and indirect product, extension, and successor-in-interest to and beneficiary of Razon Jr. and his relations.

234.    As a direct and proximate result of the false information, substantial damages were incurred by ERI and Plaintiffs, who sue for those damages resulting from the injuries to their proportionate interest in ERI.

235.    In supplying the false information to Plaintiffs, Defendants were knowingly and consciously indifferent to the rights and welfare of Plaintiffs.

236.    Plaintiffs seek damages equal to the current market value of their proportional interest in the expropriated stock, together with interest, all as set forth above.

237.    All Defendants are jointly and severally liable for Plaintiffs' damages hereunder.

Page 98 - COMPLAINT

## Claim VII:  Unjust Enrichment
### (Against Defendant Razon Jr.)

238.    Plaintiffs repeat and allege each and every allegation contained in the above

paragraphs as if set forth herein.

239.    Plaintiffs possessed the following rights as ERI shareholders:

[F]irst, to have a certificate or other evidence of his status as stockholder issued to him; second, to vote at meetings of the corporation; third, to receive his proportionate share of the profits of the corporation; **and lastly, to participate proportionately in the distribution of the corporate assets upon the dissolution or winding up.**  (Purdy's Beach on Private Corporations, sec. 554) (*Pascual v. Del Saz Orozco,* 19 Phil. 82, 87).

(emphasis added).

240.    As described, Razon Jr. and his father controlled ERI.  They exercised their

control to surreptitiously expropriate to themselves all the interests of ERI and its other

shareholders in a two-step scheme.  First, they privately amalgamated ERI into newly formed

ICTSI as part of a stock deal that left ERI holding shares in ICTSI.  Not only did Razon Jr. and

his father and others acting in concert omit to inform Plaintiffs or otherwise offer the opportunity

to ERI and its principals, they also used ERI's assets and resources in effecting their

amalgamation and creating ICTSI and, by extension, its progeny including ICTSI Oregon.

241.    As a result of ERI's amalgamation in ICTSI, ERI owned 53,038,674 ICTSI shares

which are now worth ₱1,974,702,430.10, or $37,194,310.15, considering the cash and stock

dividends earned by these shares since 1992.  Plaintiffs were not made aware of ERI's interest in

ICTSI.  Indeed, Plaintiffs were led to believe that ERI had no involvement with ICTSI.

242.    Upon ERI's amalgamation in ICTSI Razon Jr. and his father and family did not

own ERI's ICTSI shares.  The ICTSI shares were ERI's legacy—not the Razons.  The ICTSI

shares were owned by ERI and MFI and MFI's principals had a proportionate interest in and

Page 99 -  COMPLAINT

over these shares.

243.    Razon Jr. and his father and others acting in concert set about to change this and complete their two-step scheme by ostensibly transferring all ERI's shares in ICTSI to themselves and two affiliated companies through the stock scam involving the four illicit assignments orchestrated entirely by and through them and their accomplices on the false pretense of reimbursing and otherwise compensating themselves for unsubstantiated and illusory fees and services supposedly extended on behalf of ERI when ERI itself received no benefits from any of the funds or services.

244.    The assignments were a sham to complete the expropriation of ERI's interests in ICTSI.  The product of ill-conceived self-dealing, all four assignments violate fundamental principles of law and corporate governance.  All are the epitome of fraudulent self-dealing transfers.  All were done in secret without notice to, knowledge of, or consent by Plaintiffs.   All were done after ERI had been rendered a nonoperational holding company with other assets and reportedly insolvent or at least within the zone of insolvency.  And all were, in whole or in part: predicated upon demonstrably false pretenses; fundamentally unauthorized; ultra vires; without any or sufficient consideration; and ostensibly made to deceive MFI and other similarly situated stockholders.

245.    Designed with the improper purpose of completing the expropriation of all ERI's interests by Razon Jr. and his father and others acting in concert, there is no just reason to respect the integrity of the assignments.  Razon Jr. and his father and others acting in concert should not be allowed to exercise their control to unilaterally expropriate ERI's interests for themselves in private and leave nothing more than an empty corporate shell unable to satisfy its legitimate obligations.

Page 100 -  COMPLAINT

246.    Further to ERI's contrived demise, Razon Jr. and his father and others acting in concert willfully forfeited ERI's corporate franchise by failing to file mandatory reports with the Philippine SEC over several years and despite repeated opportunities to cure the deficiencies. ERI accordingly was forcibly dissolved administratively.  ERI was never liquidated as required, though.  Instead, Razon Jr., separately and together with Razon Sr. and others acting in concert, expropriated ERI's assets to themselves and their affiliates.  This includes amalgamating ERI into ICTSI in the first place.  It also includes then transferring all ERI's ICTSI stock to themselves.  Had ERI been liquidated as required, Plaintiffs might have been alerted to the expropriation of ERI's interests through the illicit amalgamation and assignments.

247.    As described, Razon Jr. is and has been at all relevant times and in all relevant respects an extension of Razon Sr. as Razon Sr.'s protégé, accomplice, successor in interest, and beneficiary.

248.    As further described, Razon Industries and Sureste Realty also are mere conduits or instrumentalities through which Razon Jr. and his father and those acting in concert are the real parties in interest.

249.    As the direct and indirect successor in interest to ERI's shares in ICTSI, Razon Jr. is the ultimate beneficiary of ERI's expropriated shares in ICTSI.

250.    Razon Jr. realized the benefits of ERI's shares in ICTSI; however, Razon Jr.'s retention of that benefit attributable to Plaintiffs' proportionate interest in ERI would be inequitable as a matter of law under the circumstances.

251.    Plaintiffs seek damages equal to the current market value of their proportional interest in the expropriated stock, together with interest, all as set forth above.

Page 101 -  COMPLAINT

## Claim VIII:  Conversion
### (Against Defendant Razon Jr.)

252.    Plaintiffs repeat and allege each and every allegation contained in the above

paragraphs as if set forth herein.

253.    Plaintiffs were the proper owners of their proportional interest in ERI, and by and

through ERI in ICTSI and ICTSI's related entities.  Through their fraudulent scheme, Razon Jr.

and his father and others acting in concert wrongfully expropriated or converted Plaintiffs'

proportional interest in ICTSI by and through ERI.  Plaintiffs have been injured by the improper

taking and disposition of their rightful interests.

254.    As a direct and proximate result of the conversion, substantial damages were

incurred by ERI and Plaintiffs, who sue for those damages resulting from the injuries to their

proportionate interest in ERI.

255.    Plaintiffs seek damages equal to the current market value of their proportional

interest in the expropriated stock, together with interest, all as set forth above.

## Claim IX:  Misappropriation of Business Value
### (Against All Defendants)

256.    Plaintiffs repeat and allege each and every allegation contained in the above

paragraphs as if set forth herein.

257.    As described and delineated, Razon Jr., separately and together with Razon Sr.

and others acting in concert, deprived, usurped, and eroded Plaintiffs' interests relative to ERI

and to ICTSI by and through ERI.  Razon Jr. and his father and others acting in concert exercised

their dominion and control over ERI to disenfranchise ERI and its shareholders by shuttering

ERI while usurping its business interests and resources in favor of newly formed ICTSI without

properly providing applicable opportunities to ERI itself.  Any number of alternatives means of

Page 102 -  COMPLAINT

refacing ERI existed besides sidelining it in exchange for ICTSI shares, including renaming it as had previously been done.

258.    As further described and delineated, Razon Jr. and his father and others acting in concert then altogether disenfranchised ERI and Plaintiffs by subsequently transferring all ERI's ICTSI stock to themselves when ERI had been previously stripped of all other assets and leaving it nothing more than an empty corporate shell unable to satisfy its legitimate obligations.

259.    Additionally, Razon Jr. and his father and those aiding and abetting them acted between and amongst themselves, and to the exclusion Plaintiffs, to ostracize Plaintiffs from ERI and preempt Plaintiffs meaningful participation within ERI and ICTSI.  Plaintiffs were thus left powerless to protect and promote their own legitimate interests.   As a result, Plaintiffs have been denied the opportunity to capitalize on their legitimate equity interest in and through ERI to include ICTSI and its related entities in a way they otherwise would have been able to had it not been for the misconduct of Razon Jr. and his father and others acting in concert.

260.    The acts and omissions described and delineated are all attributable to Razon Jr. as a direct and active participant, accomplice, and successor-in-interest to and beneficiary of Razon Sr. and others acting in concert.

261.    The acts and omissions also are imputed from and through Razon Jr. to ICTSI and ICTSI Oregon as the direct and indirect product, extension, and successor-in-interest to and beneficiary of Razon Jr. and his relations.

262.    As a cumulative result, Razon Jr. and his father and others acting in concert have diminished the value of Plaintiffs' direct and indirect interests in ERI and ICTSI.

263.    As a direct and proximate result of the misappropriations, substantial damages were incurred by ERI and Plaintiffs, who sue for those damages resulting from the injuries to

Page 103 -  COMPLAINT

their proportionate interest in ERI and by extension ICTSI and its related entities including ICTSI Oregon.

264.     Plaintiffs seek damages equal to the current market value of their proportional interest in the expropriated stock, together with interest, all as set forth above.

265.     All Defendants are jointly and severally liable for Plaintiffs' damages hereunder.

### Claim X:  Constructive Trust
### (Against all Defendants)

266.     Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as if set forth herein.

267.     As described at length, Razon Jr. and his father and others acting in concert owed ERI and Plaintiffs fiduciary duties of care, obedience, loyalty, disclosure and good faith as ERI's controlling shareholder.

268.     As further described and delineated at length, Razon Jr. and his father and others acting in concert exercised their control to surreptitiously expropriate to themselves all the interests of ERI and its minority shareholders like Plaintiffs in a two-step scheme involving: (1) the amalgamation of ERI in ICTSI with ERI ending up a primary shareholder of ICTSI; and (2) the fraudulent transfer of all ERI's ICTSI shares to themselves by way of four self-dealing assignments.   The amalgamation and subsequent assignments were a sham intended to give the Razons a new vehicle—ICTSI—by and through which Razon Jr. and his father and others acting in concert could wash out ERI's other shareholders like Plaintiffs in the continued pursuit of their own private interests.   Razon Jr. and his father and others acting in concert accordingly failed to disclose and otherwise masked ERI's involvement with and investment in ICTSI, and thereafter failed to disclose and otherwise disguised and concealed their expropriation of ERI's interest in ICTSI.

Page 104 -  COMPLAINT

269.    As a result, Razon Jr. directly and indirectly gained his interests in ICTSI and its related entities like ICTSI Oregon by improperly usurping ERI's corporate opportunities and interests in the first place, and by diverting ERI's corporate assets to his own uses in order to usurp those opportunities and interests.

270.    Plaintiffs were the proper owners of their proportional interest in ERI, and by and through ERI in ICTSI and ICTSI's related entities.  Through their fraudulent scheme, Razon Jr., together with his father and others acting in concert, wrongfully usurped and expropriated Plaintiffs' proportional interest in ERI and ICTSI by and through ERI.

271.    Razon Jr.'s retention of Plaintiffs' proportional interest in ERI and ICTSI by and through ERI under these circumstances would be unjust and inequitable as a matter of law.

272.    A constructive trust should be imposed for the purpose of preventing and remedying Razon Jr.'s unjust enrichment, and said constructive trust should be impressed upon Razon Jr.'s property and his agents, past and present, for the purpose of restitution of Plaintiffs' proportional interests in ERI and ICTSI by and through ERI, including but not limited to any income, interests and other benefits therefrom, which should be disgorged and paid to Plaintiffs.

273.    A constructive trust also should be imposed on ICTSI in particular as the continued extension and beneficiary of Razon Jr. and his expropriation, together with Razon Sr. and others acting in concert, of Plaintiffs' proportional interests in ERI and ICTSI by and through ERI.

### Claim XI:  Rescission
### (Against Defendant Razon Jr.)

274.    Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as if set forth herein.

Page 105 -  COMPLAINT

275.    Unfounded, ill-conceived and without legitimate purpose, consideration, notice, disclosure, or authority, the Razons' self-dealing assignments were fundamentally flawed and void *ab initio*.[116]

276.    The facts and circumstances surrounding ERI's amalgamation in ICTSI and subsequent assignments of all its ICTSI shares were altogether concealed from Plaintiffs. Plaintiffs accordingly had no knowledge of or involvement in either the amalgamation or assignments.  As described, Plaintiffs were only finally made aware of what had happened when copies of the assignments were obtained and given to them by a third party many years later. And even then, Plaintiffs were strung along and stonewalled in a concerted and ongoing scheme of nondisclosure and misinformation.  This made it all but impossible to detect the convoluted array of internal improprieties concerning the illicit assignments.  Because of the ongoing concealment, the full extent of the scheme is not known even today.  Plaintiffs have only been able to discover what they have through extraordinary effort before this action was filed.

277.    Plaintiffs have no adequate remedy at law for damages because any amount of damages would still disenfranchise Plaintiffs and deprive them of future potential benefits associated with their proportional interest in ERI and ICTSI by and through ERI.  In short, equity is equity.  Plaintiffs were and should be equity holders with all the commensurate rights and privileges of being part and parcel to ICTSI's past, present, and potential future growth and

---

[116] Such nullity stems from the statutory law and jurisprudence that a fictitious contract is null and void without legal effect whatsoever; the void assignments of ERI's ICTSI shares are not susceptible to ratification and the right of MFI to invoke the absolute nullity or inexistence of the assignments cannot be waived.  *See, e.g., Heirs of Ureta, Sr. et al v. Heirs of Ureta, et al* G.R. No. 165748, 14 September 2011, 657 SCRA 555 (citing Article 1409, No. 2, of The Civil Code). The nullity extends to subsequent assignments involving the ICTSI shares and can be traced through the ICTSI stock and transfer book.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

success.  Put another way, Plaintiffs would not have approved of ERI being displaced by ICTSI

or ERI's shares in ICTSI subsequently being transferred away had they been told about either of

them.  They would have acted then and since but for the deliberate and persistent concealment of

vital information.

278.    Plaintiffs therefore seek rescission of each of the following four transfers or

assignments as null and void for fraud:

  i.    T1—Sureste Deed—dated September 5, 1989, in which, Razon Sr.,
        acting as Chairman of ERI, assigned 22,725,000 common shares of
        ERI's stock in ICTSI to Sureste Realty Corporation through its
        President Razon Jr;

  ii.   T2—Razon Industries Deed—dated September 5, 1989, in which
        Razon Jr., acting as President of ERI, assigned 20,313,674 common
        shares of ERI's stock in ICTSI to Razon Industries, Inc. through its
        Chairman Razon Sr.;

  iii.  T3—Razon Sr.'s Personal Deed—dated April 10, 1990, in which
        Razon Jr., acting in an undisclosed capacity for ERI, assigned
        7,700,000 common shares of ERI's stock in ICTSI to his father, Razon
        Sr. personally; and

  iv.   T4—Razon Jr.'s Personal Deed—dated April 10, 1990, in which
        Razon Sr., acting as Chairman of ERI, assigned 2,300,000 common
        shares of ERI's stock in ICTSI to Razon Jr. personally.

279.    In the event the Court orders rescission of the fraudulent assignments, Plaintiffs

agree to consider an orderly liquidation.

## Claim XII:  Successor Liability
### (Against Defendant ICTSI)

280.    Plaintiffs repeat and allege each and every allegation contained in the above

paragraphs as if set forth herein.

281.    As described, at all relevant times Razon Jr., separately and together with Razon

Sr. and others acting in concert, controlled all the entities involved and identified, including in

particular each of the following entities from and to which they directly and indirectly

Page 107 -  COMPLAINT

expropriated Plaintiffs' interests in both ERI itself and in ICTSI by and through ERI:



282.    At all relevant times, Razon Jr. and his father and others acting in concert thus controlled as principals, agents, directors, officers, and representatives ERI, Razon Industries, Sureste Realty, ICTSI, ICTSI Ltd., and ICTSI Oregon (together with ICTSI's other related entities).

283.    Razon Jr. and his father and others acting in concert exercised their domination and control over ERI to privately funnel and strip away to themselves all ERI's interests—including Plaintiffs'—by first amalgamating ERI into ICTSI in exchange for ICTSI shares and then transferring all ERI's newly exchanged shares in ICTSI to themselves through four self-dealing assignments in which each transfer of ICTSI shares:

Page 108 -  COMPLAINT



284.    ERI was thus cut out—and Plaintiffs along with it.  *Before* the transfers, ERI and

Plaintiffs were stakeholders.  *After* the transfers, their interests were eliminated.  Razon Jr. and

his father and others acting in concert systematically funneled them forward through and to

themselves.

285.    Razon Jr. is and has been at all relevant times a dominant and controlling constant

throughout.   He was a Director and President of ERI.  Contemporaneously, he was Chairman of

Sureste Realty, and as of October 2016 is identified as its President and a Member of the

Executive Committee.  He also was concurrently an Incorporator and Director of Razon

Industries, and as of June 2017 is identified as its President and a member of the Executive

Committee.  At the same time, he was an Incorporator and Director of ICTSI, and currently sits

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

atop and presides over its global empire as Chairman, President and principal stockholder as a result of having directly and indirectly assumed ERI's original shares in ICTSI. As described, under ICTSI he also controls ICTSI Ltd., of which he is a Director, and ICTSI Oregon. In addition, he is in all relevant respects Razon Sr.'s protégé, accomplice, successor in interest, and beneficiary.

286.    Together with and under the Razons all of these entities function as one and the same in all relevant respects. All are dominated and controlled at all relevant times and in all relevant respects by Razon Jr. and his father and those acting in concert. ICTSI thus began as a privately orchestrated reincarnation of ERI with the purpose and effect of circumventing Plaintiffs and other minority stakeholders in ERI; and both ERI and ICTSI are fundamentally extensions of the Razons and those aiding and abetting them. ICTSI Ltd. and ICTSI Oregon are further pass through embodiments and extensions of the Razons by and through ICTSI and ERI before it. Razon Industries and Sureste Realty likewise also are mere conduits or instrumentalities through which Razon Jr. and his father and those acting in concert are the real parties in interest. Above it all, Razon Jr. is and has been at all relevant times and in all relevant respects an extension of Razon Sr.

287.    ICTSI is liable for Plaintiffs proportional interest by and through ERI under alter ego, agency and successor liability principles because ICTSI is merely a continued and reinstituted extension formed by and through the Razons with and from ERI itself. From inception to now, ICTSI has shared the same dominant and controlling principals as ERI in Razon Jr. and his father and others acting in concert. Those same dominant and controlling principles further exercised their dominion and control to take from ERI and give to ICTSI as mere extensions of and for themselves. ICTSI subsequently continued to operate the same

Page 110 -  COMPLAINT

business in the same place and industry as ERI using most, if not all, of ERI's former tangible and intangible assets.  And ERI promptly ceased to operate in favor of ICTSI.

288.    ICTSI is further liable for Plaintiffs proportional interest by and through ERI under alter ego, agency and successor liability principles because ICTSI was formed as part of a privately orchestrated amalgamation and assignment scheme to reconstruct ERI and otherwise avoid preexisting legal obligations and interests in favor of themselves.  The illicit amalgamation and assignments occurred at a time when ERI had no other assets and Razon Jr. and his father and others acting in concert claimed ERI was near insolvency.  The improper amalgamation and assignments amount to a fraudulent transfer that was made with actual intent to hinder, delay or defraud Plaintiffs.

289.    As ERI's successor, ICTSI owes Plaintiffs damages equal to the current market value of their proportional interest in the expropriated stock, together with interest, all as set forth above.

## Claim XIII:  Piercing the Corporate Veil (ERI)
## (Against Defendant Razon Jr.)

290.    Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as if set forth herein.

291.    Razon Jr. is further liable for Plaintiffs proportional interest by and through ERI under alter ego, agency and successor liability principles.

292.    As described, Razon Jr. is and has been at all relevant times and in all relevant respects an extension of Razon Sr. as Razon Sr.'s protégé, accomplice, successor in interest, and beneficiary.

293.    Razon Jr., separately and through and together with Razon Sr. and others acting in concert, dominated and controlled ERI at all relevant times and in all relevant respects as a mere

Page 111 -  COMPLAINT

pass-through instrumentality and extension of themselves without a separate will or existence of its own.  In doing so, Razon Jr. and his father and others acting in concert disregarded basic corporate governance principles, regulatory requirements, fiduciary obligations and formalities.

294.    Razon Jr., separately and together with Razon Sr. and others acting in concert, abused their domination and control over ERI as described to privately funnel and strip away to themselves all of ERI's interests—including Plaintiffs'—by first amalgamating ERI into ICTSI in exchange for ICTSI shares and then transferring all ERI's newly exchanged shares in ICTSI to themselves through four self-dealing assignments.  In purpose and effect, Razon Jr. and his father and others acting in concert improperly transferred ownership of ERI to themselves through ICTSI.   The illicit amalgamation and assignments occurred at a time when ERI had no other assets and Razon Jr. and his father and others acting in concert claimed ERI was near insolvency.

295.    The improper amalgamation and assignments amount to a fraudulent transfer that was made with actual intent to hinder, delay or defraud Plaintiffs.  As a result of the illicit and dishonest scheme to transfer and assume ERI's ownership interests to and in ICTSI for themselves, Razon Jr. and his father and others acting in concert usurped and otherwise circumvented and expropriated Plaintiffs' interests in ERI and ICTSI.

296.    Plaintiffs accordingly are entitled to pierce the corporate veil of ERI to impose liability on Razon Jr. under alter ego, agency and successor liability principles.

297.    As ERI's alter ego, Razon Jr. owes Plaintiffs damages equal to the current market value of their proportional interest in the expropriated stock, together with interest, all as set forth above.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

### Claim XIV:  Piercing the Corporate Veil (ICTSI and ICTSI Oregon)
### (Against Defendant Razon Jr.)

298.    Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as if set forth herein.

299.    Razon Jr. is further liable for Plaintiffs proportional interest by and through ICTSI under alter ego, agency and successor liability principles.

300.    As described, Razon Jr. is and has been at all relevant times and in all relevant respects an extension of Razon Sr. as Razon Sr.'s protégé, accomplice, successor in interest, and beneficiary.

301.    Razon Jr., separately and through and together with Razon Sr. and others acting in concert, has at all relevant times and in all relevant respects dominated and controlled ICTSI. Razon Jr. was an Incorporator and Director of ICTSI from its inception, and currently sits atop and presides over its global empire as Chairman, President and principal stockholder as a result of having directly and indirectly assumed ERI's original shares in ICTSI.

302.    As described, Razon Jr. and his father and others acting in concert formed ICTSI for the illicit and improper purpose of effecting a fraudulent transfer of ERI's ownership interests to and in ICTSI for themselves with actual intent to hinder, delay or defraud Plaintiffs.  ICTSI thus began as a privately orchestrated reincarnation of ERI with the purpose and effect of circumventing Plaintiffs and other minority stakeholders in ERI; and both ERI and ICTSI are fundamentally extensions of the Razons and those aiding and abetting them.  ICTSI Ltd. and ICTSI Oregon are further pass through embodiments and extensions of the Razons by and through ICTSI and ERI before it.

303.    As a result of the illicit and dishonest scheme to transfer and assume ERI's ownership interests to and in ICTSI for themselves, Razon Jr. and his father and others acting in

Page 113 -  COMPLAINT

concert usurped and otherwise circumvented and expropriated Plaintiffs' interests in ERI and
ICTSI.

304.    Plaintiffs accordingly are entitled to pierce the corporate veil of ICTSI and its
progeny in ICTSI Ltd. and ICTSI Oregon to impose liability on Razon Jr. under alter ego,
agency and successor liability principles.

305.    As the alter ego of ICTSI and its instrumentalities in ICTSI Ltd. and ICTSI
Oregon, Razon Jr. owes Plaintiffs damages equal to the current market value of their
proportional interest in the expropriated stock, together with interest, all as set forth above.

### Claim XV:  Piercing the Corporate Veil (Razon Industries and Sureste Realty)
### (Against Defendant Razon Jr.)

306.    Plaintiffs repeat and allege each and every allegation contained in the above
paragraphs as if set forth herein.

307.    Razon Jr. is further liable for Plaintiffs proportional interest by and through ICTSI
under alter ego, agency and successor liability principles.

308.    As described, Razon Jr. is and has been at all relevant times and in all relevant
respects an extension of Razon Sr. as Razon Sr.'s protégé, accomplice, successor in interest, and
beneficiary.

309.    Razon Jr., separately and through and together with Razon Sr. and others acting in
concert, has at all relevant times and in all relevant respects dominated and controlled both
Sureste Realty and Razon Industries.  Both Sureste Realty and Razon Industries collectively exist
only to hold shares of ICTSI stock taken from ERI through the four self-dealing assignments
orchestrated by and through Razon Jr. and his father and others acting in concert.  Sureste Realty
holds 22,725,800 of ERI's original ICTSI shares, while Razon Industries holds 20,313,674 of
ERI's original ICTSI shares—for a total of 43,039,474 of ERI's original ICTSI shares.  At the

Page 114 -  COMPLAINT

time of the transfers, Razon Jr. was a Director and President of ERI. Contemporaneously, he was Chairman of Sureste Realty, and as of October 2016 is identified as its President and a Member of the Executive Committee. He also was concurrently an Incorporator and Director of Razon Industries, and as of June 2017 is identified as its President and a member of the Executive Committee. Both Sureste and Razon Industries possess no separate mind, will, or existence of their own independent of Razon Jr. and his father and others acting in concert. They simply are pass through conduits or vehicles through which Razon Jr. and his father and others acting in concert expropriated ERI's ownership interests to and in ICTSI for themselves.

310.    As described, Razon Jr. and his father and others acting in concert exercised their domination and control over ERI, Sureste Realty and Razon Industries to privately funnel and strip away all ERI's interests to themselves by first amalgamating ERI into ICTSI in exchange for ICTSI shares and then transferring all ERI's newly exchanged shares in ICTSI to themselves either directly or indirectly through their closely held and controlled family holding companies in Sureste Realty and Razon Industries.

311.    Sureste Realty and Razon Industries participated in a fraudulent scheme and conspiracy to illicitly and improperly transfer ERI's ownership interests to and in ICTSI to Razon Jr. and his father and others acting in concert with actual intent to hinder, delay or defraud Plaintiffs.

312.    As a result of the illicit and dishonest scheme to transfer and assume ERI's ownership interests to and in ICTSI for themselves by and through, in whole or in part, Sureste Realty and Razon Industries, Razon Jr. and his father and others acting in concert usurped and otherwise circumvented and expropriated Plaintiffs' interests in ERI and ICTSI.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600    FAX (503) 227-6840

313.     Plaintiffs accordingly are entitled to pierce the corporate veil of Sureste Realty and Razon Industries to impose liability on Razon Jr. under alter ego, agency and successor liability principles.

314.     As the alter ego of Sureste Realty and Razon Industries, Razon Jr. owes Plaintiffs damages equal to the current market value of their proportional interest in the expropriated stock, together with interest, all as set forth above.

### Claim XVI:  Piercing the Corporate Veil (ICTSI and ICTSI Oregon)
### (Against Defendant ICTSI and ICTSI Oregon)

315.     Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as if set forth herein.

316.     ICTSI and ICTSI Oregon are further liable for Plaintiffs proportional interest by and through Razon Jr. under alter ego, agency and successor liability principles.

317.     As described, ICTSI's subsidiaries including ICTSI Oregon are mere instrumentalities of ICTSI itself without any separate and independent mind, will, or existence of their own.

318.     As further described, Razon Jr. is and has been at all relevant times and in all relevant respects an extension of Razon Sr. as Razon Sr.'s protégé, accomplice, successor in interest, and beneficiary.

319.     As further described, ERI and ICTSI and its subsidiaries including ICTSI Oregon have been dominated in turn by Razon Jr. and his family.

320.     Razon Jr. and his father and others acting in concert created and controlled ERI as their personal domain.  They then exercised their control over ERI to privately funnel and strip away all ERI's interests to themselves by first amalgamating ERI into ICTSI in exchange for ICTSI shares and then transferring all ERI's newly exchanged shares in ICTSI to themselves

Page 116 -  COMPLAINT

either directly or indirectly through their closely held and controlled family holding companies in Sureste Realty and Razon Industries.

321.    Acting together as one and the same with ERI and ICTSI alike in taking from one and giving to the other and themselves, the Razons' separate and collective knowledge and actions are imputed between and amongst themselves and ICTSI and its local proxy ICTSI Oregon.

322.    The actions, representations and omissions described and delineated are all accordingly attributable to Razon Jr. as a direct and active participant, protégé, accomplice, and successor-in-interest to and beneficiary of Razon Sr. and others acting in concert.

323.    The actions, representations and omissions described and delineated also are further imputed from and through Razon Jr. to ICTSI and ICTSI Oregon as the direct and indirect product, extension, and successor-in-interest to and beneficiary of Razon Jr. and his relations.  Razon Jr. directly and indirectly gained these businesses by improperly usurping ERI's corporate opportunities and interests in the first place, and by diverting ERI's corporate assets to his own uses in order to usurp those opportunities and interests.

324.    By and through the imputed actions, representations and omissions of Razon Jr. and his father and others acting in concert, ICTSI and ICTSI Oregon participated in a fraudulent scheme and conspiracy to illicitly and improperly transfer ERI's ownership interests to and in ICTSI with actual intent to hinder, delay or defraud Plaintiffs.

325.    As a result of the illicit and dishonest scheme to transfer and assume ERI's ownership interests to and in ICTSI, ICTSI Ltd. and ICTSI Oregon usurped and otherwise circumvented and expropriated Plaintiffs' interests in ERI and ICTSI.

Page 117 -  COMPLAINT

326.     Plaintiffs accordingly are entitled to pierce the corporate veil of ICTSI and its progeny in ICTSI Ltd. and ICTSI Oregon to impose liability on ICTSI and ICTSI Oregon for the imputed actions, representations and omissions of Razon Jr. and his father and others acting in concert under alter ego, agency and successor liability principles.

327.     As the alter ego of Razon Jr. and his father and others acting in concert, ICTSI and ICTSI Oregon owe Plaintiffs damages equal to the current market value of their proportional interest in the expropriated stock, together with interest, all as set forth above.

### Claim XVII:  Fraudulent Transfer with Intent to Hinder, Delay, or Defraud
### (Against All Defendants)

328.     Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as if set forth herein.

329.     As described, the fraudulent transfer of ERI's ownership interests to and in ICTSI by way of the illicit and improper amalgamation and assignments was orchestrated with actual intent to hinder, delay, or defraud Plaintiffs.  Razon Jr. and his father and others acting in concert purposefully sought to systematically cut Plaintiffs out and expropriate Plaintiffs' proportional interests in ERI and ICTSI for themselves.

330.     As further described, Razon Jr. was at all relevant times and in all relevant respects was and is aware of the intent to hinder, delay, or defraud Plaintiffs:

    i.    as a direct and active participant, protégé, accomplice, and successor-in-interest to and beneficiary of Razon Sr. and others acting in concert;

    ii.    as ERI's principal stockholder, agent, representative, President, and Director; and

    iii.    as ICTSI's Incorporator, Chairman, President, agent, representative, and principal stockholder as a result of having directly and indirectly assumed ERI's original shares in ICTSI.

Page 118 -  COMPLAINT

331.    As further described, ICTSI and by extension ICTSI Oregon also were and are aware of the intent to hinder, delay, or defraud Plaintiffs:

      i.     by imputation of the actions, representations and omissions of Razon Jr. and his father and others acting in concert; and

      ii.    as successor in interest to ERI.

332.    As a direct and proximate result of the fraudulent transfer, substantial damages were incurred by ERI and Plaintiffs, who sue for those damages resulting from the injuries to their proportionate interest in ERI and by extension ICTSI and its related entities including ICTSI Oregon.

333.    Plaintiffs seek damages equal to the current market value of their proportional interest in the expropriated stock, together with interest, all as set forth above.

334.    All Defendants are jointly and severally liable for Plaintiffs' damages hereunder.

### Claim XVIII:  Fraudulent Transfer within Zone of Insolvency
### (Against All Defendants)

335.    Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as if set forth herein.

336.    As described, the fraudulent transfer of ERI's ownership interests to and in ICTSI by way of the illicit and improper amalgamation and assignments was orchestrated at a time when ERI had no other assets and Razon Jr. and his father and others acting in concert claimed ERI was near insolvency.

337.    Plaintiffs' interests in ERI preexisted the fraudulent transfer of ERI's interests to and in ICTSI by way of the illicit and improper amalgamation and assignments.

338.    The transfer of ERI's ownership interests to and in ICTSI by way of the illicit and improper amalgamation and assignments was for less than reasonably equivalent value.  ERI

Page 119 -  COMPLAINT

effectively received no consideration.  Nor did Plaintiffs.

339.    Whether insolvent before the fraudulent transfer, ERI effectively became insolvent as a result of the self-dealing assignments to and through Razon Jr. and his father and those acting in concert.

340.    As a direct and proximate result of the fraudulent transfer, substantial damages were incurred by ERI and Plaintiffs, who sue for those damages resulting from the injuries to their proportionate interest in ERI and by extension ICTSI and its related entities including ICTSI Oregon.

341.    Plaintiffs seek damages equal to the current market value of their proportional interest in the expropriated stock, together with interest, all as set forth above.

342.    All Defendants are jointly and severally liable for Plaintiffs' damages hereunder.

### Claim XIX:  Civil Conspiracy
### (Against All Defendants)

343.    Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as if set forth herein.

344.    Defendants conspired by knowing, concerted action to wrongfully usurp and expropriate Plaintiffs' proportional interests in ERI and ICTSI for themselves.

345.    Defendants acted knowingly and with malicious intent and for the purpose of causing economic injury to Plaintiffs.

346.    As a direct and proximate result of Defendants' conspiracy, substantial damages were incurred by ERI and Plaintiffs, who sue for those damages resulting from the injuries to their proportionate interest in ERI and by extension ICTSI and its related entities including ICTSI Oregon.

Page 120 -  COMPLAINT

347.    Plaintiffs seek damages equal to the current market value of their proportional interest in the expropriated stock, together with interest, all as set forth above.

348.    All Defendants are jointly and severally liable for Plaintiffs' damages hereunder.

### Claim XX:  Declaratory Judgment
### (Against all Defendants)

349.    Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as if set forth herein.

350.    The Defendants actions and inactions relative to ERI's original shares of ICTSI stock call into question the status of the expropriated stock.

351.    A justiciable controversy exists between Plaintiffs, on one hand, and the Defendants, on the other.  This controversy pertains to the determination of the duties, rights, and obligations of the parties with respect to the expropriated stock.

352.    Pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure, Plaintiffs seek a declaratory judgment (1) declaring that:

  i.    The transfer of ERI's original shares in ICTSI through and to Razon Jr. and his father their closely held family instrumentalities to be void;

  ii.   Defendants accordingly have no interest in ERI's original shares in ICTSI; and perforce

  iii.  ERI's original shares in ICTSI should be repatriated to ERI unencumbered by any interest and as necessary formally liquidated by sale as applicable with the proceeds of said sale to be applied to any judgement rendered for Plaintiffs herein.

353.    Pursuant to 28 U.S.C. § 2202, Plaintiffs are entitled to their costs and reasonable and necessary attorneys' fees related to this proceeding.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

## Claim XXI:  Equitable Accounting
### (Against all Defendants)

354.    Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as if set forth herein.

355.    As described, Razon Jr. and his father and others acting in concert owed ERI and Plaintiffs fiduciary duties of care, obedience, loyalty, disclosure and good faith as ERI's controlling shareholder and management.

356.    As further described, Razon Jr. and his father and others acting in concert exercised their domination and control over ERI, ICTSI, Sureste Realty and Razon Industries to privately funnel and strip away all ERI's interests to themselves by first amalgamating ERI into ICTSI in exchange for ICTSI shares and then transferring all ERI's newly exchanged shares in ICTSI to themselves either directly or indirectly through their closely held and controlled family holding companies in Sureste Realty and Razon Industries.

357.    As further described, Razon Jr. and his father and others acting in concert have intentionally and persistently concealed the facts and circumstances surrounding their acts and omissions through a concerted and ongoing scheme of nondisclosure and misinformation. Because of the ongoing concealment, the full extent of the scheme and its underlying details including but not limited to the extent of any funds expended by and to whom in connection with ERI's illicit amalgamation and assignments is not known even today.  Plaintiffs have only been able to discover what they have through extraordinary effort before this action was filed.  As of the time of filing, the Defendants are still actively obstructing and misleading Plaintiffs.  For these and other reasons, an accounting is appropriate under the circumstances.

358.    An accounting also is appropriate under the circumstances to fully determine the extent of both Plaintiffs interests in ERI and ICTSI by and through ERI.  The records

Page 122 -  COMPLAINT

independently obtainable are incomplete in material respects.

359.    Plaintiffs have no adequate remedy at law for damages because any amount of damages would still disenfranchise Plaintiffs and deprive them of future potential benefits associated with their proportional interest in ERI and ICTSI by and through ERI.  In short, equity is equity.  Plaintiffs were and should be equity holders with all the commensurate rights and privileges of being part and parcel to ICTSI's past, present, and potential future growth and success.  Put another way, Plaintiffs would not have approved of ERI being displaced by ICTSI or ERI's shares in ICTSI subsequently being transferred away had they been told about either of them.  They would have acted then and since but for the deliberate and persistent concealment of vital information.

### Claim XXII:  Punitive Damages
### (Against All Defendants)

360.    Defendants are jointly and severally liable for substantial punitive or exemplary damages because:  Defendants' conduct constitutes conspiracy, fraud, misrepresentation, gross negligence, violations of statutory standards of conduct; Defendants have acted so as to breach their fiduciary duties owed to ERI and Plaintiffs; and Defendants acted with malice and/or with heedless and reckless disregard for ERI's and Plaintiffs' rights in so acting.  An award of not less than ten (10) times the actual damages incurred is necessary to present any substantial deterrents to such unlawful and deceitful conduct; and Plaintiffs hereby request that the trier of fact award not less than ten (10) times the actual damages suffered as punitive or exemplary damages from each Defendant, respectively.

Page 123 -  COMPLAINT

## JURY DEMAND

Plaintiffs hereby demand a trial on all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs' pray for judgment against Defendants, finding them jointly and severally liable to Plaintiffs, and praying specifically that Plaintiffs have relief and judgment, as follows:

A. awarding compensatory damages in favor of Plaintiffs for their claims against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, but in no event less than $37,194,310.15, including pre-judgment interest and post-judgment interest at the maximum rate(s) permitted by law or equity;

B. restitution of Plaintiffs' proportional interest in ERI's original ICTSI shares of which they were defrauded;

C. imposition of a constructive trust;

D. a declaratory judgment declaring the duties, rights, and obligations of the parties with respect to the expropriated stock as requested, to wit:

    1. the transfer of ERI's original shares in ICTSI through and to Razon Jr. and his father their closely held family instrumentalities to be void;

    2. Defendants accordingly have no interest in ERI's original shares in ICTSI; and perforce

    3. ERI's original shares in ICTSI should be repatriated to ERI unencumbered by any interest and as necessary formally liquidated by sale as applicable with the proceeds of said sale to be applied to any judgement rendered for Plaintiffs herein;

E. punitive and/or exemplary damages from each Defendant, respectively in an amount which Plaintiffs may show to be appropriate in this cause, but in any event, not less than ten (10) times the actual damages suffered;

Page 124 -  COMPLAINT

F.   reasonable attorneys' fees and costs as applicable; and

G.   all other relief in law and equity to which Plaintiffs may be entitled.

DATED this 26th day of June, 2018.

STOLL STOLL BERNE LOKTING
& SHLACHTER P.C.


By: s/Joshua L. Ross
    **Joshua L. Ross**, OSB No. 034387

209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone:  (503) 227-1600
Email:      jross@stollberne.com

-AND-

**Walter J. Scott, Jr.**, (to be admitted *pro hac vice*)
SCOTT LAW GROUP LLP
3249 Lake Drive
Southlake, Texas 76092
Telephone: (214) 755-1978
Facsimile:  (817) 887-1874
Email:     skip@scott-llp.com


**Attorneys for Plaintiffs**

Page 125 -  COMPLAINT